[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
The case is before the Court on complaint, answer and proof. In a jury waived trial the plaintiff seeks to recover damages from the defendant for losses sustained as a result of the termination of a public works' contract to construct the Jamestown-Verrazzano Bridge connecting the island of Jamestown with the mainland at North Kingstown. It is likewise before the Court on the cross-claim and/or the counter-claim of the defendant State of Rhode Island asserting claims for damages as a result of that termination.
The plaintiff in three separate categories detailed: cost claims; inefficiency claims; delayed damages related to inefficiency claims; and loss of profit in the amount of 10%. The plaintiff asserts that it is entitled to recover from the defendant the sum of $19,885,117.00. The plaintiff also asserts that it is entitled to recover pass-through claims from two subcontractors in the amount of $3,282,749.00 and $2,194,972.00 making the plaintiff's total claim $25,362,838.00.
The defendant in its countersuit claims damages for: increased cost to complete; cofferdam rehabilitation; tremie repair; repair to the plaintiff's work; and repair to subcontractors' work, in the total amount of $10,858,929.10.
In order to put the matter in proper perspective it is necessary to engage in a brief recitation of the facts which lead up to a termination agreement entered into between the parties. The saga begins in 1981 when the Rhode Island Department of Transportation ("RIDOT") began the process that would result in the design and construction of the replacement for the Jamestown Bridge ("Jamestown-Verrazzano Bridge"). The design was composed of three components: (1) a trestle approach (two alternatives) for the horizontal roadway running from North Kingstown out over the water to the beginning of the bridge itself; (2) a steel main bridge alternate; and (3) a concrete main bridge alternate. Gordon R. Archambault, Inc. ("Gordon Archambault") and T.Y. Lin International ("T.Y. Lin") each submitted a trestle design. Howard, Needles, Tammen and Borgdorf ("HNTB") designed the steel alternate and T.Y. Lin designed the concrete alternate. The design process involved conceptual submittals ultimately resulting in final plans and specifications.
Since RIDOT has Standard Specifications for Roads and Bridge Construction (the "Blue Book", so called), it required the designers to submit any necessary alternate or supplemental specifications with their respective designs (the "Special Provisions").
RIDOT retained SVERDRUP Parcel ("SP") as its coordinating design consultant. SP was responsible for coordinating the various designer's specifications and designs with all parties, and where the designs overlapped, inserting uniform provisions for all designs. RIDOT released the contract bid documents to potential bidders on September 28, 1984. Bids were originally scheduled to be opened December 7, 1984. Prior to bid, RIDOT issued three addenda modifying the bid package, one of which deferred the bid opening to December 19, 1984. Clark-Fitzpatrick, Inc./Franki Foundation Co. ("CFF"), a joint venture, submitted the low bid of $63,944,000. It bid T.Y. Lin's concrete main bridge alternate with Gordon Archambault's trestle design.
Although the specifications when issued required RIDOT to award the contract within 30 days, award was not made until June 12, 1985 approximately six months after the bid opening (Exhibit 1 at p. 13, § 103.02.) By agreement, CFF waived its claim for the delay, and RIDOT changed the specification completion date from September 15, 1988 to December 15, 1988.
The project got off to a very slow start and multiple problems arose, some of which involved the aberrant behavior of the soils in the bay bottom, RIDOT and its consultants conflicting interpretation of the specifications, RIDOT'S unreasonable stop order directives and failing to take into consideration timely response to problems as they arose.
While multiple ongoing disputes arose between RIDOT and CFF during 1985, 1986 and 1987, matters became worse as the parties headed into the year 1988. It was because of serious soil problem difficulty that RIDOT settled on a new pile design concept (the "composite pile"). RIDOT and CFF however, could not agree on the cost of the changed work necessitated by the substitution of the composite pile. It was only after RIDOT ordered CFF to proceed with work on a force account (i.e. time and materials payment used for extra work or changed work when RIDOT and CFF cannot agree) that CFF filed suit to be relieved from any further obligations under the contract. The parties at that point, while agreeing there was a substantial difference between the composite pile and the specifications in the contract, had differing opinions concerning the price for the additional work — CFF had estimated the cost in the change to amount of $30,000,000 whereas RIDOT estimated the cost to be $12,000,000.
Since this change amounted to a substantial difference of opinion, the suit as originally commenced by CFF desired to have the Court determine that the magnitude of the change amounted to a cardinal change in the contract and that the contractor was therefore relieved from its responsibility to perform under the contract. CFF also was asserting a claim for the award of damages caused for the loss that it had sustained because of RIDOT'S actions.
It was only after the institution of this suit, that RIDOT and CFF negotiated a termination agreement that relieved CFF of any further obligations to perform the contract and mutually released the parties from claims except for claims reserved by the parties in that termination agreement. This trial involved those reserved claims.
The dispute from CFF's point of view can be summarized as follows: (1) RIDOT'S failure to adhere to specifications; (2) RIDOT'S misinterpretation of specifications; (3) RIDOT'S imposition of specifications that were not contractually authorized; (4) RIDOT'S failure to interpret specifications in a reasonable manner; and (5) RIDOT'S unwillingness to acknowledge the consequences of the abnormal behavior of the soil in the bottom of Narragansett Bay.
As these problems persisted perhaps the frustrations of the parties came to a head when Figg and Mueller refused to participate in a joint venture with Daniel Mann and Johnson 
Mandenhall ("DMJM") as the consulting construction supervisor. Figg and Mueller was the party with expertise in concrete box girder bridges, the type of bridge which was the subject matter of the contract. It is alleged that the lack of experience in providing supervision, combined with the abnormal behavior of the soils at the site caused substantial delays, work being attempted out of sequence and substantial extra work. It was RIDOT'S refused compensation which resulted in the suit being brought followed by the termination agreement.
It should be stated here that while there were personality conflicts which occurred between the personnel of CFF and the personnel in RIDOT, that the problems which developed in bringing the bridge along towards completion primarily resulted from RIDOT'S inability to perform in a reasonable manner its obligations under the terms of the contract. Although RIDOT had six months from the opening of the bids to the award of the contract to prepare for its obligations under the terms of the contract, RIDOT was unprepared right from the very outset. There was delay, not only in the original awarding of the contract, but also in scheduling preconstruction meetings and in giving to the contractor a required notice to proceed. It was from this point on that the relationship deteriorated between CFF and RIDOT. This was primarily brought about in the Court's judgment because the resident engineer, although a career employee of RIDOT, had never had a major project, particularly a bridge construction project, assigned to him prior to this particular venture. This project, that is a concrete structure, was not only new to New England but was also new to this part of the country. CFF and its subcontractors had great many years of experience in building this particular type of concrete structure. RIDOT'S resident engineer and those to whom he reported became more interested in interpreting the specifications in such a fashion so as to delay rather than assist the contractor in performing the contractor's obligations under the contract. As the job progressed the Federal Highway Administration's local office realized that the resident engineer was not being given the support he was entitled to by the RIDOT administration and so testified to the Court during the examination of him by the Court. It seemed that RIDOT had developed an attitude in its relationship with this job that no matter what the problem the primary concern of RIDOT was to pass any economic loss on to the contractor rather than to increase the cost of the bridge construction. It is this attitude as evidenced by the testimony before the Court which permeates each of the issues which the Court will address.
In addressing these issues, at the Court's direction, the parties have briefed and have lettered 21 issues raised by the complaint and on the counterclaim have briefed 6 issues.
For the convenience of the reader, and to permit the reader of this decision to utilize the excellent memoranda and briefs presented by the parties, the Court will at the beginning of each issue cite the section, topic heading and, where appropriate, the page number of the parties' briefs.
The Court has requested that the parties present Findings of Fact and, where appropriate, the Court will reference those Findings of Fact which the Court accepts rather than extend this decision by reaffirming within the decision specific Findings of Fact.
A. CONCRETE PILES
REFERENCE: Concrete Piles — CFF Brief, Section III, A, p. 10; RIDOT Brief, section labeled Concrete Piles.
1. Statement of claim
The failure of the original prestressed concrete piles to sustain ultimate bearing capacity during load testing at design tip elevations resulted in substantial additional load testing of the original and composite piles for which the contractor is entitled to additional compensation.
2. Legal basis
An owner warrants that, if followed, his design plans will produce a satisfactory result. United States v. Spearin,248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). If they do not, the contractor is entitled to compensation for changes to the work.
3. Facts
The superstructure for the trestle approach to the bridge and the west side bridge approach spans were to be supported by prestressed concrete friction piles. Friction piles are piles that are not driven to bedrock or end-bearing refusal, but rather to a depth at which the friction between the surface of the pile and the soil into which it has been driven is sufficient to bear the design loads.
The contract required CFF to perform load tests on each type of pile prior to installation of the production piles that would support the bridge. Load tests are performed to insure that the piles will support design loads and to confirm the design tip elevations. Test piles on the 24" piles was to begin in September of 1985 and of the 20" piles in January of 1986. This schedule of test piles was not adhered to and the load test piles for the 20" piles did not begin until April of 1986 and the load test piles on the 24" piles did not commence until October 1986.
The first 20" test piles fell well below ultimate design capacity. A long series of additional tests ensued. As a result of these additional tests and repeated failures, RIDOT experimented with a new concept — a composite pile. The composite pile consisted of a steel H-pile section that would be driven to bedrock, spliced to a concrete section that would extend from below the mud line to a point above the water. CFF, at RIDOT'S direction, conducted load tests on the composite piles.
Since none of the load tests on the more deeply driven concrete piles or the composite piles was required by the contract, CFF requested payment for the extra work. At this point in time, RIDOT and CFF could not agree upon a formula to determine compensation for the additional work performed by CFF which was not contemplated by or under the terms of the existing contract. A further dispute between the parties arose concerning the interpretation of the contract under § 109.04 which ultimately resulted in the withholding by RIDOT of funds claimed to be due by CFF. The additional work was performed by CFF over an 18 month period of time.
4. Extra cost
The amounts claimed for the extra work performed in driving test piles and/or composite piles not covered by the contract is in the amount of $348,566.00 (the exact amount of the computation is $348,565.69 which has been rounded to the nearest dollar figure).
5. Findings of fact
In its brief filed in response to the plaintiff's claim, RIDOT has admitted its indebtedness in the said amount of $348,566.00.
B. LATE NOTICE TO PROCEED
REFERENCE: Late Notice to Proceed — CFF Brief, Section III, B, p. 16; RIDOT Brief, section labeled Late Notice to Proceed.
1. Statement of claim
The bid opening date was December 19, 1984 and although RIDOT by the terms of the bid solicitations was required to award the contract within 30 days thereafter, it was not until June 12, 1985 that the contract was awarded to CFF, the low bidder as determined by the bid openings on December 19, 1984. Such award, however, was only made to the low bidder by RIDOT upon CFF's agreement to waive its claim for RIDOT'S failure to award the bid within said 30 day period. Under the terms of the contract and specifications, CFF was prohibited from proceeding under the said award until after it had received a formal notice to proceed from RIDOT. The contract specified no period of time within which RIDOT was to give to its successful contractor a notice to proceed. The said notice to proceed was not issued until July 9, 1985, 27 days after the contract was awarded.
2. Legal basis
In as much as CFF proceeded at its peril if it proceeded prior to the notice to commence and that RIDOT had no obligation to inspect and to accept work commenced prior to said notice, the delay is judged by the doctrine of a reasonable time for the notice to have issued.
Absent a specific time period in the contract, an owner (RIDOT) must issue a notice to proceed with reasonable promptness after the award. Ross Engineering Co., Inc. v. United States,
92 Ct. Cl. 253 (1940). The key point in Ross as in the case at bar is the fact that RIDOT had established within the contract a readjusted completion date of December 15, 1988, thus imposing upon the contractor an obligation to complete the contract within that time frame. Said contractor was also obligated to be ready to proceed within a 10 day period next following the award of contract.
3. Facts
Mindful of the contract obligations imposed not only upon RIDOT but also upon CFF, the Court is faced with determining what was a reasonable time for issuance of a notice to proceed by RIDOT after the award of the contract.
The Court has taken into consideration that the State of Rhode Island first began to consider the replacement of the Jamestown Bridge as early as 1981 and had proceeded with studies in 1982, test borings in 1984 in January, September and October, had solicited bids and opened the bid proposals on the 19th day of December 1984 and had delayed almost 6 months despite a 30 day requirement to make such award before accepting the low bid of CFF and then only after insisting that CFF waive any claim for delay in the awarding of the contract. In the totality of the circumstances, RIDOT, upon the award of the contract, ought to have been prepared to issue a notice to proceed on the very day that it awarded the contract to CFF.
The plaintiff suggests that inasmuch as it had 10 days to be prepared to go forward, the 10 day period be equally divided between RIDOT and CFF. This period, namely 5 days, seems to the Court to be generous. Thereafter, any period in excess of 5 days is determined to be an unreasonable delay. That period equates with the 22 days claimed by the plaintiff as delay damages.
The defendant misconceives the nature of the plaintiff's claim when it asserts that although it gave the notice to proceed on July 9, CFF nevertheless scheduled its work so as to complete the construction of the bridge prior to December 15, 1988. RIDOT thus claims that the plaintiff CFF has therefore sustained no damage.
Where the completion day is fixed and the contractor is obliged to be ready to perform, the contractor must incur ongoing and continuing expenses, and be prepared to execute within the time frame those tasks which are sought to be performed. Long prior to the date of completion, the parties voluntarily terminated their obligations under the contract. It is mere speculation to attempt to determine when in fact and under what time sequence the contract to complete the bridge would have in fact been executed.
CFF was, because of the actions of RIDOT, delayed 27 days in carrying out the terms of its contract and are thus entitled to compensation for such delay for the extra expense including labor and overhead and the delay attributed to RIDOT'S failure to give the notice to proceed within a reasonable time.
4. Findings of fact
The record more than supports the Plaintiff's Proposed Findings of Facts numbered 1 through 12 on pages 5 and 6. The Court specifically adopts the said findings.
C. LATE APPROVAL OF COFFERDAM DESIGN SUBMITTALS
REFERENCE: Late Approval of Cofferdam Design Submittals — CFF Brief, Section III, C, p. 20; RIDOT Brief, section labeled Late Approval of Coffer Dam Design Submittals.
1. Statement of claim
CFF could not commence fabrication of its cofferdam bracing without RIDOT approval of its plans. One hundred days elapsed between CFF's initial submittal of its cofferdam design drawings for piers 12 through 20 and the ultimate date of approval.
2. Legal basis
An owner has a reasonable time to review and approve submittals required by contract documents. Langevin v. UnitedStates, 100 Ct. Cl. 15, 27-28 (1943); Kelley Control Systems,Inc., 87-3 B.C.A. (CCH) § 20,0641 at 101,593 (July 24, 1987).
The contract between the parties specified as follows:
 Submittal shall be made sufficiently in advance of construction requirements to permit not less than 21 calendar days for checking and appropriate action by the Engineer. Exhibit 267 at p. GS-7 § 6d)
It thus was provided between the parties that no period of time after submittals could be determined, no matter what the circumstances, to be unreasonable until after the passage of 21 days.
3. Facts
CFF submitted its shop drawings for cofferdams 12 through 20 to RIDOT on July 10, 1985, one day after receiving the notice to proceed. CFF ultimately received approved drawings on October 18, 1985 — 100 days later. Of the 100 days, more than half of the time (55 days) was consumed by RIDOT passing the drawings from one point to another. The drawings were in the possession of T.Y. Lin for 25 days and in the possession of CFF for redesign for 20 days.
After the initial submission, RIDOT took 29 days before returning the drawings to CFF. Of that 29 day time, T.Y. Lin had the materials for 12 days. The remaining 17 days the drawings were in the control of RIDOT in transportation to and from T.Y. Lin and then back to CFF.
T.Y. Lin marked the drawings Revise and Resubmit. Such a marking is a review notation which is reserved for critical problems that the reviewer has discovered that require substantial change. 2 S. Stein, Construction Law, § 8.01 [1][b] p. 8-8 (1991). Such a notation prevents the contractor from proceeding with the work until he has revised and resubmitted for approval the shop cofferdam drawings.
In Kelley Control Systems, Inc., supra, the court held that in circumstances where the contractor assumes all risks associated with the design, an owner (RIDOT) acts unreasonably if it delays the project with redesign objections that are not substantial.
The Court is faced with determining whether the action of T.Y. Lin on behalf of the owner (RIDOT) is reasonable in the totality of the circumstances. The parties presented testimony concerning the need for the submission and the notation appended to the drawings. The plaintiff's expert, George Tamaro, at page 35 of the transcript was of the opinion that the deficiencies noted would not justify the notation "Revise and Resubmit" but rather ought to have been endorsed "make corrections noted and respond". This latter notation would require the contractor to respond to RIDOT'S design commentary while at the same time permitting it to otherwise commence work on the cofferdam.
RIDOT contends that the "Revise and Resubmit" endorsement was justified arguing that the deficiencies noted were substantial and that it acted at all times in fulfillment of its obligations under the terms of the contract. It erroneously attributes to Tamaro testimony which it says substantiates its claim. A careful review of Tamaro's testimony does not justify that conclusion. The testimony clearly indicates that two of the alleged shortcomings in the cofferdam design were of concern to CFF but that nonetheless were not substantial and since they were intended to be temporary and that CFF was assuming all risks involved in the construction, maintenance and use of the cofferdam, ought not to have resulted in denial of CFF's right to proceed with cofferdam construction.
In addition, RIDOT argues that inasmuch as CFF ordered and had delivered and was paid for sheeting which was on site that CFF has not been delayed in proceeding with the work on the cofferdam.
Again RIDOT misconceives the nature of the defect in the design of the cofferdam. It did not relate to the sheeting but rather related to the bracing of the 4 stages of the cofferdam.
It is the Court's judgment that T.Y. Lin's notation, which is by all experts reserved to only substantial defects, was not justified but that rather a lesser notation should have been affixed to the initial submissions. This conclusion is further buttressed by the cursory endorsement placed upon the resubmittals once reviewed by T.Y. Lin. That T.Y. Lin had a right to be concerned with the cofferdam design is not disputed. That T.Y. Lin had an obligation to the contractor to place the least restrictive endorsement on the shop drawings is the question which separates the parties in the claim. T.Y. Lin in the Court's judgment unnecessarily restricted this contractor from proceeding with the internal design of temporary structures which would be used to build the permanent structure, i.e. the Jamestown-Verrazzano Bridge.
Again, we are confronted with what was a reasonable time for RIDOT to respond to the initial submissions and again the 21 day period set out by the parties herein designates a time within which period no claim of unreasonableness can be asserted. It is the Court's judgment that since the initial request asserted by CFF on the day following the notice to proceed predated the pendency of all other obligations under the contract, that any time in excess of 21 days for such response by RIDOT is unreasonable.
The Court therefore concludes that CFF was unreasonably delayed in proceeding with its cofferdam designs and/or construction by the action of RIDOT for 79 days.
4. Findings of fact
Again the record supports the Plaintiff's Proposed Findings of Fact numbered 1 through 9 at pages 8 and 9. The Court adopts these findings as its own.
D. COFFERDAM INSTALLATION
REFERENCE: Cofferdam Installation — CFF Brief, Section III, D, p. 26; RIDOT Brief, section labeled Pier 14 Boulders.
1. Statement of claim
Based on RIDOT'S boring log information and the general nature of the soils, CFF should not have reasonably expected to encounter boulders above the mud line. CFF is therefore entitled to be compensated for the extra work required to excavate boulders on the bay bottom and to include the extra time on its delay analysis.
2. Legal basis
"Changed subsurface conditions" clauses require the owner (RIDOT) to compensate the contractor for extra costs incurred by unanticipated physical conditions at the site. See collected cases in Annotation, Construction and Effect of "ChangedConditions" Clause In Public Works Or Construction Contract WithState Or Its Subdivision, 56 A.L.R. 4th at 1042, 1048 (1987).
In Foster Constr. C.A. Williams Bros. Co. v. UnitedStates, 435 F.2d 873, the court said that the purpose of the changed conditions clauses in public works contracts is to permit contractors who bid such contract to rely upon the plans and specifications as provided by the owner, thus saving government and its subdivisions of costly sums for pre-award investigations of subsurface contingencies.
To recover under a changed condition clause in a contract, the contractor must show that (1) the contract plans and specifications indicate the presence of certain conditions, (2) that the contractor reasonably relied on these indications to its detriment and (3) that the representation in the contract documents differ from the conditions actually encountered or ordinarily encountered and generally recognized as inherent in the particular work. Foster Constr., supra.
It has further been held that a contractor may rely upon an owner's positive representations contained in borings, plans and specifications concerning subsurface conditions which representations amount to a warranty and establish the necessary predicate for a breach of contract action. Morrison-Knudson Co.,Inc. v. United States, 345 F.2d 535.
3. Facts
CFF determined that it would construct its cofferdams at the Davisville precast yard and would barge the cofferdam skeletons to the pier sites; pier 14 being the first of the cofferdam skeletons to be barged out into the bay area. The cofferdam skeleton was a four stage or four level brace frame. When CFF began to lower the first stage down into the bay bottom, the northeast corner of the brace frame was hung up, that is it could not be lowered to the bay bottom because of an obstruction that existed above the bay bottom. At this point CFF determined that there was a large boulder protruding above the bay bottom and reported that fact to RIDOT. RIDOT wanted nothing to do with this problem that had developed in lowering the cofferdam bracing to the bay bottom. Perhaps, again, RIDOT'S attitude towards this project and to its contractor is best illustrated by a note appearing in the resident engineer's diary. The note says "It would appear that the public till would be best served at this stage by not obligating additional check costs". This is in spite of the fact that the same resident engineer determined that the obstruction which the staging was hung up on was a boulder measuring 6 ft. by 10 ft. by 8 ft.
CFF first attempted to blast the obstruction to break it up. When this proved unsuccessful, they dug a large hole outside the cofferdam area and rolled the boulder into the large hole. Similarly, a second boulder was encountered and was likewise disposed of by rolling it into a large hole.
The Court has had a short course in the glacial coverage in the early evolution of streams, mountains, etc. as the Ice Age receded from this part of the world. The Court had the benefit of listening to geotechnical experts. One presented by CFF was Mr. Thompson, and additional experts presented by RIDOT. During this short course the Court was presented with perhaps consistent testimony as it relates to what had been reasonably anticipated to exist above the till line. All experts who appeared before the Court agreed that what is called till contains small boulders, that is boulders less than 12 inches in diameter in the till overlay. Obviously the obstruction encountered by CFF was not only above the till, but also above the mud line in the bottom of the bay, and was considerably larger than boulders or, as they are commonly referred to in relation to till, cobbles, they being small boulders of less than 12 inches in diameter. Three of the experts who appeared, David Thompson, M. Thomas Davisson and Richard Rodgers, all agreed that this boulder, this 6 by 10 by 8 ft. boulder, would not reasonably have been anticipated to exist or to be found in the Narragansett Bay above the mud line. Only one of the geotechnical experts who appeared, Robert Myers, steadfastly adhered to the fact that in Narragansett Bay, the bay bottom, boulders of this size ought to have been anticipated by the contractor to exist in the bay bottom.
The Court found that the reliable, credible testimony, not only from the plaintiff's expert but from two of the three experts who testified for RIDOT, that this obstruction would not have been reasonably anticipated by a contractor to be found in the bay bottom. There was further evidence presented to the Court concerning matters which were brought up from the bottom. They were not native to the bay bottom but had been unnaturally deposited in the bay bottom as a result of the construction of the first Jamestown Bridge. The Court therefore finds that based upon the geotechnical information and the testimony which the Court heard concerning the Ice Age and the glacial receding from this area, that while there is some evidence that on the surface in Washington County there are large boulders, that the contra is true when we get involved with the subsurface area, that is the bay bottom under Narragansett Bay which no reasonable person bidding a contract would have anticipated the existence of these large obstructions by way of boulders above the mud line. It is interesting here to note that although there are 90 plus borings taken by RIDOT taken in anticipation of letting this contract that none of the borings indicate that there are large boulders in the bay bottom. Borings taken close to pier 14 and 15 do not indicate the presence of boulders above the mud line in the bay bottom. Pier 14 was the deepest of any of the piers, and a reasonable pre-bid inspection would not have disclosed this obstruction to a perspective bidder. On the evidence before the Court, no one knew of the obstruction that hung up the fourth level cofferdam prior to the time that it in fact became involved with this protruding boulder when it was attempted to be placed in the bay bottom. CFF basis its claim for additional compensation because of this unanticipated condition in the bay bottom on the contract provision which relates to "changed condition". RIDOT on the other hand while arguing that geotechnical information was such that the contractor ought to have anticipated running into this condition and therefore it is not a "changed condition", nevertheless interposes additional objections based upon the contract. RIDOT relies on the contract provision relating to "unclassified excavation" and the additional provision in the contract relating to the contractor's obligation to make its own investigation of the site.
Each of the provisions relied upon by RIDOT are classified as general exculpating clauses. These clauses have not been favored by the courts. The courts have disfavored general exculpatory provisions in the contract and they are narrowly rather than broadly construed. The Court has already indicated that no reasonable inspection was available to the contractor to determine at an elevation of minus 68 ft. the conditions existing in the bay bottom prior to the placement of its bid.
It is the obligation of RIDOT to present data, borings, plans, specifications and other reliable information which as a matter of public policy eliminates the need for those who are about to bid on the contract to incur the expense of conducting its underwater investigation of the bay bottom. The contractor is entitled to rely upon the information provided by RIDOT in formulating its bid. That is the reason that included within the contract the changed conditions clause allows the contractor to recover when it relies upon the information provided by the owner to its detriment.
The interpretation that the State of Rhode Island asks the Court to adopt in interpreting these provisions in the contract, that is the obligation to excavate materials in the bay bottom and the obligation to conduct its own inspections of the bay bottom, would, if given the effect that the State urges, completely negate the changed conditions clause in the contract. Stated another way, both clauses in the contract must be interpreted so that each is given its proper effect. A proper interpretation of the unclassified excavation provision in the contract requires that a contractor excavate all subsurface material of whatever nature for the bidded price. The contractor, however, in formulating the bid price is entitled to rely upon the information which is provided to him by the owner or in this case RIDOT as he reasonably expects to find based upon the information provided. If however when he does the actual excavation he finds that there are substantial and material changes in the bay bottom or in the material to be excavated, then he is entitled under the changed conditions provision to additional compensation. This proper interpretation gives effect to both provisions of the contract and one compliments the other. The State urges that the unclassified excavation provision prevents CFF from obtaining relief since it was already obligated to excavate that which it should have reasonably expected to be in the bay bottom and that this boulder was a reasonable expectation based upon the information provided. The testimony and the facts in this case do not warrant the Court coming to that conclusion. On the contrary, the substantial weight of the testimony indicates that there was a material change; that material change was substantial in nature; that the contractor did rely upon the information provided to it by RIDOT concerning what it would reasonably be anticipated to be found; that there was a change; that the weight of the testimony indicates that what was found in the bay bottom was not native to that bay bottom but were the spoils of the prior work done on the first Jamestown Bridge. The contractor is entitled to recover the costs incurred in removing the obstruction found in the placement of this cofferdam. The amount is not contested. The cost to the contractor is $115,466.00. That is contained in Exhibit No. 180, item 13; also in Exhibit E, 161, Table 1 at p. 3.
In addition, it took CFF an additional 31 days to bring about the removal of this obstruction and in the delay aspect of this litigation, CFF is entitled to add 31 days to its delay claim.
4. Findings of fact
The Court adopts the plaintiff's Finding of Fact contained in its Proposed Findings of Fact numbered 1 to 12 inclusive at p. 12.
E. EXTRA EXCAVATION COSTS
Before commenting upon the facts in this subdivision, the Court will indicate that the briefs filed by the plaintiff in this case have divided its Extra Excavation claim into four separate categories: first, rock excavation; second, rock cores; third, overburdened excavation; and fourth, land excavation. The plaintiff's brief encompasses some 40 to 45 pages. The defendant has likewise provided a brief of equal length but has lumped together its observations concerning these four separate categories. It seems to the Court that for an orderly consideration of these matters the procedure adopted by the plaintiff affords the Court the best opportunity of addressing the separate issues raised by the parties as it relates to extra costs incurred in excavating. The Court will therefore follow the format used by the plaintiff in making its claim.
E.(1) ROCK EXCAVATION
REFERENCE: Extra Excavation Costs — CFF Brief, Section III, E, p. 38, Rock Excavation; RIDOT Brief, Section labeled Excavation.
1. Statement of claim
The resident engineer unreasonably delayed approval of sound rock at pier 14 through 20. He disregarded the express terms of the contract and posed additional requirements on CFF as conditions precedent for approving sound bedrock at each pier. As a result CFF incurred substantial costs excavating sound bedrock and is entitled to compensation for the extra work performed.
2. Legal basis
The special provisions defined sound bedrock:
 Remove overburdened and weathered rock to reach sound bedrock. Sound bedrock, at any location within a foundation area shall be as determined by the engineer. It shall be understood to be the material that cannot be excavated with a clamshell bucket having teeth, or broken up with a chopping bit or light explosive charges.
Unambiguous contract terms are to be given their plain, ordinary meaning and are applied as written. Ralph Larson Son,Inc. v. United States, 17 Ct. Cl. 39, 44 (1989). See alsoAluminum Company of America v. United States, 2 Ct. Cl. 771, 776 (1983). The plain terms of a contract require a determination of sound bedrock based upon the efficacy of any one of the three alternative methods — a clamshell bucket with teeth; a chopping bit; or light explosive charges. If any one of these three methods cannot remove material, then the plain terms of the contract have been met. No further excavation of rock is required.
As previously stated, rock as sound bedrock is within the authority of the resident engineer. The resident engineer's authority however is not absolute. The resident engineer must act reasonably when construing contract plans and specifications. He cannot ignore the contract language and direct work to be performed which is at variance with the unambiguous terms of the special provisions without providing for compensation to the contractor.
3. Facts
The problem of the extra cost incurred for excavation has its origins back in the design phases of this contract. You will recall that California based designers had been engaged in the design phase to present ultimate designs for the construction of the Jamestown Bridge. RIDOT required T.Y. Lin to adopt the HNTB design based on tremie foundations, apparently to ensure that the competing designs were as similar as possible.
T.Y. Lin's plans assumed that a certain amount of rock would be sufficiently weathered that it would be broken up and excavated creating a hole in the rock; the tremie concrete foundation would be poured into that hole resulting in the tremie foundation being embedded in rock. T.Y. Lin's initial concept indicated that tremie foundations would be embedded 2 ft. into rock. The plans, as originally submitted, showed a minimum 5 ft. embedment which had been recommended by Richard Rodgers of L P. RIDOT rejected the minimum 5 ft. embedment requirement as being too expensive and instructed T.Y. Lin to only require removal of weathered rock. RIDOT also required T.Y. Lin to add "plus or minus (+ -)" indications on the assumed embedments and to reduce expected embedments in areas where pre-bid borings indicated hard material. T.Y. Lin added note number 5 to sheet number 27 of the plans which made clear that sound bedrock elevations on the plans, and the resulting embedments were only estimates of what could appear in the field. Actual field conditions would determine the elevations of sound bedrock. Finally, T.Y. Lin wrote specifications that only required the soft material to be removed — weathered rock that could be excavated with a clamshell bucket with teeth.
Thus, the plans and specifications let out for bid made no specific provision for embedment. Any embedment of the tremie foundations in rock depended upon the amount of weathered rock that could be excavated with a clamshell bucket. Based on the pre-bid borings, T.Y. Lin estimated 3 to 5 ft. would be excavated.
The contract required CFF, after it had reached sound bedrock, to take rock cores to verify the rock quality for bearing capacity. At some piers CFF, with RIDOT'S permission, took cores prior to reaching sound bedrock in order to avoid the delay in stopping the work. This decision on the part of CFF had unintended consequences. RIDOT, upon receipt of the cores, sent the core results to T.Y. Lin and in turn T.Y. Lin forwarded them to Richard Rodgers to seek their advice as to whether CFF had encountered sound bedrock in the field. Apparently using rock quality designation (R.Q.D.) values of rock cores, Richard Rodgers determined "competent rock" would be encountered at certain elevations. In making the determination, Mr. Rodgers made clear that he wanted a 5 ft. embedment even if it meant excavating "competent rock" as he defined it. Mr. Rodgers had not been included by T.Y. Lin during the specification drafting process. Mr. Rodgers was unaware that his recommendation of a 5 ft. embedment into rock was not incorporated in the final approved specifications and so indicated in his transcript.
This procedure as adopted by RIDOT as a result of obtaining rock cores prior to the time that CFF had reached sound bedrock created two problems. First of all, sound bedrock was being encountered at higher elevations than had been anticipated and the rock was harder than the pre-bid borings seemed to indicate. In effect the rock surface was resisting the bucket with teeth. This rock was not soft, that is it was not sufficiently weathered that it could be excavated using a bucket with teeth. RIDOT did not contest these physical facts but refused to accept the rock as encountered by CFF as sound bedrock. Instead RIDOT ordered the contractor to continue excavating in an effort to reach the elevations as indicated by Richard Rodgers. In effect RIDOT was ignoring the contract's definition of sound bedrock and instead was using the data generated by the cores when sent on to Richard Rodgers. The core values were predicated upon R.Q.D. values and various other considerations. These were the factors used by RIDOT to require the contractor to dig to predetermined elevations.
By tracing the correspondence of July 1986 involving piers 14 through 20, it becomes apparent that RIDOT was adopting Richard Rodgers' predetermined elevations for "competent rock" and his embedment of 5 ft. into "competent rock" without informing the contractor of this fact. RIDOT was aware that Richard Rodgers did not participate in the final design specifications. They also had rejected his cardinal recommendation that the tremie be embedded 5 ft. into rock; whether we call that competent rock or sound bedrock, he wanted a 5 ft. embedment into rock. The deviousness of RIDOT'S plan is evidenced by the fact that in forwarding correspondence to the contractor RIDOT specifically omitted from that correspondence any reference to embedment into rock as was evidenced in receipt of its correspondence from T.Y. Lin and Richard Rodgers. RIDOT did not contest that the clamshell bucket with teeth would not excavate that which CFF was urging was sound bedrock. They merely informed the contractor to keep digging and keep digging the contractor did. He was digging sound bedrock. RIDOT wanted him to continue digging and to be paid not for rock excavation but for underwater overburdened excavation. This RIDOT had no right under the terms of the contract to impose upon the contractor.
If having adopted in fact the recommendations of the geotechnical advisor, Richard Rodgers, in California as a substitute for having an on-site geotechnical advisor here in Rhode Island, RIDOT wanted embedment of the tremies and was now willing to pay the additional expense for rock excavation, then a change order ought to have been brought about to permit the contractor to use alternate means other than a bucket to dig into rock, to blast and to excavate rock and to be paid accordingly. RIDOT however concealed from the contractor the ultimate purpose of Richard Rodgers, that is to obtain tremie embedment even if it meant taking out sound bedrock to provide for that embedment. Having concealed that from the contractor, the contractor continued to excavate for long periods of time.
An example of the additional cost is contained, I believe, at pier 19 where CFF excavated plus or minus 11.3 ft. of overburdened in 91 crew hours or approximately one ft. per shift. Upon reaching sound bedrock CFF was told by RIDOT to continue digging but CFF was only able to excavate 1.1 ft. in 332.5 crew hours or approximately .03 ft. per shift. Since CFF was paid in accordance with the volume excavation it suffered damage and losses by this procedure. The Court concludes that RIDOT had in effect attempted to put through a change order without providing for compensation to the contractor.
The specifications make no specific reference to embedment. They require that the contractor excavate down to sound bedrock. Once there the contractor is required to break up weathered rock to the extent that it can be done with a bucket and remove that weathered rock. The purpose is to remove soft material that might compress and allow settlement. No one knows for sure how much weathered rock will come out. When designing the bridge the designers can only estimate. Based upon pre-bid borings, they estimated 3 to 5 ft. of weathered rock could be taken out with a bucket. This 3 to 5 ft. was represented by the plans and so labelled as an estimate. The designers, however, specifically (and in response to RIDOT'S directions) did not specify any minimum embedment. During the design phase RIDOT was satisfied to clean off soft weathered rock, rock that could be excavated with a bucket. During construction the amount that could be excavated with a bucket turned out to be negligible, resulting in little or no embedment and it was at that time that RIDOT was no longer satisfied.
It was RIDOT'S dissatisfaction which brought about a wrongful enlargement of the contractor's obligations which brought about a claim for damages. CFF presented an expert in calculating the loss. Robin Dill of Haley and Aldrich was engaged to give testimony concerning the loss to the contractor caused by the wrongful conduct of RIDOT in requiring the excavation of rock pursuant to RIDOT'S instructions which was at variance with and an enlargement of the obligations imposed upon the contractor by the terms of its contract.
Mr. Dill examined each of the cofferdams, the soundings and the rock cores taken at each cofferdam. He determined at what point in time the contractor first reached sound bedrock in any of the bays based upon the cores and soundings in that bay. A bay is brought about because a cofferdam contains multiple bracings. The multiple bracings divide the interior of the cofferdam into several distinct bays. That date as determined when sound bedrock would have been reached or was reached in any of the bays was then compared to the job records confirming that the contractor in the field was asserting that it had reached rock that was unresponsive to the bucket.
Mr. Dill reconstructed field production rates as measured by crew hours dedicated to exclusively cofferdam excavation and the quantity of materials excavated during that time. His firm, Haley and Aldrich, plotted this data on time/depth axis.
The plots prepared for seven rock excavation piers illustrates significant reduction in the production rate at a specific point in time. That point in time is referred alternately as "A" or "B" date. The production rate "flattens out" at a point beginning at the sound bedrock date at each pier.
Since RIDOT did not approve sound bedrock when first reached, CFF could not move to successive bays to complete excavation and clean up activities in those cofferdam bays. Consequently RIDOT impeded the construction sequence as set forth in special provisions and incorporated in CFF's schedule.
CFF derived its excess excavation claim by taking the total crew hours excavated at each pier after reaching sound bedrock in a bay (the "A" date). From that figure, CFF subtracted a reasonable allowance for completing excavation in the remaining bays and for clean up time — an effort CFF contracted to undertake after reaching sound bedrock, but was never allowed to proceed with in an orderly fashion because of RIDOT'S unreasonable refusal to approve the bottom surface. The net hours represents CFF's excess excavation claim.
Mr. Dill computed, based on soundings and cores, the amount of excavatable material remaining in each bay. He computed the time necessary to complete excavation of that material, including clean up. He used average actual excavation rate for cofferdams 14 through 20 for overburdened (32.8 c.y. per shift or 4.1 c.y. per hour) and actual clean up rates for the last 6 inches of material (5.6 c.y. per shift or .7 c.y. per hour). The amount of time to complete excavation in the remaining bays was attributable to the contractor using these particular rates. That excavation time beyond that point is claimed as damages and was attributable to RIDOT.
RIDOT does not challenge the cost computations, but does challenge liability and the time frames utilized by Mr. Dill in contemplating damages.
One of the key issues for the Court to determine is whether or not the contractor was obligated by the plans and specifications to provide embedment. The Court finds that the contract as written did not require the contractor to provide embedment into sound bedrock. If in the performance of the contract the rock had been soft or loose weathered rock and in removing that loose, weathered rock there was, when the tremie was poured, an embedment as a result of that removal, the embedment would thus be provided. If however sound bedrock was reached, the contract as written did not require that there be an embedment. There was no term of the contract that required the contractor, CFF, to excavate sound bedrock. If, once having reached sound bedrock, RIDOT determined that for lateral support of the structures embedment was required, then at that point the opinion of the design contractors ought to have been sought. In other words, does or does not the design of this bridge require that the tremie be anchored in rock. During the discussions as evidenced by writings between RIDOT and the designers, T.Y. Lin, Frank Drouillard, a T.Y. Lin designer, wrote to his replacement: "I discussed (the embedment) issue at great length with Norm Choppy of RIDOT. He understands that lateral loading requirements must be met but refuses to acknowledge that the embedment dimensions shown on our original drawings (3 ft. plus or minus, I believe) is enforceable . . ." See letter dated June 1988.
In a letter by the same Norman Choppy concerning piers 17 and 19 written to Graham Ray the resident engineer, Norman Choppy is quoted as follows: "It is my understanding during the telephone conversation with T.Y. Lin that engineering calculations do not support a requirement that some minimal embedment into sound rock is needed to resist lateral and overturning forces. Therefore, the criteria to be applied to the rock excavation work is that set forth in the specifications, namely, the removal of all weathered rock to reach sound bedrock".
Despite these internal communications, at trial in the initial stages of hearing testimony on this issue, almost every relevant RIDOT witness claimed that the plans required an embedment. They relied on the fact that the plan showed an embedment and one sheet of the plans stated that the foundations were embedded in rock. They also pointed to the fact that Franki in preparing the cofferdam plans assumed that an embedment would occur.
During trial however each witness conceded the following:
a) No where in the specifications does it state that the contractor must excavate some minimal depth into rock to ensure that the tremie foundations are embedded in rock;
b) The embedment shown on the plans is based upon the estimated amount of weathered rock that may be excavated before sound bedrock is encountered; and
c) The plans specifically state that sound bedrock elevations are estimates and that actual elevations were to be based upon what was encountered in the field.
RIDOT continued to contest liability and presented the testimony of Mr. Myers. He relied upon rewriting the contract specifications by testifying that sound bedrock had not been reached by the contractor because some of the cores that were sent to Richard Rodgers in California did not meet the "R.Q.D. requirements" of the contract.
Despite Mr. Myers' testimony to that fact he could point to no requirement in the contract relating to R.Q.D. except after bedrock had been reached. The contract sole provision was that cores would be taken — a minimum of six — to determine the bearing capacity of sound bedrock once it had been reached. R.Q.D. value obviously is one of the factors to be considered in determining the bearing capacity of the material. Ten ton per square foot (10 t.s.f.) bearing capacity is a small minimum bearing capacity. Most of the text most notably that of Peck, Hanson and Thornburn provide that rock material from zero to twenty-five R.Q.D. will bear 10 t.s.f. Many of the experts who testified whether they testified at the behest of RIDOT or of CFF all agreed that the requirement for bearing capacity in this contract was at the minimum range.
Mr. Myer attempted to add to the contract provisions the design consultant's SP report which made a reference to a conservative estimate for an R.Q.D. of zero to twenty-five of 5 t.s.f. The simple answer to this is that Mr. Myer could not enlarge the terms of the contract by referring to something that was prepared for the designers as the designers were making the contract design. Over all, the rock encountered in any of the piers 14 through 20 amply supported the conclusion that all rock would bear 10 t.s.f. and in some places the rock was considerably harder and would show a bearing capacity in excess of 10 t.s.f.
RIDOT in its brief again citing Mr. Myers' testimony raises another defense. Briefly stated, RIDOT says even if we are responsible to pay damages for our action in causing the contractor to excavate rock, that Mr. Dills' method or methodology is ill founded and inappropriate to this issue. While not contesting the actual costs presented, Mr. Myers points to testimony that there is evidence in the record showing that CFF continued to excavate after the so-called "A" date as determined by Mr. Dill. The State misconceives the assumption and the methodology used. The actual records will show that excavation continued at the various piers because the resident engineer once sound bedrock was reached in any one of the bays would not permit movement within the cofferdam or movement at the pier into the various other bays, thus the contractor used a method to reconstruct the "A" date. Had CFF been permitted to move throughout the bay, how much longer would it have taken to reach bedrock in all of the other bays within that cofferdam at that particular pier? Mr. Dill reviewed the excavation records at each of the cofferdams concerning the total amount remaining at each cofferdam on the date when bedrock was first encountered and, using the actual excavation rate at each cofferdam, determined the total amount of time required to complete the excavation at each dam. He then translated that to a day certain which he refers to as his "A" date.
Many of the practicing construction and geotechnical people who testified; namely, David Thompson, Robert Dill, engineers whose primary business is providing geotechnical services to construction projects, testified that excavating the type of material found in the bay bottom of the Jamestown Bridge with a bucket is routine. Mr. McEnery, an experienced contractor, supports that position. Harvey Cunningham, 23 years with Porini and Marine Engineer Construction Division which constructed the Newport Bridge, testified that in his experience materials of this nature are typically removed with a bucket. John Fowler, who worked his way up through the ranks to President of Tidewater, a major marine contractor, stated that the buckets on hand should easily have done the job. Theses witnesses all have substantial hands-on experience with New England overburden and till or similar material. On the other hand, Mr. Myers, who testified solely on this issue for the State, is not a practicing contractor or a soils rock engineer; rather he runs a claims service of Hill International. His participation in construction projects geotechnology or otherwise relates primarily to the settlement of claims. He gave no testimony concerning any hands-on experience in making determinations concerning the time estimates or his experience in the use of buckets for the removal of overburden in the bay area of Narragansett Bay or anywhere else. It seems to the Court that the State has not relied upon credible testimony to impeach the method devised by the contractor to compute its damage caused by the wrongful action of RIDOT in requiring rock excavation.
Stated another way, the State of Rhode Island seems to be saying first you are required to provide an embedment even if it meant excavating sound rock. And secondly, if you were not required to excavate the sound rock, the method of compensating you for the action taken by me is that you can't prove with any degree of certainty the damages you are entitled to. Stated in it briefest form, the contract does not require by its terms an embedment and the excavation of sound bedrock. That obligation was wrongfully imposed upon this contractor by the State of Rhode Island and the State of Rhode Island must bear the cost. In the absence of competent contradictory testimony, the method adopted by Mr. Dill in computing the time involved to do the wrongful obligation imposed upon it by the State of Rhode Island seems reasonable, uncontradicted and a logical presentment of an unliquidated claim for damages. Since the amount, that is the extra cost involved, is not disputed the Court will, for this excavation of rock, award the amount of three million one hundred ninety-six thousand, seven hundred four dollars ($3,196,704.) as damages.
There was a delayed analysis computed by Mr. McGoldrick concerning the extra time required at each of the piers. That delay analysis is as follows:
 Pier 14 — 288 calendar days.
 Pier 15 — 76 calendar days.
 Pier 16 — 29 calendar days.
 Pier 17 — 49 calendar days.
 Pier 18 — 36 calendar days.
 Pier 19 — 56 calendar days.
 Pier 20 — 38 calendar days.

In arriving at this analysis Mr. Dill computes the number of actual crew hours dedicated to excavation as reflected by actual job records. The time is incorporated in Exhibits 43 through 48 and is summarized in Exhibit 41.
4. Findings of fact
There is ample evidence within the record to support each of the plaintiff's Findings of Fact as contained in its Proposed Findings of Fact under Rock Excavation, p. 16 and numbered 1-19 inclusive, which Findings of Fact this Court adopts by reference thereto.
E.(2) ROCK CORES
REFERENCE: Rock Cores — CFF Brief, Section Extra Excavation Costs E(2), Rock Cores, p. 62; RIDOT Brief, section labeled Rock Cores.
1. Statement of Claim
CFF is entitled to additional compensation for the extra rock coring required by RIDOT.
2. Legal basis
The special provisions provided that the base of each excavated cofferdam shall be:
. . . core drilled in order to verify the quality of rock for 10 t.s.f. design loading capacity. A minimum of six cores per pier shall be drilled, one at each corner plus two at the center line.
The special provisions are silent on the length of the cores needed to verify the 10 t.s.f. design load capacity. When a specification is silent as to the scope of the work involved, the contractor is required to perform only the work that is necessary and reasonable according to the industry standards. Citing In reMann Constr. Co., Inc., 81-1 B.C.A. (CCH) § 15,087 at 74,641 41-42 May 1st, 1981. The owner in this case, the State, may not impose additional requirements outside the scope of the contract without compensating the contractor for the extra work. KennethReed Const. Corp. v. United States, 475 F.2d 588. If the owner intends to hold the contractor to a stricter standard than that required by industry standards, he must so state his intention explicitly in the specifications.
3. Facts
Just before the contract was let to bid in August of 1984, RIDOT added to the specifications a requirement that once sound bedrock was reached, the contractor, in the water piers 14 through 20, would take core borings to verify the R.Q.D. values. No borings were required to be taken after bedrock was reached on the land piers. The land piers are collectively piers 21 through 23 and the east abutment. The only borings that were taken at the land piers were the pre-bid borings. However, just before the contract was let, a change order was put through which was explained in a note penned by Mr. Choppy of RIDOT to FHWA. That change informed the FHWA that "the letter F. after the foundation areas in cofferdams have been judged by the State to be of sound rock, this will be further evaluated by a series of six cores drilled to a depth of 10 ft. to check the R.Q.D. of the rock for the design loading".
The design loading requirement was that the rock be capable of bearing a weight capacity of 10 t.s.f. This is not a tremendously high load capacity. The testimony indicates that in New England till rock of almost any kind will have a R.Q.D. value capable of supporting a minimum of 10 t.s.f.
In making the change just prior to bid in the final specifications no depth was specified in the contract. It therefore follows that what depth would be required would be that which a contractor would under the conditions existing at the site consider to be within industry standards. Since no standard was specified in the specifications, industry standards would apply. It is apparent that RIDOT was thinking of 10 ft. cores as per the letter that was written in August of 1984 by Mr. Choppy.
The problem seems to have come about as a result of RIDOT'S failure to hire its own on-site geotechnical adviser. It seems that RIDOT was attempting to get geotechnical information from T.Y. Lin, its bridge designer, by way of posing questions concerning matters as they developed on site, and in this particular case the depth of the core borings, to T.Y. Lin to be answered. T.Y. Lin was using Richard Rodgers, L P's principal geotechnical consultant. Both T.Y. Lin and Richard Rodgers had no experience in the northeast. Their experience being primarily in the San Francisco, California area made them familiar with rock strata in that area of the world as is evidenced by the testimony contained in the record of Richard Rodgers. Geological conditions in San Francisco required 24 ft. length corings because the material contained many compressible substrata areas to determine the weight bearing capacity.
Industry standards here on the east coast relied on 10 ft. cores and since the pre-bid cores were 5 to 10 ft. to support the design calculations, it seems reasonable to the Court that a contractor knowing he had six cores to bore at each cofferdam would expect if required to go further than 10 ft. in depth to have that depth specifically set out in the specifications. In the Court's judgment, anything beyond 10 ft. is unreasonable and unnecessary. The land piers were accepted without post-bid coring. The rock at pier 21 is the same rock as the rock at pier 20. The land piers were accepted without core borings. The contract required that six borings be made in the underwater piers but did not specify the depth. The only explanation based upon the testimony for 20 ft. boring was because that was the experience of the T.Y. Lin's geotechnical adviser. If RIDOT had its own on-site geotechnical consultant, there is no question that the borings would not have exceeded 10 ft. The additional work to provide such borings, that is 10 ft. at each site for a total of 420 additional feet, should be treated as extra work not required by the contract. The State of Rhode Island is obligated to pay to the contractor the amount to provide that additional coring.
4. Extra cost
Mr. McGoldrick of CFF computed the extra cost of providing 20 ft. cores rather than 10 ft. cores at four hundred sixty-three thousand, nine hundred eighty-two dollars ($463,982.). There is no contradictory testimony, such sum appears to the Court, particularly in view of no contest, to be fair and reasonable and such sum is awarded as damages to the plaintiff.
5. Delay time
The delay time for the extra work involved in obtaining these cores is as follows:
 Pier 14 — 13 calendar days.
 Pier 15 — 18 calendar days.
 Pier 16 — 11 calendar days.
 Pier 17 — 15 calendar days.
 Pier 18 — 7 calendar days.
 Pier 19 — 11 calendar days.
 Pier 20 — 4 calendar days.

This delay is part of the "but for" analysis in the summary sheets of CFF.
6. Findings of fact
The Court adopts in total the specific Findings of Fact enumerated 1 through 8 as contained in the Plaintiff's Proposed Findings of Fact found on pages 22 through 24 as if set out herein and is annexed hereto as an appendix.
E. (3) OVERBURDEN EXCAVATION
REFERENCE: Excavation Rates — CFF Brief, Section, Extra Excavation Costs E(3), p. 67, Overburden Excavation and Inefficiency Claims, R(3)(f) p. 204, Overburden Excavation; RIDOT Brief, section labeled Excavation and Inefficiency.
1. Statement of claim
CFF is entitled to recover the extra costs of excavation at piers 14 through 19 to the extent that they exceed excavation costs established at pier 12 and 20 where similar problems were not encountered.
2. Legal basis
When a contractor encounters subsurface conditions in the field that are materially different than conditions represented in the plans and specifications, the contractor is entitled to recover his extra costs under the changed conditions clause.Foster Constr. C.A. Williams Bros. Co. v. United States, 435 F.2d at 887; In Re: Holloway Constr. Co., 89 B.C.A. (CCH), § 21,713 at 109, 190-91 (March 23, 1989). This concept also includes conditions where the materials encountered, although substantially similar to those represented in the plans, behaved differently than a reasonable contractor would have expected.Shank-Artukovich v. United States, 13 Ct. Cl. 346, 355 (1987), aff'md. 848 F.2d 1245 (Fed. Cir. 1988); S.M. Kaylor Bros., 82-1 B.C.A. (CCH), § 15,484 at 76,784 (Nov. 30, 1981). In either situation, as long as the contractor can show that his reliance on the subsurface conditions represented in the plans was reasonable, the contractor is entitled to an equitable adjustment under the changes clause. See: Foster Constr. C.A. WilliamsBros. Co. v. United States, 435 F.2d at 887-888.
3. Facts
The Court received testimony from many witnesses concerning the extra costs of excavation (Messrs. Thompson, Scala, McGoldrick, Cunningham and McEnery).
The sum total of their testimony as it relates solely to the overburden excavation would seem to include the following:
The contract for excavation was a unit price to excavate a certain quantity of overburden. It required the contractor to determine prior to bid the amount of mud, sand and soil that would have to be excavated at each cofferdam in order to provide an area for either the laying of the tremie on bedrock or in placing the tremie at the bottom of the cofferdam over the piles driven at or near bedrock to serve as a base for dewatering the cofferdam. The time that it would take to excavate the material was the basis for allocating a cost for that excavation. The usual method for a contractor to excavate the kind of material as shown by the plans and specifications and the borings taken by the owner, i.e., RIDOT, was clamshell buckets, some with and some without teeth. RIDOT approved the various buckets for use in excavating the subsurface overburden. In determining what price would be associated with the removal, the contractor would have to determine how long it was going to take him to excavate the materials that were subsurface and in the bay bottom. This contractor estimated that using buckets, it would take him approximately so many hours, excavating at the rate of 120 c.y. per shift, to excavate that material. Using that estimate, he established the cost of excavating that material.
The testimony further indicated that excavation rate was a reasonable one and was a rate that was very well attainable in the field in this kind of subsurface material. In the field, however, the contractor was only able to obtain at piers 20 and 12 a rate of 70 c.y. per shift. For the cofferdam 15 through 19 inclusive, the rate was approximately one-half that 70 c.y. per shift or, namely, 35 c.y. per shift.
4. Extra costs
As this item was broken out from the extra excavation costs, testimony was received concerning what rate was attainable in pier 12 and pier 20. Although the composite rate of 120 c.y. per shift had been established, the testimony indicated that both at pier 20 and pier 12, CFF was able to excavate at the rate of 70 c.y. per shift. An examination of Exhibit 13 of those two separate piers would indicate that pier 20 is the shallowest and contains very little overburden to be excavated and pier 12 is not an excavation to bedrock, but really is an excavation in the bay bottom for a nonstructural tremie. Piles supporting the bridge were to be driven in that cofferdam to support the pier 12 footings and pier shaft to support the superstructure. Pier 12 was one of the deepest, if not the deepest, pier covered by the contract. The rate of excavation is always affected by the depth of the elevation. A composite rate of excavation is really an average rate of excavation carried across the several piers. One, on a visual inspection of Exhibit 13, would be forced to come to the conclusion that the highest rate of excavating the overburden at any of the piers would be in pier 20 since the bucket did not have to travel far and since the amount to be excavated was actually relatively small. In other words, that high rate of excavation would be offset against slower rates of excavation at the deeper piers where the bucket cycle would be much greater in time. There was another factor that the Court considered on this issue. Testimony was taken concerning a measured mile, but all of the testimony indicated to the Court that all of the piers were impacted by the condition of the soil and, although at pier 20 and at pier 12 substantially all of the excavation was done by the clamshell bucket, there was no true measured mile, i.e. an area where the soil problem was not present. We have an impacted measured mile. The Court, in this section, is asked to consider whether it will grant damages based upon the measured mile concept. It is true that the literature referred to by the experts supports a measured mile concept to determine damages. It is sometimes called the detailed cost claim. The difference between the measured mile rate and the rate at piers 15 through 19 inclusive establishes a detailed cost claim. The Court is not willing, on the basis of the testimony concerning pier 12 and pier 20, to consider that a measured mile. For the purpose of using detailed cost analysis, the Court rejects that method of establishing damages. The Court, however, does believe that the evidence presented sustains the Court concluding:
a) That the estimate contained in the bid of an excavation rate of 120 c.y. per shift was a responsible, reasonable and attainable rate of excavation. John Fowler, Harvey Cunningham and David Thompson all gave testimony that such rate was not only reasonable but attainable.
b) That the condition encountered in the field was substantially different than a reasonable contractor ought to have anticipated at the time of the making of his bid, in that while the substance appeared to be the same, that it behaved differently, i.e., it became difficult to penetrate it when it was in a confined area, namely, the bottom of the cofferdam. When it was ultimately penetrated with the clamshell bucket, it became very liquid and would flow back out of the bucket as the bucket had to make the cycle up to the surface and to the waiting barges.
c) That the contractor relied upon the pre-bid information contained in the plans and specifications to its detriment . . . i.e., contractor failed to achieve the reasonable rate of excavation, namely, 120 c.y. per shift. The time and the work necessary to excavate at the lower rate increased the contractor's costs to do this excavation work and therefore he is entitled to adjustment under the changed conditions clause of the contract.
While rejecting the measured mile detailed cost analysis for proof of changes, the Court believes that this claim should be handled in its entirety under the inefficiency claim and that any delay costs associated therewith should be handled under the delay portion of the plaintiff's brief. It is for this reason that the Court is awarding no monetary amount under this section of the Court's decision and will take them up later on as part of the inefficiency and delay sections of this decision.
E. (4) LAND EXCAVATION
REFERENCE: Land Excavation — CFF Brief Section, Extra Excavation Cost, E(4), p. 72, Land Excavation
1. Statement of claim
CFF is entitled to be compensated for excavating rock at the land piers on Jamestown and for re-excavation caused by the cement delay.
2. Legal basis
The land excavation specifications differentiated between rock and overburden excavation. Rock was a separate pay item. If rock was excavated CFF was entitled to be paid under the rock category.
Additional re-excavation work was required because there was a substantial delay once the excavation took place between its being ready for the pouring of tremies and the time that the cement was available to accomplish that work. This required new work on the site to prepare the land piers to receive the cement.
3. Facts
The facts with regard to land excavation are not seriously disputed by RIDOT. RIDOT has in its testimony before the Court indicated that rock excavation is a separate line item, that the excavation at the land piers was performed by the contractor. It does not contest the amount of the claim, namely $47,360.00 as being fair and reasonable.
4. Findings of fact
The Court finds on the evidence before it that the sum of $47,360 was due for the original rock excavation per the contract at the land piers. The Court adopts plaintiff's Findings of Fact at page 30 of plaintiff's Proposed Findings of Fact.
F. DELAYED CEMENT APPROVAL
REFERENCE: Delayed Cement Approval — CFF Brief, Section III, F, Delayed Cement Approval, p. 75; RIDOT Brief, section labeled Alkali Cement Issue.
1. Statement of claim
CFF is entitled to recover the extra cost and delay resulting from its inability to commence concrete operations on Jamestown by reason of RIDOT'S indecision relating to the cement alkalinity issue.
2. Legal basis
If the owner, in this case RIDOT, requires a contractor to use material meeting particular specifications, the owner warrants the material is reasonably available. Blought Bros.Corp. v. United States, 872 F.2d 1003 (Fed. Cir. 1989). A specification requiring a particular material that is not reasonably available is defective. Id. at 1007 (Cost aggregate specifications were defective since it was commercially impracticable to locate specified aggregate.)
An owner must act reasonably and promptly to correct specification defects, either by modifying the specifications or bearing the extra cost of meeting the unreasonable specification. If the owner fails to act reasonably or delays the decision, the owner is responsible for the contractor's costs and the delays.See, Kepner Plastics, 82-1 B.C.A. § 15,792 at 78,228.
3. Facts
RIDOT in its contract specified a "special" cement for use in the substructure concrete (Exhibit 268 at pg. 8420C1-22, as amended by addenda 2 and 3.) As initially specified the special cement had to be type II with a .5% maximum alkali content, 7% maximum tricalcium aluminate content and heat of hydration not to exceed 70 cal./gram at 7 days. An addenda resulted after the pre-bid conference wherein RIDOT increased the maximum alkali content to .6%.
Immemorializing the increased maximum alkali content RIDOT included a price adjustment clause "to insure adequate compensation for the unpredictable cost" and to "assure more realistic bidding and encourage competition". The price adjustment clause established $67 per ton as the contract base price from which cement price increases or decreases would be calculated. RIDOT arrived at the $67 per ton figure from quotes it received from Lehigh Courtman Cement Company and Independent Cement Corporation. Lehigh warned RIDOT to anticipate considerably higher prices than $67 per ton because of the special cement requirements. RIDOT did not pass along this warning to any of the perspective bidders. Lehigh and Independent Cement quotes and thus RIDOT'S base price were based upon F.O.B. Providence terminal, that is the cost of shipping the cement to Providence was to be included in the contract based price.
All bidders had been told to supply a special cement with a maximum alkali content of .6%, that .6% alkali cement was readily available in the northeast, that bidders should use $67 per ton as a base price and that RIDOT would pay the successful bidder during construction the going rate of the special cement at the Providence terminal.
RIDOT'S brief in this area completely misses the point. RIDOT talks about CFF's obligation to see whether this cement was readily available in the northeast, that some obligation was imposed upon the contractor under this contract to make certain that this special cement was available in the northeast before bidding the contract. This completely misses the point. The point is that RIDOT predetermined the kind of cement that was going to be used in making the concrete for this bridge. It determined the exact nature, the content, the tricalcium content and alkali content and indicated in putting it in its specification that impliedly, if not specifically in this case, it was available F.O.B. Providence at $67 per ton. In order to eliminate jockeying and seeking out where the bidders could obtain this cement, RIDOT devised a plan where they all would have a base price and, that should there be a fluctuation in that price, all would use $67 and RIDOT would either accept the decrease or pay for the increase at the time of the purchase of the cement necessary to fulfill the terms of this contract.
In this particular instance the problem was magnified and compounded because of the attitude of those in charge of doing one of two things. Either agreeing that they would pay the difference to transport the special cement which was available in the industry and which could be shipped to Providence in sufficient quantity from other sections of the country, or to change the specification.
RIDOT wrongfully interpreted "F.O.B. Providence" to mean that the contractor was responsible for the cost of bringing to Providence the cement necessary to fulfill this particular contract. It maintained that rigid position, refusing to increase the alkali content of its cement even though Steven Clark, RIDOT'S material engineer, acknowledged that changing the alkali specifications to .7% would present no problem with Tilcon-Gammino's aggregates and that SP and T.Y. Lin also agreed that there was no engineering basis to deny a change to .7% alkali content.
CFF had informally informed RIDOT in August and September that .6% alkali content cement was not available in the northeast, that it could be obtained and transported to Rhode Island from Michigan. Throughout that winter RIDOT refused, despite the advice of its chief engineer, its design engineers and design consultants concerning their opinion that moving from .6% to .7% would have no effect upon the cement and insisted that CFF abide by the terms of the contract as written.
A formal written notification of the request for change was dated September 25, 1985. This dispute had been going on for the better part of 4 to 6 weeks when a formal request was made. Throughout that entire winter RIDOT steadfastly stuck to its interpretation of the contract and refused to permit variance from the terms of the contract. It was not until CFF obtained a commitment from Michigan to have the cement delivered F.O.B. Providence and submitted a change order for $582,000.00 that RIDOT, after checking with its legal counsel, changed its position and permitted the alkali content to go from .6% to .7%. Legal counsel had informed them that RIDOT would be responsible to pay the additional cost to bring the cement to the Providence terminal. It was then and only then that RIDOT directed that CFF not abide by the terms of the contract and in March of 1986 increased from .6% to .7% the alkali content of the cement.
This delay was further compounded because it was not until the latter part of April that the cement was produced and became available for use by CFF.
It is interesting to note that Mr. Kirby of RIDOT, after doing an about face on the alkali content, informed CFF that it would grant the change from .6% to .7% but only if CFF agreed to waive any delay claims. CFF refused to waive any delay claims, advised RIDOT that it would not waive any delay claims after months of this type of negotiation. CFF informed RIDOT that it was going to abide by the terms of the contract and bill the State of Rhode Island for the additional $582,000.00 required to bring the cement to the Providence terminal.
Then and only then did RIDOT inform CFF "you will not, repeatwill not proceed with the contract as written (Exhibit 64 at pg. 92).
It was not until March 13, 1986 (nearly 7 months after CFF's initial request), that RIDOT allowed the increase to .7% and acknowledged that the parties would work out claims later. CFF immediately ordered the cement from Independent Cement. It was the end of April before the cement was available and could be used in the substructure work.
4. Extra cost
CFF seeks only the sum of $21,747.00 as re-excavation expense incurred on Jamestown on the land piers in its suit. Since Moseman, the subcontractor, had contracted to do the superstructure work and since the superstructure work was dependent upon the substructure work which was delayed 7 months, the impact of this delay will be addressed as part of Moseman's claim against RIDOT.
5. Findings of fact
The Court adopts as its own each of the Findings of Fact enumerated under the Delayed Cement Approval numbered 1 through 18 inclusive at page 32 of the plaintiff's Proposed Findings of Fact.
G. PIER 16 TREMIE
REFERENCE: Pier 16 Tremie — CFF Brief, Section III, G, p. 86; RIDOT Brief, section labeled Pier 16.
1. Statement of claim
CFF is entitled to be paid for the pier 16 tremie remedial work resulting from the construction methods imposed on the contractor by RIDOT.
2. Legal basis
Construction methods are generally the province of the contractor. See, e.g., G C Enterprises, Inc., 89-1 B.C.A. (CCH) § 21,556, at 108,539-41 (January 25, 1989). If an owner chooses to specify the construction method, the owner warrants that, if followed, it will produce a satisfactory result. See,Cinusa Constr., Inc., 85-3 B.C.A. (CCH) § 18,258, at 91,672-73 (July 24, 1985).
3. Facts
In preparing for the pier 16 tremie placement, CFF evacuated and cleaned the sound bedrock to RIDOT'S approval. On Monday, June 30, 1986, CFF again cleaned the bottom of the pier 16 cofferdam with an airlift. On Tuesday, July 1, 1986, CFF placed thermal curing cooling pipes and tremie pipe equipment. On Wednesday, July 2, 1986, at at 6 A.M. approximately 36 hours after final cleaning, CFF started its pour. During the concrete placement, CFF took regular soundings to monitor concrete flow and embedment of the tremie pipe to ensure that the tremie pipe seal was not lost. CFF lost the seal on the tremie pipe only once during the tremie placement. In accordance with the special provisions CFF resealed the pipe and re-entered the fresh concrete immediately. While none of RIDOT'S inspectors noted any loss of seal, Graham Ray agreed at trial time that he was made aware only of one tremie pipe seal loss on pier 16 tremie placement. Contemporaneous with the pour, the only noted deficiencies with pier 16 tremie placements related to concrete delivery problems. (After RIDOT became aware of the tremie problem, additional memoranda were generated noting other irregularities but in a nonspecific way. RIDOT presented no witnesses who observed any problems with CFF's pier 16 tremie placement.)
Post-placement concrete coring showed that the pier 16 tremie contained weak concrete zones and lack of interface between the concrete and the bedrock. RIDOT alleged that the weak zones and interface problems were caused by CFF's failure to comply with RIDOT'S specifications and that therefore the remedial costs were the responsibility of CFF. CFF on the other hand argues that it followed RIDOT'S specifications and as a result of following the specifications the problems resulted. The specifications caused the problem and therefore RIDOT had breached its warranty to the contractor that by following its specifications the pour would be successful; therefore the liability for the remedial steps falls upon RIDOT.
It is at this juncture that the Court must briefly set out, from a construction point of view, what is involved in pouring the so-called concrete tremie.
Tremie concrete is concrete placed under water. To avoid segregation of the various concrete components (e.g., cement, coarse aggregate, fine aggregate) that results from pouring concrete through water, the concrete is generally placed with what is called a tremie pipe. A tremie pipe is an apparatus for depositing and consolidating concrete under water, essentially a tube of wood or sheet metal with a hopperlike top. The tremie pipe is usually handled by a large crane. The pipe is sealed, filled with concrete and placed on the bottom of the cofferdam. The seal is released and the pipe is lifted a few inches to permit concrete to flow out the bottom of the pipe and to envelope the lower end of the pipe in concrete. The remaining concrete is placed through the tremie pipe within the previously placed concrete.
The concrete that is exposed to water results in laitance. Laitance is cementious material that is washed out of the concrete resulting in reduced strength. For that reason, the concrete placement is continued until the top surface (where the laitance accumulates) is above the required elevation of the plan tremie foundation so that the laitance can be removed leaving good concrete. The contractor attempts to minimize the amount of laitance that is incorporated (or trapped) in the concrete mass because that creates weak zones in the concrete.
There are essentially two methods of placing concrete with tremie pipes, the advancing slope method and the uniform horizontal rise or simultaneous charge method. Both methods require concrete that has good flowability to ensure that the concrete spreads well. Flow distances are generally restricted to 50 ft. although distances 2 to 3 times the thickness of the tremie are also permitted. The spacing of tremie pipes is usually 15 ft. on center although larger spacing is utilized for larger cofferdams.
The horizontal rise method or simultaneous charge method is generally utilized in smaller dams that can be placed with a single pipe placement. If this method is used in larger cofferdams where pipe spacing requirements result in multiple pipes, the horizontal rise method requires simultaneous charging of multiple pipes. This results in the top surface of the tremie concrete being brought up nearly horizontally. Because multiple pipes are used, however, there are multiple concrete surfaces flowing towards one another; this method may result in "interfolding" which traps the laitance in the concrete.
An established treatise, Tremie Concrete for Bridge Piers and Other Massive Underwater Placements, FHWA/RD-81/153, a September 1981 report by Ben C. Gerwick, Jr., Terrence C. Holland and G. Juri Komendant (the FHWA Tremie Report) notes as follows:
 "Additionally, the problem of laitance accumulation should be considered. Placements involving simultaneous starting of tremies offer the potential for laitance accumulation at all intersecting faces of the concrete. The advancing slope technique forces laitance towards the end where it may be collected and removed."
The advancing slope method calls for the contractor to begin the concrete placement at one end of the cofferdam and to charge one tremie pipe until it reaches the approximate top elevation. The contractor then either relocates the tremie pipe into fresh concrete in accordance with the spacing specifications or charges a second previously placed tremie pipe once enveloped with fresh concrete. These methods are repeated as often as necessary to bring the entire tremie up to the final elevation.
The main advantage of the advancing slope method keeps the laitance on the upper, leading edge of the fluid concrete mass as it advances across the cofferdam. The laitance on the surface is pushed towards the end of the cofferdam and to the top of the surface by the advancing slope. The laitance can then be removed with airlifts or chipped out after dewatering of the cofferdam since it is only on the exposed surfaces of the concrete mass. By not charging the adjacent pipes until they are enveloped with fresh concrete, the method avoids interfaces between two separate sources of concrete.
Various factors are considered by the contractor in selecting the method of placement: (1) the size of the mass, that is the concrete tremie, width, length and depth; (2) the nature of the tremie, that is whether the tremie be a structural or a nonstructural tremie.
It is important for the contractor to distinguish between structural and nonstructural tremies. At the Jamestown Bridge piers 15 through 20 were all structural tremies, that is they were weight bearing tremies. The weight was transferred to the footings, then to the tremie and finally through the tremie to the bedrock. These structural tremies were all anchored on bedrock. On the other hand, the tremies at pier 12 and 13 were nonstructural tremies, that is the weight of the structure was not borne by the tremies. The weight was transferred through the footing to the piles which were driven to refusal or to bedrock. The sole purpose of a nonstructural tremie is to permit the dewatering of the dam. These are considerations that dictate the contractor's desire to obtain the best and strongest tremie. Where the tremie is structural it bears the weight of the span and therefore this is a consideration in determining what method will be used in pouring the tremie. If the tremie is structural, weak zones caused by trapped laitance may affect the structural integrity of the foundation.
In the case at hand the contract documents did not specify a placement method. Generally, the placement method is left with the contractor, taking into consideration the aforementioned factors. As the contract was originally or initially written, RIDOT adopted FHWA's tremie report guide specifications of a 50 ft. maximum concrete flow distance as contained in Exhibit 270 at pg. 136, § 1.75 and Exhibit 268 at pg. 8420 C1-45. The original specification did not contain any restriction whatsoever on the pipe spacing. After the pre-bid conference a communication from FHWA asked RIDOT to "indicate the basis for the 50 ft. specified for maximum concrete flow distance". SP asked HNTB, but not T.Y. Lin, about the 50 ft. distance specification. In doing so, however, SP indicated that FHWA "questioned the special provisions on the tremie trunk spacing spread of 50 ft.". Based on this misunderstanding, SP and HNTB agreed that the specifications should be "modified" to 15 ft. and RIDOT made the change as part of Addendum No. 3, issued November 30, 1984.
In effect, this Addenda replaced the flow distance specification with a 15 ft. pipe spacing specification. In addition to the pipe spacing, the special provisions required minimum placement rates and the Blue Book required the top of the concrete surface to be raised as nearly horizontal as practical.
At the letting of the contract, the specifications apparently left the choice of method to the contractor. CFF decided to use the advancing slope method for the placement of its tremie. It arrived at this method after considering the structural nature, the plan size and the thickness of the various tremies.
The pier 15 through 20 cofferdams were identical in length (47 ft.) and width (27 ft.). CFF's initial underwater placement procedure submittal for piers 15 through 20 utilized three pipes along the longitudinal center line of the cofferdam (Exhibit 207; Exhibit 82 at pg. 26). The pipes complied with the spacing requirements. There were no flow distance requirements but the plan would easily comply with the 50 ft. limitation. CFF had planned to charge an end pipe until the concrete reached plan top of tremie elevation and enveloped at least the next pipe if not both of the other two pipes. CFF then would charge the next pipe until the concrete engulfed the next pipe and reached the planned elevation. This process would be repeated until the tremie seal was at the planned elevation. This was an application of the advancing slope method for placement of the tremie.
At this point, for reasons which are not apparent on the record, RIDOT forwarded CFF's underwater placement procedures to T.Y. Lin. T.Y. Lin had not been involved until this point and had not had any input in establishing the 15 ft. spacing between tremie pipes. T. Y Lin then advised RIDOT that the 15 ft. spacing requirement imposed a requirement of a 7 1/2 ft. flow distance restriction. This was testified to by Redfield at page 123, 124 of his transcript. T.Y. Lin disapproved of CFF's procedure and indicated that since there was a 7 1/2 ft. flow distance restriction, there would be six pipes in each cofferdam so that the pipe would be 7 1/2 ft. from the perimeter of the cofferdam. T.Y. Lin recommended and RIDOT adopted the flow restriction and the placing of six pipes. They also directed that the six pipes would be charged simultaneously even though the specifications contained no such requirements. In other words, T.Y. Lin adopted a horizontal rise method or a simultaneous charge method rather than an advancing slope method for the placement of this tremie and further modified by its directive the 15 ft. tremie pipes on center.
A problem arose because RIDOT was well aware that CFF had only one source of concrete. RIDOT therefore modified the simultaneous charging of the six tremie pipes to charging with concrete these pipes in succession and established a time schedule to move from one pipe to the other pipe. RIDOT imposed, in effect, a modified simultaneous charge method to achieve a uniform horizontal rise. Since the tremie at pier 16 was a structural tremie, the method imposed upon the contractor posed problems. The method adopted by RIDOT results in the placement of small amounts of concrete in each pipe. These six mounds of concrete move out towards one another until they meet or "interface". All faces have concrete on the surface that is exposed to water and contains laitance. When the faces meet, there is a tendency to fold over one another trapping laitance. As noted, that is a known risk of using the simultaneous charge method. It is exactly what occurred on this job.
The continuity of concrete placement in the tremie hoppers and the flowability of the tremie concrete are also important factors in the successful placement of the tremie, albeit less so than the placement method. Continuity of concrete placement is important because interruptions of the concrete placement can affect the flowability of the concrete. With a sustained charging of one pipe at a time, as with the advanced slope method, the contractor is better able to insure that the previously placed concrete remains flowable. Requiring the contractor to charge as many as six pipes simultaneously or in sequence increases the risk that the previously placed concrete will not remain in a flowable condition because of the interruption in adding concrete.
Similarly restrictions on the tremie concrete mix can impact a successful placement. For example, the size of the coarse aggregate and the allowable concrete slump influence flowability.
In this case, by specification, RIDOT required CFF to use a Class A concrete in the tremie. RIDOT'S Class A tremie concrete specification was a maximum of 1 1/2 inch for the coarse aggregate and a concrete slump of 2 to 3 inches. RIDOT, upon CFF's request, modified the Class A concrete mix making it a 50/50 mix of 1 1/2 and 3/4 inch designated maximum size for the coarse mix. It was this modified mix that was used in the placement of the pier 16 tremie.
When it came time for CFF to place the pier 16 tremie, RIDOT had designated the maximum pipe spacings, the number of pipes per cofferdam, the maximum flow distance, the rate of concrete rise, the angle of the concrete rise, the class of concrete, the designated maximum size coarse aggregate and the concrete slump and additional less significant factors. In addition, RIDOT controlled the continuity of concrete deliveries to the hoppers by its interpretation of the 90 minute concrete delivery time limit in the standard specifications. CFF could not control any of the critical factors that contribute to a successful tremie placement.
At trial the preponderance of the evidence before the Court shows that CFF followed all of RIDOT'S specifications and directives. It spaced the tremie pipes no more than 15 ft. apart; it limited the concrete flow distances to 7 1/2 ft. and charged all six pipes in accordance with T.Y. Lin's and RIDOT'S post-contract directives; a .69 ft. per hour placement rate exceeded the .5 ft. per hour minimum rate of rise requirement; it used RIDOT'S modified Class A tremie mix with a 50/50 mix maximum size coarse aggregate and a slump of 6 inches as was approved by RIDOT.
The one problem mentioned immediately after the pier 16 tremie placement dealt with the continuity of delivery of concrete to the hopper. The 90 minute requirement comes from the Blue Book (601.03.4) which I quote as follows:
 Mix concrete from the central mixing plant shall be transported in truck mixers, truck agitators or nonagitating trucks having special bodies. The time elapsing from the time water is added to the mix until the concrete is deposited in place at the site of the work shall not exceed 30 minutes when the concrete is hauled in nonagitating trucks, nor 90 minutes when hauled in truck mixers or truck agitators. These time limits may be exceeded by a reasonable period of time when, in the opinion of the engineer, such additional time would not be detrimental to the quality of the concrete.
CFF had made two prior trial runs and determined that from the time that water was added to the concrete at the plant to the time that it would be delivered to the hoppers at pier 16, the elapsed time would be approximately 63 minutes. Considering a time for unforeseen events, there appeared to be a sufficient margin for error in the 90 minute placement factor and so prepared its plans and submitted them to RIDOT accepting, if you were, the 90 minute limitation.
When, however, the actual continuous run of maintaining continuity in the placement at pier 16 in fact began at 6 A.M. The morning of July 2, 1986, RIDOT was rigid in its position that it would allow no concrete to be placed if it could not be placed prior to the 90 minute limitation. This rigidity in time limitation resulted in rejecting concrete that was on the causeway prior to the running of the 90 minutes because it was estimated that it could not be placed on the barge and transported to the middle of the bay at pier 16 for placement within that 90 minute limitation. The notes which were taken at the meeting shortly after the pier 16 placement indicates that all who were in the field dealing with this problem of continuity of delivery of cement to the hoppers were convinced that the concrete that was rejected looked pretty good. Stated another way, all agreed that the concrete that was rejected was in fact good concrete but that the 90 minute limitation would not permit it being placed.
In other words, the resident engineer would not examine each truck load of cement where the 90 minute time limit had passed to determine its suitability for placement. RIDOT interpreted the specifications in such a way that no concrete regardless of its suitability or quality after 90 minutes could be placed. This interpretation is at variance with RIDOT'S own specifications and own standards governing the resident engineer's obligations in the field. The resident engineer and the resident engineer only has the right to make the determination after 90 minutes concerning each load of concrete. RIDOT'S instructions to the resident engineer was that in no circumstances could concrete over 90 minutes be placed in the tremie.
George Tamaro, an expert who testified on behalf of CFF and who was engaged to determine the remedial procedures at pier 16, testified before the Court that once a pour begins on large tremie masses, it is better to place marginal concrete than it is to interrupt the continuity of the delivery of concrete to tremie pipes. It would seem therefore to follow that if there was a lack of continuity in the charging of the six pipes in tremie 16, the major reason for that interruption rests with the interpretation placed upon the specifications by RIDOT and in RIDOT'S not following those specifications to make an independent determination as to whether the time limit of 90 minutes ought to be exceeded for two reasons. First, the concrete was good. All parties after the fact indicated that the rejected concrete looked good. And, secondly that continuity ought to have been maintained once the pour began. At pier 16, 1504 c.y. of concrete was to be poured in that tremie in 25 hours. That was the plan. Thirty trucks, or approximately 300 c.y., twenty percent (20%) of the concrete mass determined by everyone to be good concrete, was rejected by RIDOT under the provisions of the 90 minute limitation. In the Court's judgment this was poor practice, it was not called for under the terms of the specifications and it deprived pier 16, the very first tremie pour, of continuity of concrete flowing to the hoppers. RIDOT and RIDOT only was responsible for the rejection and the interruption of continuity.
And so the concrete as poured in the pier 16 tremie begins to set during the time that critiques have been under way. And after the passage of a short time, tremie cores are taken and for the first time it is revealed that there are defects in the tremie. Namely, (1) there are multiple weak zones throughout the tremie and (2) there appears to be an interface, that is a space between part of the bottom of the tremie and the top of the bedrock. This disclosure required the services of George Tamaro, an expert who was brought in to assist in determining: first, how to correct what was a defective tremie and second, to determine why the pour was defective.
Muesser-Rutledge, George Tamaro's employer, was engaged to provide expert help to remedy the defect and to identify the problem. The company produced a plan to fix the defective seal at pier 16. This plan was approved by RIDOT and rehabilitation of the pier 16 defective pour was undertaken.
CFF had indicated in a communication to RIDOT that they were investigating what went wrong and that they were putting RIDOT on notice that at some time in the future they would consider the possibility of filing a claim under the specifications set out in the contract between the parties. At trial, it was conceded by CFF through Mr. McEnery that at no time did CFF ever file a formal letter under the appropriate specification contained in the contract.
CFF maintains, in pressing its claim before the Court for recovery of damages against RIDOT, that the purpose of notifying RIDOT in writing under the contract of a potential claim has been satisfied in this case because RIDOT participated in approving the plan to correct it and had an opportunity to monitor the cost of bringing that plan to fruition. RIDOT maintained a file concerning the remedial cost and did in fact assist and monitor and approve the plan for corrective action.
The contract provision concerning claims provides:
 105.17-Claims for Adjustments and Disputes. If, in any case the contractor deems that additional compensation is due him for work or material not clearly covered in the contract or not ordered by the engineer as extra work as herein defined, the contractor shall notify the engineer in writing of his intention to make claim for such additional compensation before he begins the work on which he basis the claim. If such notification is not given, and the engineer is not afforded proper facilities by the contractor for keeping strict account of the actual costs required, then the contractor hereby agrees to waive any claim for such additional compensation. . . .
CFF maintains in this suit that the notification of a possible claim was given, that RIDOT had the opportunity to monitor and keep strict account of the costs required, that the notification was prior to the beginning of the remedial repairs and that the approval for those repairs was made by RIDOT. CFF further maintains that there has been no showing of any prejudice resulting to the State of Rhode Island for the technical failure to give this notice in writing as required by § 105.17 of the contract and that in any event the filing of the suit by CFF seeking damages for these repairs prior to the contract or agreement of termination is a formal notice equivalent to 105.17.
This Court agrees that form should not be made superior to substance, that each of the parties were aware of the defective tremie, that each was interested in obtaining expert opinion as to why and as to how the defective pour came about, that RIDOT had every opportunity to participate prior to the incurring of any obligation by CFF to repair the tremie and the cost thereof. The failure to give formal notice under 105.17 is not a waiver in this instance of a claim for the remedial work necessary to cure the defect at pier 16 tremie.
Judging the weight and credibility of expert opinion again comes into play. CFF's expert, George Tamaro, conducted an extensive review of the pier 16 tremie. He visited the job site several times just after the tremie placement, participated in the investigation of the tremie problems, formulated the tremie remedial procedures, conducted an extensive post-job analysis of the weak zones and bedrock interface and reviewed hundreds of job records including videotapes. Based on his extensive review he ultimately concluded that:
a) the weak zones were the result of laitance trapped by reason of the placement method; and
b) the lack of interface was the result of the boney mix, lack of flowability and the configuration of the rock upon which the pour was being made. (Tamaro transcript, 4/17/91, at page 9-10, 22-30).
On the other hand, RIDOT'S expert, Fioravante Bares, who was not present during the job, did not assist in formulating the remedial plans, and did not investigate the pier 16 concrete coring patterns, was permitted to give his opinion concerning the problems at pier 16 tremie. He believed the weak zones were caused by losses of the tremie pipe seals and the inability of the freshly placed concrete to displace the older concrete. He also speculated that CFF's failure to seal the spaces between the sheet piles allowed debris to infiltrate the dam and cover the bottom. With this regard he relied upon a report, Exhibit B-132, filed by CFF's superintendent indicating that there was a 5 or 6 inch hole between the sheet plates south of the northeast corner of the pier 16 tremie. He omitted reference to another and later RIDOT inspection report indicating that CFF had patched this opening prior to the time of the tremie placement, July 2, 1986.
Mr. Tamaro had extensive experience in underwater emplacement of concrete; Mr. Bares had no previous experience with tremie concrete placement in a marine environment. Mr. Tamaro considered all of the physical facts. One of the physical facts which was most important to him was the location of the weak zones within the massive pour. The weak zones were at various elevations and were away from the tremie pipes and interspaced throughout the entire tremie mass at various elevations and depths. He believed that the evidence as to the weak zones was directly related to the overlapping of multiple surfaces of concrete as a result of the simultaneous chargings of the tremie pipes. It is to be remembered that when we use the words "simultaneous charging of the pipes" we are talking about a modified charging of the pipes since there was only one source of concrete. The pipes were successively charged. The schedule required that pipe one would be charged and thirty minutes later, after the remaining other five pipes were charged, one would be back at pipe one so that pipe one was charged for 5 minutes, pipe two for 5 minutes, pipe three for 5 minutes, and when you finish charging all six you then pick up again and follow that sequence so that in a sense while it is referred to by the parties in their memoranda as simultaneous charging, it was a modified simultaneous charging. Mr. Tamaro indicated that one of the major problems with simultaneous charging of tremie pipes is this meeting of the masses within the flow pattern. That the laitance become trapped where the masses overlap and cause weak spots throughout the tremie pipe. The literature bears him out. The physical results of his investigation indicate that the problem was not at the tremie pipe. On the other hand, Mr. Bares on his testimony indicated that the cause of the weak spots was the loss of the tremie seal. There is only one documented loss of the tremie seal during the pour and certainly one loss of the tremie seal could not possibly account for the multiple weak spots throughout the tremie mass. He also speculated that the fresh concrete when it was poured could not displace the older concrete. If this were so, the physical evidence remaining would require a looking for the weak spot at or around the tremie pipe. This again was not the physical evidence that was found in the investigation of the tremie. Mr. Bares further speculated that dirt had seeped in under the sheet metal, the sheeting, and was at the bottom when the tremie was poured. This again is not justified by the physical findings. First of all, the hole that he referred to in the sheeting was patched before the tremie was poured. Secondly, he referred to evidence of sheeting not being fully grounded but the video inspection of the bottom of the tremie conducted on the 30th of June or on the 26th of June clearly indicates that the sheeting is embedded and that there is no opportunity for seepage. The divers confirmed this. Again it was not until after Mr. Tamaro had reviewed these videos of the bottom, which although taken prior to the pour, were not made available to him until he was testifying before Judge Almeida.
Up until the time Mr. Tamaro viewed the videos of the cleaning of the bottom of the tremie, his conclusions were ambiguous. He too did some speculating concerning what the causes of the problem were. Once he viewed the videos, he emphatically said that the problem at the bottom of the tremie causing the interface problem related to the stiffness of the mix and the configuration of the rock upon which the pour was being made. He explained to the Court that as the stiff concrete cozed out over the rock, it had a tendency not to follow the configurations of the rock, but to adhere to itself so that the top and bottom of the concrete was enmeshed in water, that when the tremie kept moving forward instead of having laitance just on the top of the concrete, there was laitance accumulating on the bottom. It was this laitance that washed away causing the interface to become as wide as 6 to 12 inches. He attributes that to the stiffness of the mix, i.e., the coarse aggregate of the mix.
The Court was faced with judging the experts and evaluating their opinion against the physical facts and the literature on the subject. The Court has rejected Mr. Bares' explanation.
Number one, he was short on experience in underwater placements. His conclusions did not jibe with the facts as determined by the investigation, i.e., where the weak spots where. He did not, in the Court's judgment, adequately explain the loss of concrete at the bottom of the tremie at the interface. It is true that Mr. Tamaro originally thought that dirt in the bottom of the cofferdam had accumulated causing the interface; that when he inspected it, water under pressure injected into the mass while testing the integrity of the tremie had washed the dirt leaving the interface. It was not until he viewed the clean bottom, by way of video during the first trial, that he concluded that there was not sufficient time from the thorough cleaning of the bottom, the 26th of June, vis-a-viz, the 2nd of July, to have had 6 to 12 inches of debris seep in and clutter the bottom of the tremie. This conclusion is further warranted because on the 30th of June, there was an airlift cleaning of the bottom just before the pouring of the tremie. It seems to the Court that then by a process of elimination the cause had to be something else. Mr. Tamaro explained that the only other possible way for that interface to have taken place would have been as a result of the coarseness of the cement.
The Court further was impressed by Mr. Tamaro's suggestion following his investigation as to how to cure the interface problem, for each of the tremies to be poured were being poured on irregular bedrock. His recommendation was to change the coarse aggregate in the cement. RIDOT agreed to the change and in all of the other tremies that were poured, there was no interface problem. In other words, there was no stiff aggregate at the bottom of the tremie to cause an overlapping of the concrete as it was being poured resulting in the space between the concrete and the bedrock. In addition, Mr. Tamaro recommended that an advancing slope method of placement of the concrete be utilized. RIDOT rejected this latter recommendation. Pier 14 and 16 were poured according to the directives and specifications laid down by RIDOT after conferring with T.Y. Lin at both piers 16 and 14. The weak spots through the tremie persisted. CFF defied RIDOT in pouring the tremie at pier 20. At pier 20, CFF used the advancing slope method to pour the tremie. Although RIDOT insisted on several corings before accepting pier 20 tremie, pier 20 tremie passed with flying colors. Pier 14, on the other hand, was replete with weak spots caused primarily by the multiple masses moving one toward another and trapping laitance within the concrete mass.
It is true that these experts testified after the fact and that as to Mr. Tamaro there are some inconsistencies in his in-court testimony, vis-a-viz, investigative reports which he made during the investigation. However, the Court finds his ultimate conclusions to be more than justified and I give great weight to his opinion concerning the problem and explanation as to why it happened and the evidence to sustain his conclusions subsequent to that pour with the recommendations' effect upon the future tremies, particularly tremie at piers 20 and 14. Pier 20, using the advancing slope method, was a good pour; pier 14, using the horizontal rise method, was a bad pour.
This Court holds that CFF followed the specifications laid down by RIDOT in pouring the pier 16 tremie. That in addition, RIDOT, and RIDOT alone, was responsible for the interruption of the charging of the hoppers, thus preventing a continuous charging of the hoppers by its wrongful rejection of good concrete. The Court further finds that RIDOT'S action was the sole cause of the failure of the contractor to be able to pour a satisfactory tremie at pier 16.
RIDOT had every opportunity to monitor the cost and to approve the corrective measures taken at pier 16; that they did, in fact, monitor the repairs and the costs at pier 16. No objection has been raised by RIDOT concerning the actual cost to remedy the problem at pier 16. Those costs are set out as part of two separate claims for damages.
a) The claim for damages resulting from the additional tremie pipes and the extra costs in complying with T.Y. Lin's six tremie pipes within that cofferdam, namely, the amount of $25,409.00 (Exhibit 180, Item 36).
b) The repair cost to rehabilitate the tremie of $976,260.00 as set forth in Exhibit 180, Item 18.
c) There is also a noncontested delay claim set out in Exhibit 173 in the total calendar days of 290. Likewise, RIDOT does not contest this additional delay time and is also an element of the contractor's delay damage claim.
4. Findings of fact
The Court substantially adopts each and all of the Findings of Fact set out in the plaintiff's Proposed Findings of Fact memoranda starting at page 36-47 and numbered 1 through 39, inclusive.
While this decision does not in each and every circumstance cover all the Proposed Findings of Fact, the matters set forth herein support all of those Findings of Fact and the Court adopts them as its own.
H. PIER 20 TREMIE
REFERENCE: Pier 20 Tremie — CFF Brief, Section III, H, p. 109; RIDOT Brief, section labeled Additional Cost, Pier 20.
1. Statement of claim
CFF is entitled to be paid the cost of extra coring required by RIDOT at pier 20.
2. Legal basis
Section 105.11 of the standard specification provides in part as follows:
 "If the engineer requests it, the contractor, at any time before acceptance of the work, shall remove or uncover such portions of the finish work as may be directed. After examination, the contractor shall restore said portions of the work to the standard required by the specifications. Should the work thus be exposed or examined prove acceptable, the uncovering, or removing, and the replacing of the covering or making good of the parts removed will be paid for as extra work; but should the work so exposed or examined prove unacceptable, the uncovering or removing and the replacing of the covering or making good of the parts removed, will be at the contractor's expense."
Under this specification, RIDOT had the contractual right to require CFF to perform extra work to satisfy RIDOT'S inspectors that the quality of CFF's work met contract requirements. However, if the extra work demonstrated that CFF's work conformed to the specifications, RIDOT was required to pay the contractor for the extra work.
3. Facts
Fresh from the disastrous pour at pier 16, CFF hastened to bring to fruition some of the recommendations which had been made by George Tamaro. One of the recommendations was to permit the use of the advancing slope method placing the tremie at pier 20. CFF requested that the flow distance limited to 7 1/2 ft. by T.Y. Lin and RIDOT be increased and that the distance between the tremie pipes be increased.
Charles Redfield of T.Y. Lin, commenting upon several of the requests made by CFF, indicated that "research of recent tremie literature (see REFERENCE 1) assures us that the flow distance of 15 ft. is acceptable". Charles Redfield, speaking for T.Y. Lin and RIDOT, however, refused to authorize the advancing slope method of placement as requested by CFF.
REFERENCE 1, referred to in Mr. Redfield's letter, was to the FHWA report of 1991, the report used by RIDOT in originally formalizing the tremie specifications. A review of that report would indicate that the authors were advancing programs for the use of the advancing slope method of placement and a flow distance for the concrete of 30 to 70 ft. The treatise cited by T.Y. Lin and referred to by Mr. Redfield indicated in several conclusions that very excellent concrete resulted from the slowing down of the time rate of the placement and extending the flow rate or flow distance to up to 70 ft.
Notwithstanding the clear conclusions of the very article cited by Redfield, T.Y. Lin and RIDOT extended only the tremie space to 21 ft. between pipes and a flow distance of up to 15 ft.
It seems that CFF was faced with a perceived problem. Its investigation of the pier 16 tremie indicated that it was the fault of the placement method that contributed to the weak zones at pier 16 tremie. Not wishing to have an additional failure at pier 20 tremie, CFF defied the objection of T.Y. Lin and used the advancing slope method of placement and placed the cement at pier 20 through the use of two tremie pipes.
It was at that time that RIDOT, relying upon this variation of the placement method, requested and received three cores of the tremie to determine whether the work was consistent with the requirements of the specification. The work was accepted by RIDOT. Demand was made by CFF for the expense incurred in providing the two additional corings. RIDOT contends it was justified because of the safety structure of the bridge and because of the recent failure at pier 16 to request the additional corings. This may very well have been the motive in seeking the additional corings, but clearly specifications § 105.11 makes no reference to whether the request is or is not justified, but merely indicates that, if the work is consistent with the requirements and extra work is requested, the contractor is entitled to the expense for the extra work.
The contractor is entitled to be compensated pursuant to the contract for the requested work.
RIDOT, in its brief, attempts to pass the cost of the additional coring on to CFF by alleging that there was some difficulty with the cores indicating the presence of water and that therefore the tremie was defective. Its own consultants agreed with CFF at the time that the presence of this water did not indicate that the core was unsatisfactory. It is inappropriate now to bring up this matter since its own consultant agreed with the integrity of the tremie core at pier 20. RIDOT also questions the amount of $18,843.00 during testimony before the Court. This amount as damages was agreed to by RIDOT'S own expert on the stand. This was the final figure. Mr. McGoldrick had given a lower figure of $4,517.75, but that figure did not include the allocation of the cost for equipment that was required to be present at the tremie during the additional corings. The $18,000+ figure was not contested and was agreed to. The claim in this case for that amount is allowed in full.
4. Findings of fact
The Court adopts the plaintiff's Findings of Fact listed as Pier 20 Tremie commencing at page 48 of its Proposed Findings of Fact for and as its own.
I. THERMAL CURING
REFERENCE: Thermal Curing — CFF Brief, Section III, I, p. 115; RIDOT Brief, section labeled Thermal Curing.
1. Statement of claim
CFF is entitled to recover the cost of thermal curing, the substructure and the tremies. These costs were not included in CFF's bid.
2. Legal basis
An owner, for the bid price, is only entitled to work specified in the contract documents. See, e.g., Com., Dept.of Transp. v. Gramar Constr. Co., 454 A.2d 1205, 1207-08 (Pa. 1983) If the documents are ambiguous as to what work is to be performed, the ambiguity is construed against the owner, BigChief Drilling Co. v. United States, 15 Ct. Cl. 295, 301 (1988), unless the ambiguity is patent.
3. Facts
The Jamestown-Verrazzano Bridge was the first prestressed, post-tension concrete box girder bridge to be built in Rhode Island (or New England for that matter). It was because of that fact that the designers were required to submit special specifications modifying or supplementing the standard specifications to the extent necessitated by their respective designs. The Rhode Island Blue Book, so-called, (Standard Specifications for Road and Bridge Construction) contained no provisions or specifications relating to this type of a structure. Each of the designers, T.Y. Lin and HNTB, adopted substantially the same method of amending, modifying or supplementing the Blue Book. The designers and their consultants went through the Blue Book section by section and modified, amended or supplemented the various provisions. It fell to SP, RIDOT'S coordinating design consultant, to review and synthesize special provisions in areas where the designs overlapped.
The Rhode Island Blue Book contains § 807 covering structural concrete masonry. It has specifications in that section for foundations, forming, concrete placement including placement under water, § 807.03.5(f) and curing concrete § 807.03.7 among other provisions. Both of the designers made modifications to § 807.
HNTB's special provisions, Code 807. 9901, Structural Concrete Masonry, modified the Blue Book, § 807, subsection by subsection. Although changes were made to the underwater placement, § 807.03.5(f), no thermal curing requirement was placed in the underwater placement section. Changes were likewise made in the curing section, § 807.03.7. In this section, however, HNTB required pier caps and footings (parts of the substructure) in piers 10, 11, 12 and 13 to be thermal cured as well as concrete in other massive pours defined as those with 5 x 5 x 5 ft. dimensions.
Industry standards at the time the amendments and modification of the Blue Book were being made, namely 1983-1984, did not require thermal curing of the tremies. It seems odd that if HNTB wanted the tremies to be thermally cured that it would not have said so since it required pier caps and footings which were part of the substructure to be so cured. The intent appears to be that HNTB intended to follow the industry standard of not thermal curing tremies.
The other contractor, T.Y. Lin, as it related to Blue Book, § 807, Standard Masonry, took a different approach. It divided § 807 into three separate sections covered by the special provisions. First, it wrote a separate section labeled Code 807. 9901, Concrete Seal. This section dealt exclusively with tremie seals in the cofferdams. It did not require thermal curing. Second, T.Y. Lin wrote a section labeled Code 807. 1150, Prestressing. Third, it wrote a section labeled Code 807. 1550, Structural Concrete Masonry. This section appears to apply to the superstructure only. It is divided into subparagraphs which are labeled submittals, materials, construction methods, methods of measurement and basis for payment. The thermal curing requirements appear in a sub-subparagraph of the subparagraph labeled Construction Methods. Everything in the subsection relates solely to the superstructure.
CFF bid the project based upon T.Y. Lin's special provisions for the concrete alternate. CFF included costs to thermally cure the superstructure only. Its bid carried no money to thermal cure the substructure or the tremies.
During the trial testimony was received from Charles Redfield, from McGoldrick and from Steven Chase of FHWA concerning whether the specifications required that the tremies and the substructure be thermally cured.
There is no question in the Court's mind that it was the purpose and the intent of FHWA to have the tremies thermally cured. The Federal Highway Agency had been conducting experiments or investigations during the early 1980's concerning this very issue. It was after that research that FHWA, upon review of the synthesized and modified specifications of the designers, inquired of RIDOT concerning the need for the thermal curing of the tremies. It was on October 31, 1984, after the specifications as written were out to bid, that FHWA wrote to RIDOT (Mr. Choppy) and inquired whether it was the intent of the specifications to include the tremies in the definition of massive pour. See Exhibit 171 at pages 3(A)-3(E). FHWA also required RIDOT to have T.Y. Lin specify in its Concrete Seal section (Volume 3, Code 807. 9901) how the heat of hydration was to be controlled. The relationship to the hot and cold parts of a concrete mass as large as the tremie is part of thermal curing and RIDOT was asked to inquire from T.Y. Lin how the heat of hydration was to be controlled. See page 3(E) of Exhibit 171. To break it down to its simplest forms, the Federal Highway Agency was confused by the specifications and was asking for a clarification concerning exactly what was meant by the specifications.
RIDOT'S consulting design engineer forwarded the inquiry to one of the designers, HNTB, but for some unknown reason did not forward the inquiry to T.Y. Lin despite the fact that a major portion of the inquiry was specifically directed towards T.Y. Lin. In replying to the inquiry made by SP, HNTB responded that tremies would be covered by HNTB's massive pour definitions. In other words, without referring specifically to parts of the substructure as they had done with footings and pier caps, HNTB extended the definition of massive pour to include tremies. No inquiry having been made of T.Y. Lin, no response obviously was given.
Evidently RIDOT accepted HNTB's explanation but made no changes in the specifications and the contract was already in the hands of the bidders but RIDOT did not notify any of the bidders concerning FHWA's inquiry of RIDOT and SP and HNTB's communications concerning FHWA's inquiry. It seems to the Court that when Steven Chase of the Federal Highway Agency testified, he clearly brought the problem into focus during litigation. He was asked in a series of questions as to whether thermal curing applied to tremies. He answered: "Yes, certain of the tremies." He then was asked: But you would agree that the fact that tremie concrete was discussed in one section of the specification and mass concrete was discussed in another section of the specifications could lead to some confusion? and he answered: Yes. The best position that RIDOT could be placed in would be that the specifications were confusing. They were not clear.
The Court has re-read the specifications. The Court has looked to the design of the Blue Book. The Court has looked to the method by which the designers complied with the obligation to modify, amend, supplement or alter the standard specifications. The Court is of the opinion that under the specifications as metered out in this contract there was no thermal curing required of the tremies or the substructure. The problem before the Court is would a reasonable bidder bidding T.Y. Lin's design for this bridge have or have not the obligation to include in its bid monies for thermal curing of the tremies or substructure. It's the Court's judgment that a reasonable bidder based upon the specifications would not have included such money. This is particularly true when the contra was true of the superstructure. The superstructure was required to be cured and a fair reading of the contract indicates that the superstructure was required to be cured. It is not so with the substructure including the tremies.
In the defense of this claim, RIDOT misses the boat. This is not a patent ambiguity. At best, the ambiguity, if any, would be an ambiguity not communicated, a question asked by FHWA, answered, never discussed, never communicated to any of the people who had the obligation of submitting a bid. And only after the fact, the best position that a neutral observer, the Federal Highway Agency, could come up with was that it could be confusing. That confusion arises in RIDOT'S attempt to say that the contractor had some obligation pre-bid to raise the problems concerning whether the tremies in the superstructure would be thermally cured. In other words, we didn't make it clear in our bid specifications and since we didn't make it clear in our bid specifications, you, Mr. contractor, as part of the pre-bid conference, had an obligation to bring it up or otherwise forfeit any claim when you relied upon the language of the specifications. As the Court has said, reading and knowing the history of the amendment and reading the fair language used, there was no obligation to thermally cure the substructure including the tremies.
In responding, the defendant, RIDOT, has failed to address the issues that come to the Court's mind. The Federal Highway Agency was confused by the specifications. It was interested, that is the Agency, in having the tremies thermally cured. It was part of a research program. No where was this communicated to the bidders. Neither was the concern of the Federal Highway Agency on T.Y. Lin's specifications communicated to T.Y. Lin. If thermal curing was to be required, it seems to the Court that when the section called Concrete Seal, which is really what a tremie is — it is the seal of the bottom of the cofferdam with concrete, made no mention of curing in that section none was required. It seems to the Court that this defendant has not addressed this issue, but seeks to avoid responsibility by indicating that this was a matter which should have been brought up in the pre-bid conference. The Court finds no merit in this defense. It finds that the claim of the contractor is a justified claim. The amount is not contested.
4. Extra costs
The cost set out again in Exhibit 180, item 7 and 8, the tremies' cost is $262,499.00 and the substructure, $54,349.00. These are the amounts which were expended by the contractor to perform the work of thermal curing the substructure and the tremies.
There is a delay related to the thermal curing of the tremies. That delay by piers is as follows:
 Pier 14 — 8 calendar days.
 Pier 15 — 7 calendar days.
 Pier 16 — 5 calendar days.
 Pier 20 — 4 calendar days.

The extra time in curing the substructure (footings, pedestals, shafts, and pier caps) is not included above but will be part of the claim for inefficiency set out in a later section.
5. Findings of fact
The Court substantially adopts each and all of the Findings of Fact set out in the plaintiff's Proposed Findings of Fact memoranda starting at page 48 and numbered 1 through 7, inclusive. However, the Court incorporates by reference and amends paragraph 7 of said Findings of Fact to change the amount to $18,843.00 rather than $8,843.00.
J. CONCRETE MIX DESIGN
REFERENCE: CFF Brief, Section III, J. p. 123; RIDOT Brief, section labeled Mix Design.
1. Statement of claim
CFF is entitled to recover the amounts expended on resolving what appeared to be a concrete strength problem but was, in fact, a specification problem. The time impact of this problem is addressed in CFF's delay analysis. The concrete placement cost overruns associated with the problem are addressed in the inefficiency claim section.
2. Legal basis
If an owner issues prescriptive specifications, it warrants that, if followed, they will produce an acceptable result. J.L.Simmons Co. v. United States, 412 F. Supp.2d 1360, 1362 (Ct. Cl. 1969). Generally a prescriptive specification is one that requires a contractor to proceed in a certain manner. A performance specification, on the other hand, permits the contractor to select the construction methodology and makes the contractor responsible for the results. Stuyvesant Dredging Co.v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987).
3. Facts
The concrete design problems primarily revolve around the Class X and the Class X(ae) concrete. While there are other classes of concrete, Class A and Class B, the primary problem involved just the Class X and X(ae) concrete and therefore I will restrict my remarks to the Class X and X(ae) concrete. Again there is a distinction between the superstructure and the substructure. In the superstructure the contractor was responsible and required to prepare concrete cylinders for acceptance testing; in the substructure RIDOT was responsible for acceptance testing. By specification, acceptance testing was required to be performed at 28 days. It is usually four weeks after the placement that most concretes will have attained a substantial portion of their test strengths. There are other time settings for testing, namely, at 56 days and 90 days.
There was a persistent problem with the Class X and Class X(ae) concrete achieving 5,000 p.s.i. at 28 days. This fact resulted in constant disruption of the job including two formal stop work orders. The problem led to disputes as to whether CFF or RIDOT was responsible for corrective measures.
To dispose of this claim, the Court has been called upon to decide who is responsible for solving the problem brought about by the specification in the contract: Class X and Class X(ae) 5,000 p.s.i. in 28 days. The record is fairly clear what the evidence was concerning those facts which are dispositive of this problem:
a) The substructure was standard construction, therefore, acceptance testing the responsibility of RIDOT.
b) RIDOT had not conducted pre-placement testing of the mix design with the special cement to determine whether in fact the mix design with the special cement was capable of having a strength of 5,000 p.s.i. in 28 days.
c) RIDOT had been advised in March 1986 by Herman Protze, a concrete subconsultant working for DMJM, of RIDOT'S lack of strength testing in a letter dated March 27, 1986 as follows:
 This will confirm my recently expressed concern regarding the absence of proper background data for basic field concrete mixtures and constituents. It seems to me that for an important project of this size the casual use of some past historical data is not enough. The detailed testing of mixed constituents (particularly the specific aggregates) and fabrication of laboratory trial mixtures employing the specific source of the cements, aggregates and add mixtures should be carried out, first to substantiate the propriety of the materials and mixtures and, second, to have such data available for later comparative reference. (Emphasis in original).
d) Moseman, working with superstructure Class X and Class X(ae) concrete in the summer of 1986 using additives in order to shorten the period for reaching strengths that would allow it to remove forms in the superstructure, also noted for RIDOT strength problems.
e) RIDOT, while testing the Class X mixture with the special cement being used on the land piers at Jamestown, noted in its results a weakness in attaining at 28 days the 5,000 p.s.i. It did not convey this information of weakness to either CFF or Moseman.
f) RIDOT ordered as a result of a discrepancy in the specifications between RIDOT'S Materials section and its Construction section that CFF upon reaching the water piers was to use the Class X(ae) cement. The (ae) stands for air entrainment which is the phrase that means that additional air is added to the concrete. Upon making the change from Class X to Class X(ae) RIDOT was already possessed of knowledge that the Class X concrete was not reaching the 5,000 p.s.i. Clearly, adding air by use of the Class X(ae) concrete would further exacerbate the problem. RIDOT remained silent not passing the test results it was conducting on to either CFF or Moseman.
g) Although RIDOT had been testing Class X(ae) concrete both for Moseman and CFF from September 1986, it did not pass the test results on to either the contractor or to the subcontractor and allowed them to continue using the concrete mix until finally things were brought to a head when RIDOT rejected Span 19 partially because of what it perceived to be a strength problem. It was at that time that CFF demanded and received a meeting with RIDOT on December 22, 1986 at which meeting for the very first time RIDOT informed CFF and Moseman of the low strength readings it had been receiving on its test results concerning the Class X(ae) concrete.
h) RIDOT announced at that meeting that it would no longer be responsible for testing the designs and passed that responsibility to the contractor. Once again, RIDOT adopted the position that it was not a problem solver and allowed the contractor to determine how the problem would be solved.
i) None of the concrete placed by either Moseman or CFF has been rejected and directed to be torn down. This is a clear statement by RIDOT that the strength of the concrete placed met the concrete specifications. It seems illogical to assume that weak concrete would be allowed to support the structure. This latter fact is very significant because it indicates that the concrete made and surpassed the strength requirements, but it did not do so in the first 28 days after placement. It seems then to the Court this is strong evidence that the problem was in the specification and not the strength of the concrete.
j) The Court heard testimony from Steven Gebler that concrete is tested usually at 28 days, sometimes at 56, and sometimes at 90 days. He also testified that low heat of hydration cement takes longer to reach strength. It was his opinion that the lower the heat of concrete the more slowly it will gain strength. It was in his opinion the modified type II cement, which was low heat cement, slowed the strength time of the concrete placed in the substructure and in the superstructure.
k) David Fielding who testified for RIDOT seems to place the lack of strength at 28 days in the Class X and Class X(ae) concrete on excess water added to the cement. He uses the test results obtained by a concrete expert hired by CFF to assist in determining why the concrete failed to make strength in 28 days. At the time this testing was going on, the contractor, the expert, Moseman, and RIDOT all assumed that the concrete had been tested and that in the laboratory the concrete and the mixed design was capable of reaching 5,000 p.s.i. in 28 days. Based on that assumption, Construction Technical Laboratories, Inc. (hereinafter "CTL") raised possibilities as to what was causing the low readings in the field. One possible exception or reason was additional water. The other related to the aggregate being used, dirty aggregate and washed aggregate. Tests were done by the CTL to see whether either of these possible explanations would explain the low reading. Ultimately neither of these possible solutions proved to be the cause of the low reading.
1) David Fielding conducted no tests of his own but zeroed in on the tests that were conducted by CTL as his explanation as to what was wrong with the cement. CTL, after termination, addressed the problem and concluded:
 (1) that there was nothing wrong with the strength of the cement placed by Moseman and by CFF. The fact that the cement that was placed by them is still supporting the Jamestown Bridge is strong evidence that that concrete that was placed met the strength requirements.
 (2) That the problem of being unable to achieve strength at 28 days was because of the low heat of hydration in the special or modified cement that was required on the job.
m) Had RIDOT pre-pouring or pre-design tested the special cement with the low heat hydration, it would have learned that there was a problem in making 5,000 p.s.i. in 28 days. It also would have learned, as it later did on this job, that that concrete was very strong. It more than exceeded the p.s.i. of 5,000 but not in 28 days. Had the pre-placement testing been done by RIDOT it would have found that historically on those tests this mixture acted differently than the standard mix, that it would reach lower p.s.i. in 28 days. It then would have had two options, to either lower the p.s.i. in 28 days or to provide for strength testing because of the low heat hydration at 56 or 90 days to determine the acceptability of that concrete. It was because of RIDOT'S failure to provide the testing in advance of placement that this problem came up. RIDOT threw its hands up and, in various arguments advanced to the Court, points the finger again at the contractor. Mr. Fielding comes in and lends his "expertise" to RIDOT'S allegation. But the physical facts present in this case belie the conclusions of David Fielding. There is no strength problem. The concrete is still there. It was accepted. The problem was a problem in specification, and RIDOT was responsible for establishing the specifications.
The Court heard much testimony concerning a performance specification and a prescriptive specification. If a specification in a contract is a performance specification, then the contractor has a great deal more leeway with the design of the specification since he is responsible for meeting a certain standard. On the other hand, if it is a prescriptive specification, the owner or in this case RIDOT assumes responsibility. In this particular matter the Court concluded that on all three of the standards, the ASTM-C94 (Exhibit P 120), and the Canadian CAN/CSA-A231-M90 and the AASHTO, the concrete specification in this contract are prescriptive specifications in that RIDOT by contract limited the contractor in the use of the ingredients that were to compose Class X(ae) mix. It specified the minimum maximum of 7 1/2 sacks/cubic yards. The cement type was Type II special. The water content was 4.75 gallon per sack minimum. The coarse aggregate was 3/4 inch designated maximum. The slump was 2 to 4 inches maximum. Air entrainment was 6 plus or minus 1 percent. When it approved superplastics type f or g dosage per manufacturer superplastic water reduction was set at 20 percent and the superplastic slump was 6 plus or minus 2 inches. In this fashion RIDOT dictated what the concrete mix would be. It is interesting to note that when RIDOT abandoned the problem created with regard to this strength mix that CFF after January of 1987 requested from RIDOT some flexibility with regard to the cement. Permission to make changes in the specification was denied. This is further evidence in the Court's judgment that this was a prescriptive specification. The Court also heard testimony concerning testing. In the last analysis the Court concludes that the problem here was caused principally by the failure of RIDOT to determine in advance of this prescriptive specification being placed in the contract that it had the capacity to meet 5,000 p.s.i. in 28 days and secondly, that when it had knowledge concerning this particular problem in time to discover an early solution, it withheld that information from the contractor and allowed him to invest time, money and materials into solving a problem that everyone assumed was in the field, when in fact there was no hard core evidence that this specification for the Class X and Class X(ae) concrete ever could meet the 5,000 p.s.i. in 28 days. There is absolutely no evidence before the Court, none whatsoever, that this concrete mix described in this contract ever met the 5,000 p.s.i. in 28 days, and the reason it is not present in this case is that that mix could not consistently meet that specification. It therefore became a problem dropped right on the doorstep of RIDOT; it should have made a specification adjustment or a timing adjustment for the acceptance test. Having failed to do that, the burden of the loss, the expense of the loss, the expense of the delay falls fully and completely on RIDOT'S shoulders. There is an inefficiency claim and a delay claim that will be addressed in other parts of the Court's decision, but the responsibility for the concrete mixed design and the problems surrounding it belong totally and completely on the shoulders of RIDOT.
4. Extra costs
CFF did not pour substantial amounts of Class X concrete. Its extra costs are enumerated in Exhibit 180, Item 4 in the amount of $23,866. for consultants and materials. This amount is uncontested. Moseman's damages are included in its claim which will be addressed later in this decision. The major impact of the strength issue, however, was the inefficiency resulting from the constant interruption to the work. That also will be addressed later in the Court's decision.
5. Findings of fact
The Court adopts the Findings of Fact enumerated in the plaintiffs' Proposed Findings of Fact starting on page 54 and numbering some 44 paragraphs as its own and incorporates them herein by reference.
K. Pier 12
REFERENCE: Pier 12, CFF Brief Section III, K., p. 147; RIDOT Brief Section Labeled Pier 12
1. Statement of claim
CFF is entitled to recover its costs and delay time because of the aberrant nature of the soils at pier 12 which affected the driving time of the tests and production piles and caused bay bottom settlement far in excess of what a contractor would reasonably anticipate.
2. Legal basis
A contractor is entitled to an equitable adjustment under the contracts changes clause for differing site conditions if a subsurface conditions turn out to be materially different than those indicated in the bidding information. See e.g., FosterConstr. C.A. and Williams Bros. and Co. v. United States, 435 F.2d at 887. The same rule is true if the subsurface conditions, although primarily as indicated in the pre-bid materials, behave differently than a contractor would reasonably expect. Shank— Artukovich v. United States, 13 (Cl. Ct.) 346, 355 (1987); S M — Traylor Bros., 82-1 B.C.A. (CCH) § 15,484 at 76,784 (Nov. 30, 1991) (Tunnel contractors expectation that subservice sand would behave in a particular manner was reasonably inferred from the pre-bid documents entitling him to an equitable adjustment when sand behaved in a different manner); T B Builders, Inc., 77-2 B.C.A. (CCH) § 12,663 at 61,387 (June 7, 1977); (Excavation contractor entitled to an equitable adjustment when soils, although predominantly the same as indicated in the pre-bid boring logs behave differently than the contractor had reasonably anticipated); Smyth, Jeffrey A., Construction LitigationReporter at p. 158 (June 1990).
3. Facts
Pier 12 is supported by steel h-beam piles approximately 130 ft. in length driven to refusal at or near bedrock. The pier footing was designed to be below sea level. Consequently, the work was performed within an excavated cofferdam. Prior to driving the production piles, the contract required CFF to load test a pile. Once it was determined that the pile would bear the design-loads, CFF was to drive production piles, pour a tremie, dewater the cofferdam and construct the pier in a dry environment. CFF, however, encountered problems with driving piles.
 a) Failure of the First Test Pile
Mr. McEnery testified as to how the load testing pile was to be secured to the bottom of the cofferdam and that the portion that was above sea level would be driven through a driving template. He further testified that, although the plan for driving the load test pile had been submitted, when it came time to drive the pile CFF departed from its own plan and in fact drove the load test pile through a 24 inch steel support pipe which was not anchored to the bottom of the cofferdam. In theory the support pipe was to contain the buckling forces during the driving of the pile. The overburden below the pipe in the bay bottom down to a depth of 130 feet was to provide lateral support for the pile. After driving the pile, CFF placed the design-load on the pile. While the upper portion of it was still being confined by the 24 inch cylindrical pipe, the pile buckled. The cause of this buckling is in dispute between CFF and RIDOT.
There is no question in the Court's mind that there was abnormal reaction by the soils at pier 12. This pier had a subsidence problem, that is, the settlement of the soil during the driving operation. It manifested itself visually with the settlement of the soil thus depriving a portion of the pile in the overburden of lateral support. There is also no question in the Court's mind that had the test pile been anchored at the bottom of the cofferdam, there would have been greater support during the driving operation. The Court has heard no testimony from anyone that the method used to actually drive the pile was equivalent to the original design submitted by CFF. It would seem, on the basis of the evidence as to the second test load pile that was driven after it was reinforced and braced at the bottom of the cofferdam and driven through the driving template, that when that second pile was test loaded it survived; it passed the test. It is true that when the first test pile was removed, some backfilling of some 6 to 7 ft. had to be done before the second pile was driven because of the cone shaped indenture into the overburden caused by the removal of the test pile. But when the second one was driven, it was driven in substantial conditions as to elevation of the subsoil as the first one. When the driving through the template, through the braced pile at the bottom of the cofferdam, down through the overburden took place, that test pile survived.
On the basis of the evidence that the Court heard, the Court concludes that there were two causes for the failure of the first test pilem, First, the lack of lateral support caused by the subsiding overburden, and second, the failure to brace the pile at the bottom of the cofferdam. One of those causes was completely unexpected and unanticipated. The other cause in the mind of the Court was within the control of CFF and it was the deviation by CFF which likewise contributed to the failure of the first pile when tested. It seems to the Court that CFF is not entitled to recover for the full cost of driving a second pile since the action of the subsoil was not the sole cause in the Court's judgment of the failure of that pile to meet design specifications. The Court, therefore, will award 50% of the actual cost of driving that second pile.
I am mindful of the testimony of Dr. Davisson in making this decision. A reading of his testimony would support a conclusion that he believed that the pile bent while it was contained in the steel cylinder pipe. However, the bend could not have occurred while the pile was within that cylinder. The excellent photograph taken of that failed pile depicts such a severe bend that would be measured as a 12 to 15 inch deviation from a straight line. There was not sufficient room within the pipe for such a deviation to have occurred. The cylinder was not bent nor is there any evidence that the pile was wedged in the cylinder. I do not believe that Dr. Davisson, when he testified, was indicating to the Court that his opinion was that the bending took place within the pipe's cylinder. Dr. Davisson is an authority in pile driving and had an opportunity to see the photograph. A cursory examination of the photograph indicates clearly that the bending took place outside the cylinder. It is the Court's conclusion that the bending of the first test pile took place at a point below the bottom of the steel cylinder pipe either in the overburden or above the overburden. The lack of an anchor at the bottom of the cofferdam permitted the pile, when design-loaded to move so that the weight was permitted to shift from the vertical thus causing failure of the pile.
In the Court's judgment it was a failure to anchor the cylinder to a position of rigidity at the bottom of the cofferdam which contributed to the failure of this first test pile, necessitating the Court's adjustment of a recovery of 50% of the cost of the second test pile being allocated to CFF and not to the subsoil conditions.
 b) Driving Production Piles and Backfilling
Again, there was testimony concerning the observations being made in the field which were recorded and documented in a series of letters exchanged between CFF and RIDOT. The letter and records show continual trouble with the soil. The soil was not acting as one would anticipate it to act. Those who testified before the Court testified that at best during this type of driving of piles, one would expect some subsidence but no more than 3 ft. There is recorded within the field several drops of 6 to 7 ft.; the need to backfill after the first test pile; the walking of piles, that is the moving of piles once driven; and the dropping of the cofferdam, in other words the bottom of the cofferdam was sucked down as the operation within the cofferdam was taking place because the bottom was dropping out. The planned elevation for the top of the pile was being affected by the subsoil failing to sustain its position so as to necessitate continued repair and maintenance of the cofferdam. The cofferdam had to be welded because it was reattached to another section of the cofferdam when one portion or one side of it dropped some 5 or 6 ft. There was bending and twisting of steel by reason of the action of the soil in the bottom of this bay. These were conditions which could not, in the Court's judgment, have been anticipated by the contractor when the contractor made its bid. They are conditions which are covered by the contract. The changed conditions clause is to permit the contractor to receive relief when these conditions develop and are completely unanticipated.
RIDOT seems to seek excuse for having to pay for these changed conditions on the ground that it made suggestions as to how to react. And when the condition was encountered, for the first time in the Court's judgment, RIDOT was contributing suggestions to the contractor consistent with its obligation. It was attempting to participate in the solution of the problem while denying any responsibility. But the need to have additional bracing and the suggestion about pinning the cofferdam to bedrock some 100 ft. below do not constitute a defense for RIDOT if the cause of the problem was a changed condition which could not have been anticipated. There is no evidence before the Court that pinning the cofferdam would have had any affect at all on the subsidence in the soil. It may have anchored the cofferdam at a particular elevation if the cofferdam was pinned to bedrock, but that may not have solved the problem of the subsiding soil. But because RIDOT recognized there was a serious problem and was attempting to offer suggestions in no way establishes that the condition that existed in the field ought to have been anticipated. RIDOT'S own expert who testified, Frank Giunta, agreed with the other experts who testified that 3 ft. is to be anticipated as a usual amount of subsiding. He erroneously felt that there was only 6 ft. involved in the subsidence problem, but the Court has evidence before it from which the Court could conclude as much as 13 ft. of drop in the elevation of this soil during this pile driving actually took place, necessitating backfilling and backfilling. The Court believes RIDOT'S expert was aware that what was happening at pier 12 was unusual. In his opinion, he would permit the contractor to recover but only half of the additional cost incurred by the contractor. In the Court's judgment, the only amount that should be shared by the contractor is on that first pile. The remainder of the costs in the Court's judgment are recoverable by the contractor under the changed conditions clause of the contract. These conditions could not have been anticipated by any reasonable contractor as conditions which would exist in this soil to provide such radical displacement to the detriment and the delay of the contractor. The Court will award the balance of the claim minus 50% of $173,732. Fifty percent of that would be $86,866. The total amount of damages would be that sum, $86,866. for the load test; $678,650. for the production pile driving; $35,119. for backfilling and $14,205. for sheet splicing; making the total claim under this section $814,840.
The Court will adjust the delay time by awarding 15 days for the load test delay rather than 31 days. The production pile delay is 128 days, backfilling 7 days and sheet splicing 4 days.
4. Findings of fact
The Court adopts as modified in this decision the Findings of Fact as contained in the Proposed Findings of Fact of the plaintiff under the section Pier 12 at page 63, n. 1 — 15 as modified by this decision as and for the Findings of Fact of the Court.
L. TERMINATION COSTS
REFERENCE: Termination Costs — CFF Brief, Section III, L, p. 154; RIDOT Brief, section labeled Termination Damages.
1. Statement of claim
CFF is entitled to recover the extra expense associated with the amortizing construction costs over a less amount of work.
2. Legal basis
The parties mutually terminated the contract. The agreement (joint Exhibit 1) provides:
 2. Except as waived or limited below all claims, defenses, and counterclaims of both parties as of the date of this agreement shall survive termination. . .
 3. The parties waive any claim for damages arising after the date of termination of this contract. This waiver includes any claim by Clark-Fitzpatrick for anticipated profits that it might have earned after the date of termination if the contract had been completed. . .
As a result of the termination, CFF's costs to perform the pretermination work was actually increased. One would seem to ask oneself how could that be? It is the essence of this termination cost claim to seek to recover for fixed costs incurred by the plaintiff for money spent to put in place items and material for the performance of the total job which are recoverable over the lifetime of the entire contract. When the contract is terminated those fixed costs become a legitimate claim because the cost incurred by the contractor was one that was not amortized over the full length of the contract. In the event that part of the fixed cost was recovered then that sum is deductible from the total costs. There are six separate and distinct items of fixed costs listed by the contractor as recoverable under the terms of the termination agreement.
While Frank Giunta, RIDOT'S damage expert, acknowledged to the Court the legitimacy of these claims and had some comment concerning possible setoffs against the claim, RIDOT, nevertheless, argues in its brief and memoranda that the termination agreement itself is a bar to the award of these damages. It is RIDOT'S position that to allow the recovery of these listed termination costs, the Court would be allowing recovery for monies for damages arising after the date of termination.
RIDOT misconceives the concept, a concept which is recognized by its damage expert. That is, that fixed costs actually incurred prior to termination of the contract are legitimate damage claims.
Each of the separate categories listed below are for costs actually incurred and monies actually spent prior to termination for items which were to be used by the contractor throughout the contract and his ultimate cost recovered in the future, but because of the termination, the contractor who had to necessarily incur the expense is entitled to amortize, that is to recover those costs during the period from inception to termination minus any recovery paid during the time the contract was enforced.
There are six fixed costs and expenses which were affected by the termination of the contract.
 a) Precast segment transportation barges
CFF leased barges to transport the precast spans from Davisville to the bridge where the spans would then be lifted into place. At the time of termination these barges were in dry dock being outfitted to perform this function. The total cost of leasing these barges was $93,482. The amount is not contested by RIDOT. It was necessary in order to perform this contract that this expense be made by CFF. No portion of it was amortized, that is recovered by CFF prior to termination. The entire amount of the cost is recoverable. RIDOT, in presenting its evidence to the Court, spoke of the issue of delay and somehow attributed about 50% of the delay to CFF and therefore was seeking to have the amount apportioned between RIDOT and CFF. The right to recover is not predicated upon any concept of delay. It is a fixed expense which necessarily had to be incurred by the contractor and recovered by him over the entire period of the contract as the work was being done. This expense was necessary, was incurred and is recoverable. It has nothing to do with any fixing of blame or apportionment of a delay claim.
 b) Peri Shaft Forms
CFF purchased and assembled the Peri shaft forms at a cost of $630,103. Such testimony was received by the Court through Mr. McGoldrick. The method of amortizing this cost was for the placement of 5,000 p.s.i. concrete. The total amount of that concrete was to be 9,559 c.y. At termination, 1,851 c.y. had been placed, meaning that the contractor had amortized a certain percentage of that fixed cost. Applying the mathematics to it, there was yet to be recovered the sum of $507,863. which would have been recovered by the contractor had it placed the total of 9,559 c.y. of 5,000 p.s.i. concrete. This is a legitimate expense. It is a fixed expense. The amount is not in controversy. The expert of RIDOT recognized the legitimacy of this claim. That amount is recoverable.
 c) The EFCO Footing and Pedestal Forms
This claim is in the amount of $55,619. Again, it was for forms that were placed. The cost would have been amortized and recoverable through the use of the forms in the performance of the total contract. The analogy to support it is the same as the Peri forms concept. This amount is likewise a fixed cost and is recoverable.
 d) Causeway and Dock
By the terms of the contract, CFF had an option to build a floating concrete plant or to use an existing ready mixed plant. CFF decided to use a ready mixed plant and to truck its concrete to the site. In order to place the concrete on a barge to be moved to the various piers, it was necessary to build a causeway to the dock so that the barge would be in sufficiently deep water to allow the concrete to be placed in the barge and transported by water to the piers. The method of recovering for this expense was over the entire term of the contract for the entire placement of concrete. These fixed expenses were incurred in the amount of $489,534.
There are several objections raised by RIDOT in an attempt to avoid this fixed cost which was required to be amortized over the full term of the contract. RIDOT is in error when it attempts to use estimates or costs incurred in the bid process and the allocation for a dock in RIDOT'S analysis of the records of CFF. This is a fixed cost which should be amortized over the entire contract and recovered over the entire period of the contract, but because of termination, this expense was incurred, paid by CFF and is a legitimate termination expense and will be allowed in full.
 e) Liability Insurance
The unamortized amount is uncontested, namely, $184,168. It is a legitimate expense. It must be recovered as termination costs.
 f) Bond Premium
CFF's bond premium was adjusted to reflect termination. The unamortized portion for the completed work is $8,975. It is uncontested. It is a proper cost of termination and the plaintiff is entitled to recover that amount.
3. Findings of fact
The Court substantially agrees with the Findings of Fact contained in the plaintiff's Proposed Findings of Fact under Termination Costs, p. 67-71 and incorporates those Findings of Fact as and for the Court's own.
The total amount recoverable as termination costs, including all categories, is $1,333,945.
M. DELAY DAMAGES
REFERENCE: Delay Damages, CFF Brief, Section III, M, p. 162; RIDOT Brief, section labeled But For Analysis.
1. Statement of Claim
CFF is entitled to recover those job costs it would not have incurred "but for" delays which are the responsibility of RIDOT.
2. Legal basis
A contractor is entitled to be compensated for the increased cost of performance resulting from unreasonable periods of owner cause delay. Once the contractor has established that the delays are the responsibility of the owner, the appropriate measure of determining delay damages is the difference between the actual cost of performance and what the cost of performance would have been "but for" the owner cause delay. See, e.g. SpecialtyAssembling and Packaging Co., Inc. v. United States, 174 Ct. Cl. 153, 183-184, 355 F.2d 554 (1966); Stephenson Assoc., Inc.,
86-3 B.C.A. (CCH) § 19,071 at 96,343 (May 22, 1986).
3. Facts
To completely understand the delay damage claim of CFF one must first become familiar with Exhibits 160, 162 and 172-177, which exhibits are graphic representations of CFF's as-built schedule reflecting not only delay, which is the responsibility of CFF shown in green, but also the claimed delay of RIDOT which is shown in red. On each exhibit, by moving all of the red shadowed portions to the right side of the schedule graph, a "but for" schedule may be created. The summary graph, Exhibit 178, shows on the single graph the as-built periods, and the delays associated both with CFF and RIDOT. The piers include piers 12 through 20, excluding pier 13. An analysis of the summary graph indicates that the last pier to be built would have been built "but for" the delay which is the claimed responsibility of RIDOT on April 8, 1987.
The delay claim asserts delay damages for the period from April 9, 1987 to March 22, 1988, the date of termination.
The figures testified to by Mr. McGoldrick relating to the period of time after the latest "but for" date, that date being for pier 17, namely, April 8, 1987, are set out in Exhibit 180, items 19 through 33 and 41. With the exception of item 24, Home Office Services, and 27, Master Mechanics, both of which are discussed later in this decision, the amounts are uncontested. (Exhibit E 161, table 1, at page 3) RIDOT, however, does contest the liability and the damage calculation methodology but not the cost incurred after the "but for" date which costs are the essence of CFF's delay claim.
CFF has incurred additional delay costs which have not heretofore been itemized in the detail presentment of its individual claims and which are not appropriately damages subsequent to April 8, 1987. Those damages are related to what would have happened to the barges at the various piers when the work in those piers would have been completed "but for" the delay caused by RIDOT. As each of those piers, the four prior piers, there being five barges, would have been completed, a demobilization would take place taking that barge and the supporting service off line. Those damages are the costs associated with relieving those barges. They are itemized as follows:
 Personnel boat $ 49,195.00
 Marine towing $105,461.00
 Master mechanic $ 13,300.00
 Maintenance $ 43,619.00
 Yard service $ 57,389.00
 Material barges $ 48,324.00
 ___________
 $317,288.00

The amounts appear individually as part of Exhibit 180 under the respective headings but include the period prior to April 8, 1987, that is, the difference between the individual last four piers "but for" date and the last "but for" date of April 8. They are appropriately added in and are listed here because of that individual "but for" date.
The Court will refer to the individual items numerically as contained in Exhibit 180 as it relates to the delay claim items. Each of the delay claim items as graphically portrayed on the plaintiff's Exhibits 160, 162 and 172-177 are given great weight by the Court. These exhibits, in the Court's judgment, substantially reflect the testimony presented by the parties in this case as it relates to the problems encountered subsequent to the signing of the contract. The Court has in its prior rulings, with but one exception, substantially agreed with all of the claims presented as detailed claims. The Court has disallowed a claim for delay damages and money damages at pier 12, fixing partial responsibility for the test pile failure on both RIDOT and CFF. This decision of the Court's will require an adjustment to the claim asserted both in the brief and in the Exhibit 180. The Court will attempt, as I understand the evidence and these exhibits, to modify that exhibit to reflect the Court's award of individual damages. As the Court has said, the figures and expenses incurred after the last "but for" date are not seriously disputed by RIDOT.
Item 19 — Davisville Rentals — $169,171.00.
RIDOT does not dispute this expense and it is recoverable as a delay expense.
Item 20 — Fort Getty Rental — as claimed — $7,500.00. The Court's award, $7,280.00.
The actual amount involved for the last three quarters at Fort Getty from April 1, 1987 to December 31, 1987 was $7,500.00. The Court must exclude the eight days which results in a reduction to the amount of $7,280.00.
RIDOT had objected to this claim for two reasons. The bid estimate being only $20,000.00 and the actual costs incurred were $24,523.00 and the cost report indicates $20,000.00 in earnings. RIDOT therefore assumed in its discussion of this issue that the actual loss was $4,523.00.
In many instances RIDOT through its experts has attempted to use cost control documents and allocation of funds received by CFF as to individual items as a basis for resisting payment of claims. The "earned" column is a management tool that allows a contractor to compare actual costs to what it expects costs to be at any point in the life of the project. This allocation in the records of the management corporation has nothing to do with revenue. Neither does the bid estimate for this expense have anything to do with the claim. If it is costing the contractor more than he bid to rent property then he must absorb throughout the term of the contract that underbid item. But if he is required to expend sums of money because of the delay caused by the owner or RIDOT, RIDOT is responsible in damages for the actual amount that the contractor had to pay. In other words, a two year rental that would cost him $20,000.00 may be above the bid estimate. If he completes the job in two years then he absorbs the underbid difference. If, however, because of the wrongful conduct of the owner it takes him three years to complete the job, then the actual cost of the additional year is an appropriate element of damages. That is true on this item. It has been true on other arguments raised by the experts on behalf of RIDOT. First of all, it ignores the law as it relates to the measure of damages. The measure of damages entitles the contractor to recover his actual cost necessitated by the wrongful conduct of the owner or RIDOT. Secondly, the attempt to introduce by way of expert testimony reference to records, whether they be revenue allocations as a management tool, or estimates in the bid documents, is an attempt in the Court's judgment to ignore the law and to confuse the facts as they relate to the right of the contractor to recover damages. This is not the first time that efforts have been made in this regard nor will it be the last time in the Court's opinion that I will have an opportunity to comment on this procedure. The actual sum claimed was for a rounded period of time. The Court believes it to be more appropriate to relate that to the actual time and that is $7,280.00.
Item 21 — Survey Costs — $168,913.00.
Again RIDOT does not contest the amount but comments that some expense incurred after April 8, 1987 were not in the original bid estimate. Again this is another variation of RIDOT'S expert's bid estimate argument. Mr. Giunta suggests that if actual costs exceed bid estimates they are not recoverable. Again this confuses the law and it is an attempt to bring in irrelevant and immaterial matter into a discussion of what is a recoverable amount. An example given by plaintiff in his brief says that it bid $200.00 as an estimate of the cost of doing a particular job. During the course of the project the contractor was able to do the job for $100.00. RIDOT was responsible for delay in performing the service that cost another $100.00. The Court could not, and it would be foolish to say, that it would permit recovery against RIDOT of $200.00 because that was the bid estimate. The law of damages is the actual cost incurred by the contractor because of the delay of the owner that is recoverable. In this case the amount recoverable is the amount actually incurred, and the amount actually incurred is not disputed — it is $168,913.00 and the Court will allow it.
Item 22 — RIDOT Inspection Boat — $191,505.00.
Again RIDOT does not argue or contest the amount that was expended by CFF after the "but for" date. RIDOT makes certain arguments, however. It presents the following:
a) The cost report shows earnings of $222,889.00 against total costs of $351,040.00 for a net loss only of $128,151.00. Again the Court is confronted with the earned column of the cost report in its relationship to revenue. They are not related. CFF seeks to recover the cost after the "but for" date actually incurred.
b) RIDOT points out for bid purposes CFF estimated a purchase of a boat for $47,700.00 but actually rented the boat for $1,360.00 per month which created a cost overrun to CFF. Again the fact that CFF was losing money on this item because it represented a cost overrun to CFF is a cost that CFF has to absorb in the contract, but if there is a delay which is the responsibility of RIDOT the amount of damages is the amount actually paid for the item. Whether it was underbid or overbid in the contract is irrelevant. It is the actual cost paid. This is the actual cost paid. RIDOT does not dispute that.
c) RIDOT finally argues that the cost of maintaining the inspection boat for RIDOT was very substantial; that the labor costs were high. There's no question in the Court's judgment that on the evidence before the Court that inspection boat was working sometimes as long as 24 hours in a row. That it was working Saturdays, Sundays and holidays. I have no doubt that because of the substantial problems associated with RIDOT'S delay responsibility that those costs were high, the problems were serious, and there was indeed substantial delay.
Again the only issue is what costs did CFF incur after the "but for" date with regard to this item. The amount is uncontested. The record shows that CFF incurred for the inspection boat for RIDOT after the "but for" date $191,505.00 in expenses and it is entitled to recover that amount.
Item 23 — Field Overhead — $1,580,649.00.
This amount is taken directly from CFF's cost reports for its field costs for supervision and related costs not included in the direct labor, material and equipment costs for the job. It is a cost incurred after April 8, 1987. RIDOT was provided all backup material and Mr. McGoldrick was made available formally, informally and at trial for examination. This amount stands unchallenged. It is an element of damages relating to the delay, the responsibility of which the Court has fixed on RIDOT.
Item 24 — Home Office Overhead — $174,619.00.
This item is for services provided to the joint venture at the Clark-Fitzpatrick home office location. The services included payroll, accounting, purchasing, et cetera. The costs incurred for those services after the "but for" date is unchallenged. RIDOT'S only arguments are the earned argument based on the cost report and that bid estimate was approximately $1,000.00 per month. Again RIDOT either does not understand or wishes to confuse the factual issue. It is the actual cost incurred. The Court has examined the records introduced in evidence. I have no doubt that this item was an expense after the "but for" date and I award that sum for this item.
Item 25 — Personnel Boat — as claimed — $233,197.00. As awarded — $238,173.50.
RIDOT did not contest the amount as claimed; namely, $233,197.00 but its expert expressed confusion about how the figure was arrived at. This is one of the categories of claims where CFF has included as part of its detail cost analysis portions attributable to personnel boat claims and has recovered a portion of it prior to the April 8, 1987 date and the adjusted "but for" date at the individual piers as they relate to that April 5, 1987 date. The amount is set out on page 28 of Exhibit 180. There is a deduction for items heretofore recovered as set out by CFF in its claim. That amount was $305,827.00. Because the Court disallowed a claim as it relates to the test pile at pier 20 there has been a reduction in the credit and the credit reduction for this item is in the sum of $300,850.50. This credit adjustment results in a gain under this section of $4,976.50 because the credit against the total claim has been decreased by the Court's disallowance of a portion of one of the detailed claims. That therefore increases the claim under this section for delay damages to $238,173.50. There basically is no dispute with RIDOT that this sum was actually expended by CFF after the "but for" date. It is a proper charge. It is a proper claim and is allowed in the amended amount of $238,173.50.
Item 26 — Marine Towing — as filed — $369,345.00. As amended — $374,767.50.
Likewise, on page 29 of Exhibit 180 there is a breakdown showing the credits and charges. The credit due on this matter as filed was in the amount of $561,774.00. As a result of a rejected claim there is a subtraction of $542.50 so that the total credit is $556,351.50 with a corresponding increase of a like amount raising the amount that the Court allows to $374,767.50.
Item 27 — Master Mechanic — as filed — $55,429.00.
There was a rejection of a claim in the amount of $707.50 thus increasing the amount the Court allows to $56,136.50. The amount of the credit was reduced to $83,177.50 necessitating the adjustment upward in the amount recoverable under this section.
Item 28 — Maintenance Staff — as filed — $173,047.00. As amended — $175,418.50.
Again this results from a rejection of the responsibility of RIDOT in the test pile at pier 12. The adjustment results in a deduction of the credit of $2,371.50 so that the credit adjustment available to prevent duplicity of recovery is now $271,873.50 with a corresponding addition to the claim as filed. It is appropriate. It is allowed in full.
Item 29 — Yard Service — as filed — $346,641.00. As amended — $351,084.50.
Yard services involves the service of employees who are not otherwise covered by a direct claim. Their claims have been handled under the category of barges. Their job is to unload and receive materials and supplies that would be used on the job. They stored them, they handled them, and they subsequently transferred the materials and supplies to the site. They likewise receive from the barges materials moving from the site back to the yard. Their purpose really is to keep the job going, to make certain the materials are on hand and to remove them when they're no longer being utilized at the site. There is no contest by RIDOT as to the sum paid. It is an appropriate charge and is recoverable under the delay damage claim.
There is an adjustment on this claim of some $4,443.50 because of rejected claim reducing the credit to $432,037.50 with a corresponding increase in the amount allowed by the Court.
Item 30 — Holiday Pay — $66,719.00.
This amount is the amount of holiday pay that was required to be made to workers after the "but for" date and prior to termination. The amount is uncontested. It's an appropriate award.
Item 31 — Truck Rentals — $61,902.00.
Again this amount is uncontested. However, there is reference made by RIDOT through its exhibit and comments thereon numbered 161 that instead of using actual costs as has been done in presenting this claim, that it should be computed by using average monthly costs based on the total project costs, divided by the total number of months worked, multiplied by the "but for" delay period.
There is no computation submitted by RIDOT. This particular item may or may not, if so computed, result in a smaller award for damages under this category but if one is to use this approach rather than the actual cost, it should be applied throughout the delay damage section of the claim. One would then have an opportunity to determine whether this method of computing the damages would result in a material increase or decrease in the amount of the claim where the claim is based upon actual costs incurred. Since RIDOT has not presented any calculations either for this section or for the other sections under the delay claim, the Court will reject this method but does recognize that it is a method which is actuarial sound and responds to good accounting principles in presenting this type of a delay claim. Not having received any evidence as to what those figures are either in this claim or the other claims, the Court will not apply that theory to this item or to any other items under the delay damage claim. The amount of $61,902.00 is awarded as damages under the delay claim for this item.
Item 32 — Automotive Insurance — $18,240.00.
The amount is not contested and is an appropriate claim and it is awarded in full.
Item 33 — Marine Insurance — $456,791.00.
This amount likewise is uncontested as the amount of marine insurance paid between April 8, 1987 and the date of termination. That is the delay period attributable to RIDOT. It is an appropriate amount. The Court awards it as damages.
Item 41 — Material Barges — $90,741.00 — as filed. As amended — $94,717.00.
As a result of the Court's rejection of a claim at pier 12 relating to test piles the credit of $229,141.00 was reduced to a credit of $295,165.00 thus resulting in an increase recoverable under this section of $3,976.00 making the total awarded under this element of delay damage $94,717.00. It is an appropriate sum and is so awarded.
Based on the foregoing, total delay damages for items 19-33 and 41 on Exhibit 180 are $4,186,087.00. This sum represents the total variable costs associated with RIDOT caused delay. The delay period is April 9, 1987 through March 22, 1988, or 349 calendar days. In computing the calendar day cost $317,288.00 must be deducted from the total damages because that amount of damage was incurred prior to April 8, 1987. Therefore the calendar day cost for the period after the "but for" day is $11,085.00.
The Court will refer to the Proposed Findings of Fact presented by the plaintiff and in its Proposed Findings of Fact will amend paragraph 1 to change the sum of $4,164,408.00 to read $4,186,087.00. The Court will adopt as its findings of fact numbered 2 through 8, inclusive.
As to paragraphs 9 through 13 inclusive, the Court will set them out below:
9. The Court, however, rejects certain of these claims which have the indicated impacts:
(a) Claim 16 days Pier 12
The reason will be pier 12 test pile rejection (partial). No other items will be filled in under paragraph 9.
10. Based on the above, the adjusted "but for" dates for each pier are:
 PIER DATE USED PLUS DAYS FOR LESS DISALLOWED ADJUSTED
 FOR CLAIM INEFFICIENCIES DAYS "BUT FOR"
 DATES
 12 02/17/87 86 -16 12/09/86
 14 01/16/87 8 0 01/08/87
 17 04/08/87 6 0 04/02/87
 18 03/11/87 2 0 03/09/87
 20 02/10/87 119 0 10/14/86

11. As adjusted, the last pier completed was pier 17 on April 2, 1987. That is 6 days earlier than the April 8, 1987 date utilized by CFF to calculate delay damage. The per diem rate is $11,085.00 which requires damages to be increased by $66,510.00.
12. Based on the adjusted dates, the next previous four piers to be completed would have been:
 PIER DATE
 18 03/09/87 — 23 days before April 2, 1987
 14 01/08/87 — 83 days before April 2, 1987
 12 12/09/86 — 113 days before April 2, 1987
 20 10/14/86 — 169 days before April 2, 1987
 ___
TOTAL DAYS: 388

The number of days between these dates and April 2, 1987, the overall "but for" date is 388. CFF's damages were predicated on 189 days. The difference between 189 and 388 is 199. At the rate of $1,679.00 per diem rate, damages must be increased by $334,075.00.
13. Allowed delay damages are:
 Claimed Amount $4,186,087.00
 Plus adjustment to reflect new overall "but for" date $ 66,510.00
 Plus adjustment to reflect new "but for" dates for next
 previous four piers $ 334,075.00
 _____________
 TOTAL $4,586,672.00

The Court awards $4,586,672.00 for damages as adjusted and computed in all other respects. In other respects as it relates to the Special Findings of Fact of the plaintiff, they are adopted as the Court's findings of fact and are incorporated herein by reference.
N. ACCELERATION DAMAGES
REFERENCE: Acceleration Damages — CFF Brief, Section III, N. p. 180; RIDOT Brief, section labeled Additional Cofferdam Sheeting.
1. Statement of claim
CFF is entitled to recover extra costs incurred to offset delays that are the responsibility of RIDOT.
2. Legal basis
The essence of a "constructive acceleration" claim is that a contractor has been required to incur extra expenses in completing a contract in accordance with a progress schedule that does not include allowances for "excusable delay". A contractor who accelerates its work as a result of an excusable delay is entitled to recover labor, Polock Refrigeration Co., 65-2 B.C.A. (CCH) § 4,896 (June 2, 1965); Materials, Varo. Inc.,
72-2 B.C.A. (CCH) § 9,717 (September 18, 1972); and Equipment and Overhead Expenses, Raymond Int'l., 70-1 B.C.A. (CCH) § 8,341 (June 12, 1970). Lost profit and loss of efficiency damages are also recoverable. Utah-Manhattan-Sundt, 1963 B.C.A. (CCH) § 3,854 (June 26, 1963); Raymond Int'l., 70-1 B.C.A. (CCH) § 8,341 (June 12, 1970).
3. Facts
The claim for accelerated damages really is a claim based upon a delay concept. CFF had planned to construct the concrete footings and the pedestals within the dewatered cofferdams at piers 12 through 20 using steel plate girder forms manufactured by Economy Forms Co. ("EFCO"). In addition, CFF planned to recycle and reuse the cofferdam steel sheet pilings from pier to pier in accordance with its bid proposal and RIDOT's approved progress schedule. These facts were testified by Mr. McGoldrick during his testimony concerning the effect of the problems with excavation, pier 16 tremie and the thermal curing of the tremies and the substructure.
The Court has already assessed the primary responsibility for the delays on RIDOT. The effect of those delays on these materials becomes evident when one reviews the testimony that:
a) CFF had purchased a sufficient quantity of EFCO forms to construct the footings and pedestals in each of the cofferdams as it was scheduled to be completed.
b) As originally scheduled, CFF had purchased sufficient steel sheeting to complete, according to its progress schedule, the various piers. The longest of those piers were at piers 14, 15 and 16. The sheeting in those piers would be cut off and as the sections were cut off from these deeper cofferdams they would be used at piers 18, 19 and 20. Additional scheduling would permit the sheeting at pier 12, which was a narrow cofferdam, to be used with additional sheeting stored at Davisville at pier 13, which was a larger cofferdam, which required not only the sheeting from pier 12 but additional sheeting to engulf the perimeter of that cofferdam at pier 13. When piers 12 and 13 were completed, the sheeting at pier 13 which included the sheeting at pier 12 would be cut off and used at pier 17. Under the schedule, pier 17 was to be the last constructed pier.
RIDOT, in its opposition to these accelerated damages, again complains that it was not responsible for the delays, the conditions and/or the problems at pier 16, the tremies, the thermal curing of the substructure etc., but that those were problems relating to CFF and since RIDOT bore no responsibility, then no damages should be recovered. The Court has already fixed responsibility for the causes of the delay which gave rise to the problems involved in this section upon RIDOT.
EFCO forms had to be added to because of the simultaneous availability of multiple cofferdams rather than having the availability occur in the planned sequence. In order to respond, CFF purchased additional EFCO forms. Had the plan sequence not been interrupted, the quantity originally purchased would have been sufficient to move from cofferdam to cofferdam. Since the need for additional forms became immediate and simultaneous with the availability of some of the planned cofferdams, the quantity of forms to respond to the need increased. CFF spent $49,923. (That sum is set out in Exhibit 180).
Likewise, as it relates to the steel cofferdam sheeting, delays to the work at pier 12 prevented the recycling of part of the steel sheeting to pier 13 and impacted upon pier 17. Delays to the work at pier 16 impacted upon the reuse cycle of the steel sheeting at pier 20. As delay mounted upon delay, it impacted upon Moseman, who was responsible for the superstructure. Pier 17 was a key pier in permitting Moseman to work on the superstructure running its cast in place concrete spans from pier 23 out into the bay as far as pier 15.
In order to accommodate and not hold up the superstructure, steel sheeting stored for pier 13 at Davisville was used by CFF in conjunction with the purchase of other steel sheeting to accelerate the placement of pier 17. Since steel sheeting for pier 13 was not available and the sheeting stored at Davisville for pier 13 was used in pier 17, additional sheeting had to be purchased. In other words, the contractor, because of the delay which was the responsibility of RIDOT, was unable to recycle and reuse sheeting and had to purchase additional sheeting rather than continue with his planned progress from cofferdam to cofferdam reusing portions of prior cofferdam sheeting in the more shallow cofferdams. The cost of the additional sheeting was $160,259. In arriving at that last figure, there was a charge incurred of $35,869. for the purchase of sheeting to accelerate the placement of pier 20, which was the shallowest pier, and a charge incurred of $124,390. for the multiple piers.
These expenses are additional costs incurred because of the disruption of the cofferdam sequence schedule and are recoverable as damages to the plaintiff.
4. Findings of fact
The Court adopts the Findings of Fact contained in the plaintiff's Proposed Findings of Fact labeled Acceleration Damages, commencing on p. 79 and including the 15 paragraphs stated therein. Those Findings of Fact substantially reflect the Court's thinking and are incorporated herein by reference.
O. WAGE AND BURDEN ESCALATION
REFERENCE: Wage and Burden Escalation, CFF Brief, Section III, O, p. 184; RIDOT Brief, section labeled Wage and Burden Escalation.
P. Material Purchase Escalation
REFERENCE: Material Purchase Escalation, CFF Brief, Section III, P, p. 186; RIDOT Brief, section labeled Wage and Burden Escalation.
The claims for wage and burden escalation and material purchase escalation are predicated upon the same concept, namely, that RIDOT is responsible for the wages and materials purchased after the "But For" date of April 8, 1987 and is predicated upon the concept that had CFF been able to do the work on time, that is when it was planned, instead of doing the work and purchasing the materials when CFF did, then the cost of the labor and the cost of the materials would have been less. The Court has examined the records with regard to this claim and has concluded that there is no dispute between the parties as to the amount involved.
As to wages, the union wage at the earlier period for the same service was $272,882. less than that which was actually paid for the service.
The materials cost CFF $21,181. more than it would have had to pay but for the delay in buying the goods.
RIDOT does not seem to understand this concept. Its brief talks about escalation costs were for work not performed as of termination. These expenses were incurred. They are items for which CFF paid money.
It is like a person who has an opportunity to shop on Monday at a local hardware store and to purchase goods for $100. Because that person is unable to get to the hardware store because her neighbor has interfered with her ability to get to the store until Friday, instead of paying $100. for those items that person now has to pay $120. for those items. Again, as it relates to labor, the charge for union help on the first day of February was $10. an hour. Had that worked been performed in February, that is the wage that would have been paid. But it was not performed until May, and in May the wages had jumped to $12. an hour as the union wage so that performing the same service in May cost CFF $2. an hour more than it would have had to pay but for the delay caused by RIDOT. With this explanation, the Court incorporates by reference the Findings of Fact as contained in the Proposed Findings of Fact of the plaintiff on pages 83 — 85 as and for the Court's specific Findings of Fact.
Q. UNABSORBED HOME OFFICE MANAGEMENT COSTS
REFERENCE: Unabsorbed Home Office Management Costs - CFF Brief, Section III, Q, p. 187; RIDOT Brief, section labeled Wage and Burden Escalation.
1. Statement of claim
CFF is entitled to recover its home office management costs in excess of those normally attributable to the project.
2. Legal basis
A contractor who shows "unabsorption" of his home office overhead costs as a result of delay is entitled to relief. Seee.g. BFPE Int'l., 88-2 B.C.A. (CCH) § 20,742 (April 7, 1988). These costs include office personnel and senior management payroll expenses for work performed beyond the scheduled contract time.
3. Facts
In testimony given primarily by Mr. McGoldrick, the Court learned the following about home office management costs and procedures:
a) In managing a construction company, home office expenses are not billed to the owners of projects as part of the contract bid. The management costs are recovered by markups throughout the general bidding to cover costs of payroll, supervision in the home office, trouble shooting, etc.
b) At any given period of time in the life of the management company, the costs of running the home office are spread among the various projects. In other words, it is determined as to what percentage of the time of the home office personnel will be allocated to each of the projects then going on in the management company.
c) When in the course of time, because of circumstances developing in a particular project, additional time above and beyond that which is allocated is required to keep that particular project running, then these are termed to be unabsorbed home office costs, because the amount of money, the markup and/or the profit to be derived from that particular project is insufficient to support the cost of managing and the time devoted to that particular project.
d) The testimony of the principle witness indicated to the Court that the amount claimed for costs incurred for problems that developed were for problems alleged to be the sole responsibility of RIDOT. In other words, that RIDOT was responsible for the presence on the job and for the extra time of personnel at the home office to support these particular projects.
e) The allegation was that the problems which caused the need for the extra services that were unabsorbed related to the problems of the friction piles, the composite piles, rock excavation, concrete strength, defect of tremies, cofferdams, etc. These problems were substantial and required an extraordinary commitment by the home office personnel and in particular by the principals of Clark-Fitzpatrick, namely Mr. McGoldrick and Mr. Fitzpatrick.
RIDOT says very little about these costs, except they don't want to pay them. There is no question that the Court has thus far in this decision, for different reasons, placed substantial responsibility for the delay in moving this project along on the shoulders of RIDOT; the cofferdam, thermal curing, tremies, concrete strength problem, concrete design, rock excavation. It seems to the Court that to help solve these problems, Mr. Goldrick in particular was practically a resident engineer on the project, daily working with his personnel and RIDOT's personnel in attempting to move this project along. An examination of Exhibit 180, which shows the general breakdown on page 44 of that exhibit of what was involved in this excess overhead costs, would indicate that all of the costs, both to Franki Foundation Co. and to Clark-Fitzpatrick Co., are not earthshaking with the exception of the two items under Clark-Fitzpatrick; namely, the claim for $208,625. for E.B. Fitzpatrick as President, and for J.M. McGoldrick, Executive Vice President, in the sum of $213,599.
Exhibit 180 is a substantial exhibit and was used by the witness during the many hours that he was on the stand explaining the various facets of his testimony. That exhibit was an exhibit introduced without objection as a full exhibit before the Court. The Court is aware of the substantial time that Mr. McGoldrick spent on this project; and I am confident that some of the time he spent was necessitated by mistakes, deficiencies, errors caused by CFF. To a lesser degree, the president of the corporation was involved according to the testimony. Discovery engaged in by RIDOT provided some information prior to the time of trial to RIDOT. The Court witnessed the request for and the presentation of so-called backup material which was present in the courtroom. Mr. McGoldrick testified that the charges contained on page 44 for his time and that of the president of the corporation are charges for those problem matters which were the responsibility of RIDOT. The Court has so found. It may very well be that some of the time claimed by Mr. McGoldrick on behalf of himself and Mr. Fitzpatrick were related to other matters, not necessarily the deficiencies of RIDOT. The period covered from the time of the signing of the contract in 1985 until the termination agreement in 1988 is substantially three years. Cross examination may very well have limited the testimony of Mr. McGoldrick concerning what these items were for, but no such cross examination took place. There was some reference to the fact that one of the expenses in the amount of some $12,000. ought not to be paid because that particular person in the home office was involved in the design of the cofferdams. The testimony is that this was for work over and above any compensation for the design of the cofferdam. Mr. McGoldrick's testimony stands uncontradicted. This is an appropriate item of damage. There is no question in the Court's mind that substantial time and effort was involved in order to help solve and to solve problems as they arose in the field which were the primary responsibility of RIDOT. The Court approves the allocation of the sum of $571,055. as unabsorbed home office expense as a proper element of damages.
4. Findings of Fact
The Court incorporates by reference the Unabsorbed Home Office Management Costs contained in the Proposed Findings of Fact of the plaintiff at page 87, being 1 through 7 inclusive as and for the Court's own Findings of Fact.
R. INEFFICIENCY CLAIMS
REFERENCE: Inefficiency Claims - CFF Brief, Section III, R, p. 190; RIDOT Brief section, labeled Inefficiency Claims.
1. Statement of claim
CFF is entitled to recover its cost overruns resulting from the delay, disruption and inefficiency caused by RIDOT's conduct or by events for which RIDOT has legal responsibility.
2. Legal basis
The inefficiency claims reflect cost overruns in certain categories that are in whole or in part the responsibility of RIDOT. They are claims, however, that cannot be quantified on a direct cost basis either because there is no "measured mile" or because the cause and effect relationship is not subject to precise measurement. It is for this reason that the plaintiff has utilized a mini-cost claim methodology. The method involves computing the amount by which the actual cost exceeded bid estimates and then deducting cost overruns that are not the responsibility of the owner. The net amount is asserted as a claim, in this case, against RIDOT.
Total cost methodologies are recognized in certain circumstances. They are where:
a) Direct cost methods cannot be used;
b) The bid estimate was reasonable;
c) The actual costs are reasonable;
d) The overrun is the responsibility of the owner.
See e.g., Paul N. Howard Co. v. Puerto Rico AquaductSewer, 744 F.2d 880, 885 (1st Cir. 1984); Cert. Denied 469 U.S. 11-91 (1985); State Hwy. Comm'n. v. Brasel and Simmons Constr.Co., 688 P.2d, 871 (Wyo. 1984); Bechtel National. Inc. 90-1 B.C.A. (CCH) § 22,549 (Dec. 22, 1989). The mini-total cost claim method is used by the plaintiff in seven categories where the above criteria are satisfied.
3. Facts
The Court accepts the mini-total cost claim methodology presented by the plaintiff, CFF, for these categories of damages. The criteria are present for the application of such a method of computing the amount of the claim. In each of the categories, RIDOT is being proceeded against for the periods associated with delay which the Court has heretofore established as being applicable to RIDOT. In some of the categories, CFF must absorb substantial portions of the cost overrun. In other categories there is little or no absorption by CFF. The responsibility being that of RIDOT.
The Court has in awarding damages to the plaintiff under this inefficiency claims section modified the sums involved, particularly in the cofferdam section and in the overburden section from those appearing in the referenced section of the plaintiff's brief. These modifications are directly related to a recomputation of the figures.
 a) Cofferdams
CFF experienced a $3,913,452. cost overrun for installation and maintenance of the cofferdams (Exhibit 180; items 42 at p. 46). The principle officer, Vice President McGoldrick, testified at great length concerning the items contained in Exhibit 180. The Court has examined not only the Exhibit 180 but also has reexamined exhibits relating to the graphic representation of the claim relating to the delay time allocation as it relates to the cofferdams.
Mr. McGoldrick testified that CFF accepts responsibility for some of the cost of the overrun. Those areas do appear in the green section of the various exhibits 160, 162 and 172-178 inclusive. The thrust of these exhibits and his testimony is to seek recovery of a portion of the overrun for inefficiency that is the responsibility of RIDOT. The Court has already in prior rulings in this decision in other sections identified and fixed responsibilities relating to the detailed cost analysis on the issues that give rise to the inefficiency claim. More specifically, RIDOT is responsible for the additional costs resulting from interrupted operations during unanticipated boulder excavation and for extra maintenance costs associated with the extended period of time the cofferdams were in the water because of extended operations. The extended operation for which RIDOT is responsible include, inter alia overburden excavation delays, sound bedrock excavation delays, rock coring delays, tremie concrete delays and structural concrete delays. It is for the inefficiencies caused by these delays that this section seeks recovery.
The extra cofferdam maintenance costs cannot be precisely allocated between RIDOT and CFF. This results from the fact that the structural elements that required repair were under water in most instances. It was impossible to know when the damage requiring repair took place. Most of the damage was not discovered until the cofferdam was dewatered. It was then impossible to determine whether the damage occurred prior to or during the delay period for which RIDOT was responsible. It is for this reason that CFF has attributed otherwise unattributable excess costs to RIDOT and to CFF on a pro-rata basis with RIDOT being charged only for the time the cofferdam was in the water during delay attributable to RIDOT. In other words, if the cofferdam were in the water, for example, 10 months and the Court in other sections has determined that three months of that delay is attributable to RIDOT;, then the maintenance cost is pro-rated three months the responsibility of RIDOT, seven months the responsibility of CFF and the overrun is apportioned on a three-tenths, seven-tenths basis. That is an example and has nothing to do with the facts of this case. The Court will take up the various piers, 12 through 20, excluding 13.
The starting point for the cofferdam allocation claim is Exhibit 180, item 42. There are two constant figures that are used throughout all of the cofferdams. The total amount of the labor cost overrun at all piers is in the sum of $1,123,916. Individual labor costs were kept at each of the piers involved. The total cost at all piers is also found on Exhibit 180. That figure is $3,823,820. An examination of that exhibit will indicate that there is an item which I have deducted from that cost concerning design consultant's fee. The design consultant fee was in the amount of $89,632. The design consultant fee is a charge contained in that exhibit which must be deducted from the total additional cost at these piers. Those two total figures are constant throughout the computations made on piers 12 through 20, excluding pier 13.
 Pier 12
Item 42 on Exhibit 180 indicates that the labor cost overrun was $150,082. That figure is 13.35% of the total labor cost overrun of $1,123,916. 13.35% multiplied by the total cost of all expenses, namely, $3,823,820. will determine the total cost overrun allocable to pier 12, namely, $510,480. That amount is then multiplied by 38.9%, a percentage figure that is determined by taking the total in months that the cofferdam was in the water, 18.44 months, and determining that RIDOT on prior factual determinations was responsible for 7.17 months of that time or 38.9%. That percentage is then multiplied by $510,480 to determine the amount of the claim and damage sustained by the plaintiff at pier 12. Of the total overrun, RIDOT is responsible to the plaintiff in the sum of $198,577.
 Pier 14
Reference again is made to Exhibit 80, item 42 and it is there determined that the total labor costs were $603,010.; that there was a resulting cost overrun of $562,020. That amount has to be reduced by those items which CFF is clearly responsible for.
a) the repair of the brace frame which was in the amount of $192,000., and
b) the repair of a design area which caused a bowing in the horizontal members of the cofferdam. That was $158,000. This was according to the testimony of Mr. McGoldrick. Likewise, there is a sum certain to repair the hung-up cofferdam frame and for excavation of the boulders and other subservice obstructions in the amount of $168,000. which is clearly the responsibility of RIDOT. There then is remained the sum of $44,020. Of that sum, an allocation has to be made based upon the total time the cofferdam was in the water and the time during that total period that has been allocated to RIDOT. RIDOT was responsible for a period of 8.28 months of the 17.13 months that the cofferdam was in the water. Stated as a percentage, that amounts to 48.4%. 48.4% of $44,020. is the sum of $21,306. That sum added to the $168,000. indicates that $189,306. is the dollar responsibility of the labor cost overrun attributable to RIDOT. What percentages is that figure of the total overrun of $562,020? That percentage works out to 33.7%. It is that percentage that is multiplied by the sum of $1,911,910. This latter figure is derived by determining what percentage $562,020. is of $1,123,916. That percentage is 50%. Fifty percent of the total labor cost overrun is attributable to pier 14. 50% of the total cost is $1,911,910. (50% multiplied by $3,823,820.). $1,911,910 multiplied by 33.7% equals $644,314. and is RIDOT's portion of the overrun at this pier.
 Pier 15
The total labor overrun on pier 15 was $163,183. Stated as a percentage of the total labor overrun at all piers, it is 14.52% ($163,183. divided by $1,123,916.) 14.52% of the total overrun at all piers is in the sum of $555,219. (14.52% multiplied by $3,823,820.) The percentage of the overrun attributed to RIDOT is 56.7% (total time in the water — 19.53 months, time attributable to RIDOT — 11.08 months). The amount awarded as damages at pier 15 attributable to RIDOT is $314,809. (56.7% multiplied by $555,219.)
 Pier 16
Total labor overrun at pier 16 is $105,489. Stated as a percentage of the total labor overrun at all piers, it is 9.386%. ($105,489. divided by $1,123,916.) 9.386% of the total overrun at all piers is $358,904. (9.386% multiplied by $3,823,820.) The percentage of overrun attributable to RIDOT is 67.5%. Sixty-seven percent of the overrun is attributable to RIDOT based upon the length of time in water attributable to RIDOT as compared to the total time the cofferdam was in the water. Sixty-seven percent multiplied by $358,904. establishes damages recoverable for the overrun in the sum of $242,260.
 Pier 17
Total labor cost at pier 17 is $33,073. As a percentage of the labor overrun at all piers, it is 2.94% ($33,073. divided by $1,123,916.). 2.94% of the total overrun at all piers is in the sum of $112,420. (2.94% multiplied by $3,823,820.) The percentage of the overrun attributable to RIDOT based upon the inwater percentage is 42.3%. The amount attributable at pier 17 is $47,554. (42.3% multiplied by $112,420.).
 Pier 18
Total labor overrun at pier 18 is $77,910. There is a damage overrun which must be absorbed by CFF. That damage reduction is $9,000., making the overrun $68,910. That sum as a percentage of the total overrun is 6.131% ($68,910. divided by $1,123,916.). 6.131% of the total overrun at all piers is $234,438 (6.131% multiplied by $3,823,820.). The percentage of overrun attributable to RIDOT on the inwater percentage is 30.3%. The claim is $71,035 (30.3% multiplied by $234,438.). That sum is assessed as damages attributable to RIDOT at pier 18.
 Pier 19
Total labor costs at pier 19 is $31,671. As a percentage of the total labor overrun at all piers, it is 2.82% ($31,671. divided by $1,123,916.) 2.82% of the total overrun at all piers is the amount of $107,832 (2.8% multiplied by $3,823,820.). The percent of overrun attributable to RIDOT on the inwater relationship is 54%. 54% attributable of the total claim is $58,229 (54% multiplied by $107,832.).
 Pier 20
RIDOT makes no claim for damages attributable to RIDOT at pier 20.
In summary, of the total cofferdam inefficiency cost overruns of $3,823,820. ($3,913,452. minus the consultant's fee), CFF is awarded the sum of $1,576,778. as follows:
 Total Overrun RIDOT
 Pier 12 $ 510,480. $ 198,577.
 Pier 14 $1,911,910. $ 644,314.
 Pier 15 $ 555,219 $ 314,809.
 Pier 16 $ 358,904. $ 242,260.
 Pier 17 $ 112,420. $ 47,554.
 Pier 18 $ 234,438. $ 71,035.
 Pier 19 $ 107,832. $ 58,229.
 Pier 20 $ 1,669. $ 0.
 ___________
 $1,576,778.

The total overrun column will not total $3,823,820., but rather $3,792,902. This difference of approximately $31,000. is accounted for by the allocation within the cost overruns of specific items that were determined to be the liability of CFF so that the percentages do not work out because of that allocation.
Of the approximate $3.9 million overrun, CFF must absorb $2.33 million of that overrun and RIDOT is responsible for $1.57 million of that overrun, namely, the sum of $1,576,778.
 b) Concrete Construction Inefficiency
Again, the starting point is on Exhibit 180, item 43 on pgs. 47, 48 and 49. There is a breakdown of the total cost overrun involving the footings and pedestals, the pier shafts and the land footings on Jamestown islands including the abutment. There are five categories relating to the footings, pedestals, shafts, land foundations and the east abutment, the abutment on Jamestown. An analysis of that Exhibit indicates that CFF experienced a $1,065,470. cost overrun in its concrete construction expense. John Fowler reviewed all of the bid estimates as it relates to this claim and the claim on the cofferdams and found that the contractor's bid estimate was reasonable and responsive to what the costs would have been to perform work at this project under normal conditions. This is one of the criteria, the reasonableness of the bid estimate that permits a contractor to frame a claim against the owner, in this case RIDOT, where there has been high cost overruns brought about by the wrongful conduct of the owner.
There is no question that the work involving the concrete construction was performed under circumstances that one would not term as normal conditions. Work was performed by this contractor out of sequence, was slowed by the thermal curing requirements imposed by RIDOT and was interrupted because of the concrete mix designs and the concrete mix strength issues.
Originally, the contract work was scheduled in such a manner that the contractor provided for a short learning curve and the rapid recycling of the EFCO forms for the footing and pedestals and the peri-form system for the pier shafts. From the very beginning, the work of the contractor was delayed, disrupted and performed out of sequence. There was no continuity of work. The work originally was scheduled to begin on Jamestown and then to move from the Jamestown landmass to the water piers. RIDOT delayed its cement approval; that delay prevented the commencement work on the concrete on Jamestown, which in turn disrupted the follow up concrete work both on Jamestown and in the water.
Once the work had proceeded to the water, the piers themselves were delayed by cofferdam installation problems, excavation and tremie concrete problems, etc. RIDOT by an interpretation defined footings and pedestals as "massive pores" and required thermal curing, although the specifications for the substructure work made no such requirement in the contract. On Jamestown, the forms could not be recycled as planned until RIDOT approved the thermal curing. In the water, thermal curing further complicated the form movement from pier to pier. Because of the thermal curing requirements, forms could not be removed until two successive days of temperature differential reduction had occurred. Since there are a limited number of forms, when these delays occurred, crews were basically idle. While CFF would try to keep crews busy elsewhere, it was inevitable that the work became less efficient when concrete work was only intermittently available. The intervals were too short to warrant layoffs of the crews and too long to keep the crews efficiently employed. The result was a higher labor cost associated with concrete construction. The footing cost in the cofferdams was $99. per yard estimated versus $308. per yard actual cost. In the pedestals it was $92. per yard estimated versus $184. per yard actual cost.
The shafts were affected the most. The shafts required special forms, the peri-forms. There was a bottom form, a middle form and a top form. They were not interchangeable. The contractor planned to have crews pour the bottom and move to the successive piers. Middle lifts then could be poured and work places for the top forms would be available. By having all the piers available, there would always be a place for crews and the specific forms to be working. That did not happen. Piers 13, 14, 17, 18 and 19 never became available and other piers became available in uneven and unscheduled fashion. The problem was exacerbated by the concrete placement stop work orders, official stop work orders and unofficial stop work orders. While not labeled a technical stop work order, because of the strength issue with the 5,000 p.s.i. concrete, CFF was often requested to wait until cylinder break information was available before pouring additional concrete. As a result of these problems, additional crews were idle. Like the footings and the pedestals, the interruptions were too short to warrant layoffs and too long and frequent to productively employ the crews. This results in an abnormally high labor cost associated with this concrete construction. It seems to the Court that the testimony and the records before the Court more than warrant the Court in awarding the cost overrun as an element of damages for the inefficiency in concrete work. There was no reason but for the conduct of RIDOT that this contractor ought not to have been able to perform the work required by its contract within the bid estimates that he made for the construction of the footings, pedestals and the other concrete masses to support the superstructure. The Court awards as damages for this inefficiency the sum of $1,065,047.
The Court also has determined in a prior section of this decision that there was additional delay caused by this inefficiency in the concrete construction. That delay is as follows:
 Delay
 Pier 12 75 1/4 calendar days
 Pier 15 65 3/4 calendar days
 Pier 16 38 1/2 calendar days
 Pier 20 117 calendar days
 Pier 21 53 calendar days
 Pier 22 65 1/2 calendar days
 Pier 23 37 1/2 calendar days

These figures have already been computed as additional delay on the summary graph, Exhibit 178 and in the delay section of this decision have been accounted for in that fashion.
 c) Reinforcing Steel
CFF incurred $103,613. labor cost overrun for the placement of reinforcing steel. CFF had a dual responsibility for the placement of reinforcing steel:
 (1) In the substructure of the main bridge and approaches which was CFF's own work, and
 (2) In the superstructure spans, which was Moseman's work.
An analysis of Exhibit 180 at p. 50 reinforces the testimony of Mr. McGoldrick concerning concrete delays which affected his workers when working on their own work and his workers when working on Moseman's work. The delays were too short to let the crews go and too long to efficiently use the crews. An analysis of the main bridge as built and as estimated as it relates to reinforcing steel indicates that there was a cost overrun on piers 2 through the east abutment, the work of CFF; but on working on the portions of the main bridge relating to the work to be done for Moseman, there was a savings. The "as built" labor cost was 0.134, "as estimated" it was 0.163. The crews, however, were not kept busy as it relates to the main bridge where the bid estimate was 0.143 and the labor cost because of the delays in concrete work, discussed in the prior section, raised the labor costs to 0.228. All of these costs are per pound of steel, so that when the mathematics are done and you subtract the "as bid" from the "as built", there is an additional cost of 0.085 per pound. When it is determined that the total amount for the main bridge was $1,218,981. per pound, the multiplication brings out that there was a cost overrun which was the total responsibility of RIDOT in the amount of $103,613., and that sum is awarded as part of the inefficiency damages sustained by this contractor in performing the reinforcing steel work.
 d) Cofferdam Dewatering
Again the starting point is on Exhibit 180, item 45 on p. 51. An examination of that exhibit indicates that the additional costs allocated toward cofferdam dewatering inefficiency is the sum of $815,522.65. Because John Fowler, CFF's expert, and Mr. McGoldrick readily admitted that CFF omitted certain costs associated with pumping the cofferdams in its bid, the "as bid" versus the total costs is not an appropriate way to determine the cost of the overrun.
It has been suggested, however, that there is a relationship between the concrete inefficiency and the dewatering of the cofferdam. In other words, the length of time that the cofferdam had to be dewatered is related to the cause for the delay in placing the concrete: the concrete had to be thermal cured; there were problems with the design mix; there were problems with the tremie at pier 16 and again at pier 14. These inefficiencies are directly related to concrete. The testimony suggests that one can determine mathematically a relationship between the actual costs in placing the footing and the actual costs in placing the pedestals, and by mathematically establishing that relationship one can determine a percentage and use that percentage in fixing the responsibility for RIDOT. The mathematics of that proposition appear on page 51 of Exhibit 149.
The Court is confronted with the problem of knowing that there were additional costs sustained by the contractor in dewatering the cofferdams, which are responsibility of RIDOT. The amount of the bid estimate is not reliable. The Court has been presented with a formula keyed to the RIDOT caused construction delays associated with the pedestals and footings. The Court feels that this is an appropriate method of the determining the responsibility for that additional cost. The additional costs, applying that formula, is 54.15%. By multiplying that percentage with the total amount of the additional costs, namely, $815,522.65, the Court has determined that $441,606. is the responsibility of RIDOT for the additional costs incurred by this contractor as a result of delays, which the Court has fixed upon the State of Rhode Island. The Court has, therefore, accepted the formula and the method of proving the damages sustained by CFF. That sum is awarded as damages in this inefficiency claim.
 e) Tremie Concrete Construction
Using its bid estimate for materials and labor, CFF is entitled to recover on a total cost basis the sum of $575,261. (Exhibit 180, item 46 at p. 52) This figure is arrived at by considering the as built cost to erect piers 12, 14, 15, 16 and 20. The total cost is in the amount of $491,545. The pay volume, that is 9,046 c.y., is the total cubic yards that RIDOT agreed it would pay for. The bid estimate for the same four piers, for labor and burden, was $87,895. This, however, was for replacement of 11,380 c.y. or the cost of $7.72 per cubic yard. The Court must adjust that bid estimate cost to the volume actually placed, multiplying 9,046 per cubic yard by $7.72 per cubic yard. The cost on the bid estimate would therefore be $69,835. It is then readily determined that there was an overrun for the labor and burden work in the amount of $421,710. ($491,545. minus $69,835.)
There is an additional cost for the concrete material used. The total material cost to place this concrete was in the amount of $680,012. The volume revenue, that is the amount for which RIDOT agreed to pay, is 9,046 c.y. Dividing the total cost $680,012 by the total cubic yards of concrete placed 9,046, the cubic yard cost is determined to be $75.17 per cubic yard. Referring to the bid estimate for the material cost, the estimate was $60. per cubic yard, so as to this item there is a $15.17 per cubic yard overrun. It should be noted that the actual purchased per cubic yard cost of the concrete placed was actually lower than $75.17. But the rejected, wrongful rejection, of concrete increased the cost of the as placed concrete. It is actually the rejection of concrete that creates the overrun.
The Court has heretofore determined that RIDOT wrongfully rejected concrete both because of the 90 minute time limit and the testing procedures taken for that concrete; that the specifications permitted the engineer in the field to determine whether the quality of the concrete had or had not been affected by the passage of more than 90 minutes. All parties, particularly in the initial thirty truck loads that were rejected, agreed that the concrete was good concrete. It was the domino effect of these rejections that caused the backup of trucks at the causeway. That backup in turn waiting for the barges that were involved in disposing of the rejected concrete, prevented trucks being rotated back to the Tilcon-Gammino plant therefore interrupting the efficient placement of concrete at the various piers. There is no appropriate method other than a comparison of the bid cost, which again John Fowler testified were reasonable that the concrete and the materials ought to have been capable of being placed for the bid estimate. Therefore the Court has awarded the full amount of $575,261. There is included in that figure, in addition to the $137,228. additional cost for the material, an item of $16,323. which represents small tools and equipment. That is 4.08% of the total small tools cost on the job. The items making up this inefficiency claim include $421,710. for labor plus burden and supplies; $16,323. for small tools allocation; and for concrete material a sum of $137,228.; for a total award of $575,261. The Court approves the method of considering the bid estimate against the actual cost and affixes responsibility for the payment of this sum in total on RIDOT.
 f) Overburden Excavation
Before proceeding with the Court's decision on this element of inefficiency the Court must indicate that upon rejecting the detailed cost analysis in Section III E (3) Overburden Excavation of the plaintiff's brief, for want of a measured mile chronology, the Court requested from counsel representing the parties communication as to how that claim would be treated in the inefficiency section of the brief. The Court concluding that it was cognizant of the fact that CFF had experienced abnormal soil behavior which impacted upon the overburden excavation, but was rejecting the methodology used because of the lack of a "non-impacted measured mile."
On March 2, 1993 the Court received a reply memoranda from plaintiff's counsel replying to defendant counsel's memo. The Court was then able to address the issues raised in this inefficiency claim.
Prior to receipt of the reply memoranda from Mr. DeFanti's office the Court made several mathematical computations. The Court had arrived at a unit cost of $68.73 per cubic yard or a total cost of $430,883.00 for the overburden excavation at piers 12 through 20 excluding 13. No evidence had been introduced before the Court directly bearing upon what was the actual cost to excavate 6,269 c.y. of material. The Court had used the mathematical computation but was unable to verify from any direct testimony that this was the actual cost. In the inefficiency claim the Court was, of course, concerned in determining the difference between the "as bid" estimate of $154,280.00 and the actual cost incurred. As a footnote to the communication of March 2nd Mr. DeFanti informs the Court as follows:
 "CFF's cost records, although not introduced into evidence, were produced to RIDOT and its experts to allow them to evaluate CFF's claims. After examination of CFF's cost records RIDOT did not challenge the amount. See Exhibit E-161. CFF's cost records state the total labor and burden costs of overburden excavation for piers 12 through 20 as $430,891.89."
The Court had arrived at its figures by adding the unit cost for the measured mile, the inefficiency unit cost and the bid unit estimate and computed the totals of those three multiplications by the total of cubic yards excavated.
There is still nothing contained in the file as to what CFF anticipated its costs would be for equipment, small tools, and fuel, oil, gasoline. The Court will assume since the information indicates that these items were presented as part of the detailed cost that these sums as listed were excess of any allocation made by CFF at the time of bid for those items. The Court will, therefore, award inefficiency damages as follows:
 Equipment $394,271.00
 Small tools $ 8,283.00
 Supplies $ 22,211.00
 F.O.G. $ 16,702.00
 ___________
 Total fixed cost $441,467.00
 Labor and burden $276,603.00
 ___________
 Total claim $718,070.00

The total of labor and burden contained in this claim is arrived at by subtracting the bid sum of $154,280.00 from the actual cost of $430,883.00.
The Court therefore awards as damages for inefficiency involving the failure of the soil to respond in a normal fashion the sum of $718,070.00.
 g) Granite Panel
The top of the concrete substructure pedestals had granite panel surfaces to protect the concrete against the environment. These panels were fabricated on shore by combining individual pieces into larger assemblies. The prefabricated assemblies actually became part of the forming system for the pedestals. As a result of the start/stop and out of sequence nature of the cofferdam and substructure concrete work, there was substantial double handling and stop/start work on the granite panel fabrication. It rendered this work inefficient. Since all work on the panels was impacted there is no measured mile. Consequently, CFF seeks to have the Court consider recovery based upon the difference between actual cost and its bid estimate.
The Court cannot do that. The testimony of John Fowler indicated that CFF had made errors in submitting its bid estimate. Specifically, CFF had not placed in its bid estimates sufficient funds to provide for the loading of the panels on the barge at the fabrication yard and the subsequent cost to bring them to the various piers to be installed as the top surface of the panels. The bid estimate, therefore, was low. Mr. Fowler, however, did testify with the concurrence of Mr. McGoldrick that the bid was $170,000 low and that $170,000. would have been required to provide for the transportation of the prefabricated assembled panels to and from the fabrication yard to the site for placement.
Mr. McGoldrick had testified that the excess costs as contained in Exhibit 180, item 48 at p. 54 was in the sum of $304,352. When one deducts the amount of $170,000. from those excessive costs because of the lack of a bid estimate, one concludes that the differential is $134,352. The Court believes that this fairly represents the difference between the bid estimate as amended and the total costs and awards the said sum of $134,352. as damages for the increased costs resulting from the inefficiency of handling this element of construction.
 h) Summary of Inefficiency Claim
Of the $6,504,072. cost overrun set forth in Exhibit 180, the amount of the excess cost or overrun is listed in one column and the amount that the Court awards is listed in a second column.
 Overrun amount Damages awarded
 Cofferdams $3,913,452. $1,576,778.
 Concrete $1,065,047. $1,065,047.
 Restructured Steel $ 103,613. $ 103,613.
 Dewatering $ 441,605. $ 441,605.
 Tremie $ 375,261. $ 375,261.
 Excavation $ 718,070. $ 718,070.
 Granite Panels $ 304,351. $ 134,352.
 ___________
 $4,414,726.
4. Findings of fact
The Court adopts as its Findings of Fact those proposed by the plaintiff under Inefficiency Claims, pages 89 through 102 and numbered paragraphs 1 through 53 inclusive as amended mathematically by this decision as the Court's Findings of Fact.
S. SUMMARY OF DAMAGES AWARDED TO CFF (EXCLUSIVE OF MOSEMAN ANDCPC)
The Court has awarded damages thus far to CFF based upon a detailed cost analysis of $13,282,467.00 as well as damages for inefficiencies caused by RIDOT in the amount of $4,614,726.00 before any markup for profit. The detailed cost damages award includes delay damages based on a "but for" date on pier 17 of April 8, 1987. The delay award does not include any damages relating to concrete and excavation. When excavation and concrete inefficiency/delay (now in the green hatch portion of Exhibit 178) are included in the "but for" analysis the "but for" dates move to the dates set forth in the table below.
 Pier But For
 17 April 2, 1987
 18 March 9, 1987
 14 January 8, 1987
 12 December 9, 1986
 20 October 14, 1986

The Court has heretofore determined the per diem cost to be $11,085.00. The pier 17 adjustment amounts to six days. Six times $11,085.00 is the sum of $66,510.00. Heretofore the Court also determined that the per diem rate for pre-April 8th at the other piers is in the amount of $1,678.77. As adjusted those dates will equal 199 days. One hundred ninety-nine times the per diem of 1678.77 is in the sum of $334,075.00.
Based upon the above calculation the additional delay days because of inefficiency increased damages in the amount of $400,585.00.
Damages awarded to CFF exclusive of Moseman and CPC are as follows:
 Detailed cost claim: $13,282,467.00
 Modified total cost: $ 4,614,726.00
 Additional delay damages
 related to inefficiency: $ 400,585.00
 ______________
 Total damages: $18,297,778.00
 Profit (10%) $ 1,829,778.00
 ______________
 Total award of damages: $20,127,556.00
T. MOSEMAN'S CLAIM
REFERENCE: Moseman's Claim, CFF Brief, Section III, T, p. 209; RIDOT Brief section labeled Moseman.
1. Statement of total cost claim
RIDOT's responsible delays prevented Moseman from proceeding with its work as scheduled. RIDOT's interference, misapplication of the specifications and delay to the substructure work impacted on Moseman's ability to perform work efficiently and prevented any work at the balanced cantilever piers.
2. Legal basis
Since Moseman never worked in unimpacted conditions, there is no basis for computation of a detailed cost claim. Moseman's claim is therefore prepared as a modified total cost claim. The legal basis underlying CFF's claims for delay to the substructure are relied upon by Moseman in its claim against RIDOT resulting from its inability to build the superstructure because of the delay caused by RIDOT in preventing CFF from building the substructure.
Other delays, misapplications of specifications as they affect Moseman's ability to efficiently perform, will be specifically covered in the presentment of its claim.
3. Facts
Moseman subcontracted with CFF to construct the main bridge superstructure, i.e. all work above the pier caps. Moseman specializes in cast-in-place and pre-cast segmental concrete construction. On this particular job Moseman's project manager was Simeon Crosier who had extensive prior experience with balanced cantilever construction. A review of Exhibit 127 establishes the project manager as having a wealth of experience both in working for Moseman and his prior employment in this type of construction. The Court was frankly impressed with him as a person on the stand. He gave the impression of being an outstanding leader of men. This is a characteristic that I believe one must have in order to motivate people who do this kind of work. He willingly offered criticism and took criticism for work that was poorly performed. He staunchly defended, however, his position in spite of attacks.
This project was to have three work places: Jamestown, Davisville and the Balanced Cantilever Spans. Moseman could not really begin building the superstructure until CFF had completed the work on Jamestown. This type of bridge construction is anchored at the abutment, and you build from the abutment out, so it was necessary for CFF to build the substructure, that is, the substructure and the land piers being the east abutment, piers 23, 22, and 21. These had to be in place before any work could be done by Moseman on the superstructure.
Moseman had determined that it would pre-cast the west and east water approach spans (Spans 1-11 and 15-19 respectively). Moseman was responsible for the pre-cast segments and had the obligation of delivering them to the water's edge at which point CFF would deliver these pre-cast segments to the bridge site. Another subcontractor, VSL, was responsible for lifting the segments into place, making the closure between segments and to complete the superstructure, and finalizing the stressing and post-tensioning.
It was Moseman's job to build the cantilever part of the bridge joining piers 12 and 15, but in order to accomplish that, piers 13 and 14 would have to be in existence since the cantilever balancing segments went east and west from piers 13 and 14 joining the segments at 12 and 15. No work was ever done by Moseman on the balance cantilever segment of the bridge basically because piers 13 and 14 were not built prior to the date of termination.
As initially envisioned by Moseman, work would commence in Jamestown and Davisville, the pre-cast sites, and as experience was gained in pre-casting, when the work was finished, these experienced workmen would then be used by Moseman for the balanced cantilever spans. Once the bridge was complete from abutment to abutment, the responsibility for finishing the bridge, that is putting up the guardrails, sidewalks, medium barriers, etc. fell upon CFF.
Although Moseman had prepared a schedule for its work which it intended to commence in the spring of 1988, Moseman was never permitted to work consistent with its schedule. This was a result of various problems which developed between Moseman's project engineer, Simeon Crosier, and inspectors for DMJM. As those problems have significance, the Court will make its comments and findings. Obviously, based upon the brief submitted by RIDOT, it does not contest the figures, that is, the costs involved to Moseman in doing the work for the extended period of time that Moseman had a physical presence at Davisville and Jamestown; but it has pointed and serious comments concerning the reputation, abilities and competence of Moseman to perform the work involved at the bridge. The Court has heretofore made a comment concerning RIDOT's lack of on site consultants who had experience in this type of construction. The inspection for Moseman's work was primarily carried out by inspectors employed by DMJM.
 a) The "Davisville Yard"
Under the special provision section of the contract, Moseman as a subcontractor of CFF, elected to establish a pre-cast construction yard at Davisville. It was necessary under the contract that it submit to RIDOT shop drawings for approval of the Construction Option, that is the right to build the bridge pre-cast on land and move the spans once cast to the bridge site for erection.
As submitted, the Construction Option drawings did not include calculations. The engineering calculations were not sent along with the drawings. T.Y. Lin in California expressed an interest in reviewing the drawings without the calculations. However, RIDOT insisted that the calculations be submitted before the transmittal of the drawings to T.Y. Lin. Some engineers prefer not to be influenced by another engineer's calculations and therefore make their own calculations. However, the contract did require the calculations to be submitted, and some delay was involved before those calculations could be made and forwarded. It was not until March of 1988 that the calculations were forwarded to RIDOT and the matter then under the terms of the contract, required RIDOT's approval within 90 days. In the meantime RIDOT allowed Moseman, notwithstanding the approval problem, to begin its construction at the Davisville yard, and Moseman went about its business building the yard. Moseman became abreast of the situation toward the end of the summer. It so happened that the design mix problem with the concrete was solved when cement became available in March. Concrete was available to CFF in April, and CFF began to do its substructure work in April. By the end of the summer, Moseman was therefore ready to begin its work on the superstructure. The approval for the Construction Option had not come through by that time, but when Moseman was standing by waiting for that approval it came through and Moseman began its work toward the end of the summer.
The first span was Span 19, that is a concrete span pre-cast at Davisville in six sections. It is referred to in the transcript of the proceedings as Lift 1 Stage 1. This span and the problems encountered by Moseman at the outset are described by Crosier as "not our finest hour" and by the resident engineer, Graham Ray as "a Chinese fire drill".
Moseman had elected not to have a trial run the day before, but planned a trial run with the first load of concrete arriving about one-half hour before the second load. If everything went well, Moseman would continue to make the pour. It suffices to say that nothing went well. There were green troops in the trenches. There was a conveyor system for the concrete that did not function as planned. There was a truck driver who could not keep the rear end of his truck over the conveyor so as to have the concrete end up in the conveyor and then in the form at the end of that conveyor, so that there was some wasting of cement. There were other problems that developed. The Court finds that following the industry standard was the practice on this job, i.e. to test concrete as it was discharged from the mixer. Concrete was tested before it was loaded on barges and brought out to the various water piers, but RIDOT, without prior notice to Moseman, since this was air entrainment concrete, determined that it would test the concrete at the end of the conveyor. This caused problems. Air entrainment is added by the insertion within the concrete of certain chemicals which increase the air content of the concrete, and in this case the specifications required 6 ± 1%. The air entrainment chemical was to be added at the batching plant in Cranston. When the conveyor system was set up, the first load was tested and was low in air entrainment. The load was rejected. The Court has examined all of the specifications in this matter. The engineer is specifically instructed when a conveyor system is set up, if that conveyor system affects the quality of the concrete then he has the right to order the conveyor system discontinued. This seems to indicate that double testing was appropriate, according to industry standards, at the mixer and at the end of the conveyor system to determine what the loss of air content would be. The engineer is also instructed that he is to adjust the air content of the cement. In the Court's judgment there is no specific authority for the engineer to reject concrete because it is out of specification for air entrainment. Concrete is generally brought to the site in 10 c.y. trucks. That is a lot of concrete. Chemicals can be added in the field to affect the air content of the concrete. In this particular case, the first three truckloads were rejected because of problems with the air. The specifications seem to indicate that the conveyor system could have been rejected and ordered suspended. Later pours indicate that an adjustment was made in the conveyor system. The problem was solved. When the trucks arrived, the air content had been adjusted at the plant so that it was undoubtedly above the specifications at the point of discharge from the mixer, but at the end of the conveyor had lost some air so as to be within specifications. In any event, a job that was originally anticipated to take five or six hours to make that first Lift 1 Stage 1 pour actually took ten or eleven hours, thus, the connotation by Crosier that it was not one of our finest hours. Problems arose when that first pour was rejected outright. It was rejected by RIDOT, I would assume basically because RIDOT was concerned by the Chinese fire drill and the inefficiencies of Moseman's crews. There was some honeycombing. There was some suspicion that there may have been an initial setting of some of the concrete so as to cause voids within the concrete. Acting upon these suspicions, RIDOT rejected the span, refused to examine it for structural defects and refused to participate with the experts hired by Moseman to determine whether the span was structurally sound.
Under the job specifications which govern the conduct of Moseman as well as RIDOT, honeycombing, which exists on this initial Span 19 segment, if less than one inch deep, shall be repaired without intervention of the resident engineer. If greater than one inch, the resident engineer has the obligation to determine whether the span is or is not structurally sound. If found to be structurally sound, the contractor is directed to repair the defects.
The evidence with regard to this span is that it is structurally sound, that it contains some honeycombing, but that that honeycombing can be repaired and the span is competent to be used in the structure to be built. In the engineer's report, Edward A.B. Salze of Construction Technology Laboratories ("CTL") indicated that the work should not be rejected as no irreparable defects existed. That report from an expert in the field is weighed against the testimony of DMJM's Ozman Marzouk's complaint that his visual inspection led him to believe that cold joints existed. Walter Praszker made a cursory visual inspection some four or five days after the pour. He made this visual inspection while there were still wooden forms on the span. He also concluded that cold joints existed and acceptance of the work should be placed on hold. These particular visual inspections made by RIDOT and its consulting engineer are weighed by the Court against the opinion of an expert who performed tests and who concluded that this span was in fact structurally sound and that the minor defects, less than 1% of the total concrete poured, requiring repair work ought not to be rejected. The Court has determined that the span was a good pour and even though it was the result of a Chinese fire drill that took two and one-half times as long to complete than as originally anticipated, produced a structurally sound segment; that it was wrongfully rejected by RIDOT; that RIDOT was deficient in failing to perform its own structural inspection and that to have taken this segment off line, to remove it and have it replaced was an unnecessary expense.
Some of these same inspectors who were operating through DMJM interpreted winter curing provisions of the contract's specifications in such a fashion that if the temperature on any given day dropped below 50° winter curing methods would have to be put in place and that if it dropped below 50° during the curing period that was grounds for rejection of the entire segment.
Crosier, project engineer for Moseman, was terribly disturbed and fought the battle concerning this interpretation for the better part of a year arguing that under the terms of the contract when the temperature was 35° and rising, or 38° and falling Moseman had a right to place a pour without the approval of the engineer. Winter curing methods limit the time when concrete can be poured and cured. It is the danger of the concrete freezing before the concrete has reached a strength of 500 p.s.i. that causes the problem.
RIDOT's specifications are a bit confusing but what seems to be undisputed is that:
 (1) concrete cannot be poured without engineer approval unless the temperature is 35° and rising or 38° and descending (Exhibit 1 at pg. 154, § 601.03.05.);
 (2) concrete cannot be allowed to freeze until it reaches a strength of 500 p.s.i.; and
 (3) concrete should cure for 5 days at 50° degrees (Exhibit 1 at pg. 206, § 807.03.07.)
The basic dispute between Moseman and RIDOT/DMJM revolved around what steps had to be taken to meet these requirements. DMJM maintained that if concrete was placed and the air temperature dropped below 50° for any length of time during the 5 days, the concrete was out of specifications and should be rejected. Consequently, it wanted Moseman to build an enclosure for the pre-cast yard or take steps to ensure that the air around the concrete was maintained at 50°.
As noted above, that is contrary to the industry practice. While the specifications are convoluted at best they appear to recognize that concrete exposed to sub 50° weather can meet specifications by extending the curing period (Exhibit 1 at pg. 206, § 807.03.7). Special steps are unnecessary until average
daily temperatures are below 50° (Exhibit 1 at pg. 131, § 501.03.12(f)).
Generally concrete is required to cure for 5 days at or above temperatures of 50° (Exhibit 1 at pp. 205-206, § 807.03.7). If the surrounding air temperature should drop below 50° for a time during the 5 days, the curing period is extended to compensate for the low temperature (Exhibit 1 at pg. 156, § 601.03.8). The need for winter curing procedure does not arise until the temperatures begin to be constantly lower than 50° and freezing is a significant risk.
Moseman's schedule anticipated casting concrete throughout most of the year (with scheduled shutdowns during cold spells in the winter) without taking special steps for cold weather curing conditions. This however was no longer feasible given RIDOT's interpretation of the specification. The requirement that the air temperature be constantly above 50°, if on any one day it dropped 50°, was imposed with no contractural or engineering basis so that whenever the temperature dropped in September for one day below 50° RIDOT said you now must take steps to keep the air temperature constantly above 50° during that period of time and winter curing requirements existed from that point on until the spring. This in effect eliminated pouring in September, October and November. Concrete could not be poured without these special enclosures. This dispute between RIDOT and Moseman existed and was intensified when a fire broke out during one of the curing sessions causing damage to the concrete at Span 23 but more concerning that span later in this decision.
Two additional problems developed in this scenario relating to Davisville. First of all there was a problem concerning the post-approval resubmittal of the Construction Option and there were problems brought about by the claim of low strength concrete. Both of these problems effectively shut down the Davisville operation for months.
As to the resubmittal of the Construction Option RIDOT had received a communication on October 7, 1986 indicating that RIDOT had approved the Construction Option; on the basis of this approval from RIDOT, the contract specifications were satisfied. However on October 10, 1986 RIDOT informed CFF that the State "will not participate in the inspection of work related to your redesign submission until the redesign plans have been approved by both RIDOT and the Federal Highway Administration. Work done without inspection prior to receipt of this approval will not be accepted." It would seem that this stop work order prevented work at Davisville from October 1986 until June 1987 since no work could be done without inspection and any work to be done without inspection would automatically not be approved and accepted.
The problem seems to be between RIDOT and Federal Highway Agency. In hindsight it would seem that RIDOT had an agreement that it would obtain the Federal Highway Administration's approval as part of its relationship with the funding agency, namely the Federal Government, on part of this project. RIDOT had become little more than a transmittal agent on the Construction Option. The work was done in California by T.Y. Lin, the calculations were done in California by Engineer Computer Corp. (ECC) and submitted directly to T.Y. Lin. This scenario resulted in RIDOT being poorly informed about what the Construction Option was all about. After the October 7, 1986 letter to CFF indicating that acceptance had been finally approved for the Construction Option, RIDOT submitted the Construction Option plans to the Federal Highway Administration. The Federal Highway Administration in turn began asking questions of RIDOT, the answers to which RIDOT did not have. The Federal Highway Administration evidently concluded that until RIDOT was aware of what was going on they were not going to approve the Construction Option. The contract between RIDOT and CFF did not require FHWA approval of anything. It may very well be that as between RIDOT and its funding agency there was some agreement but it was not part of the contract. The contract had already been fulfilled. RIDOT had given its approval and so informed CFF. T.Y. Lin had already informed RIDOT that Moseman was not obligated to provide a manual for DMJM's inspectors. These inspectors had lost assistance in performing their consulting functions for RIDOT and wanted a manual of procedures as a guide. The Federal Highway Administration decided that until Moseman provided that procedure manual, it would withhold its approval of the project. Moseman, caught in the bind, developed a procedure manual to be used by the inspectors of its work and sought payment or compensation for having provided the manual. RIDOT denied their claim for compensation.
The second problem existed at Davisville when the dispute came about as it related to the strength of the 5,000 p.s.i. in 28 days. Effectively when this problem existed RIDOT held up all placement of concrete pending resolution of the problem. As heretofore discussed, the problem was not with the concrete itself, it's just that because RIDOT had used a low alkali type concrete mix that the mix could not in 28 days attain a strength of 5,000 p.s.i. RIDOT had failed to test to determine whether it should adjust the strength at 28 days or adjust the time when it would be tested to see if it had obtained the 5,000 p.s.i. This problem again impacted upon Moseman and it was unable to continue its work during that period of time. All of these problems at Davisville impacted the relationship between Moseman, its inspectors, RIDOT, the Federal Highway Administration and impacted upon the ability of Moseman to perform its work according to schedule and on time. The delay and the inefficiency related are claimed to be the responsibility of RIDOT.
 b) Jamestown Island
Moseman originally planned to commence its work on Span 23 in April of 1986, and as scheduled intended to complete its work in about 7 1/2 months. In order to complete its work in that time frame, CFF would have had to have the east abutment and piers 23 and 22 complete before Moseman could begin the superstructure work. Obviously, because of the mixed design cement concrete design problems, CFF did not begin to do its work on the substructure until April. It was not until late August that Moseman was able to do any work from the east abutment out. Unlike the pre-cast work at Davisville, Span 23 was cast-in-place. Span 23 became available for cast-in-place work the latter part of August. During the prior winter, the dispute arose between RIDOT and Moseman concerning the winter curing problems. These problems caused friction and throughout that winter at Davisville caused many inefficient periods and start-stop of the work.
It was in March of 1987, the spring following the first winter after the dispute arose, that Moseman poured its first cast-in-place span, number 23. Number 23 was poured, and because of the winter curing misinterpretations, Span 23 had to be heated and protected during the month of April. It was during the month of April that Span 23 had a fire that erupted when material came in contact with a flame causing extensive damage. The cost of which to repair was about $40,000. Likewise, since there was delay in being able to cast Span 23 and Span 22, rather than be cast during the summer months of 1986 when the ground was firm and not subject to torrential rains in the spring of 1987, large amounts of spring rain caused an undermining of the support forms for the tens of thousands of pounds of wood frames that required additional bracing and jacking in order to hold the proper alignment. Again, these were additional expenses that Moseman was required to expend because of the delay in placing these spans to the spring of 1987 rather than the summer months of 1986.
On Span 23, again without doing a structural inspection, RIDOT was suspecting cold joints and preliminarily rejected the span. Had this rejection persisted then Span 23 would have had to be taken down and replaced. Unlike the prior experience when Moseman informed RIDOT that it was hiring concrete experts to study and determine the integrity of the structure, RIDOT participated. And after participating, accepted the span since there was no evidence of any defect of a structural nature. The damage, including the damage to the span brought about by the fire was all capable of being repaired. An examination of the photographs of Span 23 being exhibits taken after the fire from a visual one of view one would wonder whether any amount of repair could restore the span. These exhibits should be contrasted with the exhibits of Lift 1 Stage 1, Span 19. There were no structural defects. Span 23 as originally poured was repaired and is still part of the present structure at the Jamestown Bridge.
The state, as it related to this exhibit, tried to indicate that the span was not reasonably in close compliance with the plans and specification because of cold joints and honeycombs. Moseman concurred that some honeycombs existed and required repair but it disagreed that it affected the structural integrity of the section cast. After inspection, RIDOT finally agreed that Span 23 would be accepted. It was on this span that an additional problem developed concerning the vibrating of concrete. The inspectors, during a period of poor relationships between Moseman and the inspectors, when Crosier and his supervisors were not available, directed workmen to vibrate and to revibrate the concrete as it was being poured. There is no question that the record sustains the fact that these instructions were given. An inspector should never direct a laborer how to perform a job. The standard specifications so advise. The Court finds that there was some breach in the relationship of inspector to workmen. The workmen were inexperienced but likewise, the inspectors were just as inexperienced telling inexperienced laborers how to do their job. These were some of the problems that developed during the spring of 1987 as it related to the spans coming out from Jamestown.
In the Court's judgment, RIDOT was incorrect in its interpretation of the winter curing specifications of its own contract; that it was permitted under the specifications to place concrete when the temperature was less than 50°. By the terms of the specifications, concrete could be placed if the temperature was 35° and rising and 38° and falling. The problem of curing the concrete is an entirely different problem. Steps had to be taken to keep the concrete warm so that it would not freeze. It is advised that the concrete be kept with an air temperature of 50° or so treated so that the temperature around the concrete, either by insulation or otherwise, would remain at 50° for five consecutive days. The first 24 hours after the pour are the critical hours that concrete may not be permitted to freeze. But the freezing of concrete is a different problem than the pouring of concrete. Concrete may not be poured if the risk of freezing is great. But if the risk of freezing is not great, it may be poured under the specifications at 35° or 38°. The inspectors were incorrect in establishing winter curing standards prematurely. It is the average temperature below 50°, that is the winter season from November to March. Likewise, RIDOT was wrong in rejecting, after minimal visual inspection, both Span 19 and originally Span 23 without first conducting a structural inspection to determine whether the concrete was structurally sound. These actions by RIDOT not only caused additional delay, but also caused unnecessary expense to the contractor Moseman. RIDOT's prior conduct in relation to CFF and the substructure directly impacted upon Moseman's ability to conduct its operations and to complete its work as originally scheduled, all to the detriment and the additional expense of Moseman.
The Court, however, rejects Moseman's claim for $39,303.00 for damages caused by the fire at Span 23. That damage was caused by the negligence of Moseman's own workers and is an independent intervening cause which relieves RIDOT of any responsibility for the fire loss.
 c) Balanced cantilevers
It is only necessary for the Court to observe that problems with the substructure eliminated all possibility for Moseman ever to do any work on the cantilever construction, the main bridge. One of the problems that directly impacted that event was the problem surrounding the Class X concrete which resulted in stop work orders because of a supposed lack of strength of 5,000 p.s.i. in 28 days. The stop work order was in effect for a substantial period of time. It was followed by a second stop work order in December 1987 which was in effect for the greater part of the balance of the term prior to termination.
4. Damages
An inspection of Exhibit 137 must be the starting point. The Court was impressed with John Elmer of the CPR Group, Inc. who was hired as Moseman's financial expert to give testimony concerning the total cost approach to damages. His qualifications appear as part of Exhibit 132 showing not only a wealth of experience in finance but also in industrial and power generation projects. The Court was impressed not only by his credentials but also as to the manner in which he gave testimony. Although the financial records indicate a claim in the amount of $4,311,176.00 according to plaintiffs' Exhibit 137, as part of his audit of those financial records Mr. Elmer identified cost overruns and other non-RIDOT caused expenses which had serious impact on Moseman's work. Some of those included expenses in the pre-cast yard mobilization and setup work, material cost overrun including false work and forms, and Moseman's own inefficiency in losing some 10 to 11 weeks of delay. During his testimony, Moseman's expert modified the claim by reducing it approximately 1.1 million dollars; indicated that the RIDOT related additional expenses were in the amount of $3,282,749.00. His opinion presupposed the truth of the factual predicates as testified to by Simeon Crosier, the project manager. He relied upon his factual testimony in order to make the adjustments and in order to determine the amount by which Moseman sustained damages by reason of the delay of RIDOT. The Court is troubled in awarding damages in that amount not because it has difficulty in accepting the financial information which has gone unchallenged by RIDOT, but because the Court believes that this figure of $3,282,000 plus or minus does not take into consideration the impact that CFF's delay and inefficiency had upon Moseman's work. By that the Court means that in studying the claim advanced by CFF against RIDOT, the Court learned that CFF was absorbing part of the delay and part of the overrun expense because CFF itself was responsible for some of that overrun and some of that delay. Therefore, CFF assumed responsibility and thus reduced its claim against RIDOT in a corresponding fashion.
This is a pass-through claim and while Moseman may very well recover against CFF in a suit by the subcontractor against the contractor for all delays, whether caused by RIDOT or CFF, the contractor, when the claim is passed-through and is now being asserted as CFF's claim for Moseman's damages, the Court believes that the claim should be reduced in a certain sum in order to reflect that CFF like Moseman himself was responsible for a portion of the damages sustained because of the delay of the substructure work. The Court has attempted mathematically to review the record to determine precisely what amount CFF acknowledged that it was responsible for, particularly as that relates to the construction and building of the substructure. The Court has determined that CFF has swallowed, if you will, approximately 17% of the overrun and the delay factor in building the substructure in asserting its claim against RIDOT. The Court is therefore going to use the same 17% and reduce the claim for damages being asserted by this plaintiff by 17%. Such a reduction will therefore reflect CFF's responsibility as it relates to the damages incurred by Moseman. To not reduce it by 17% would be to permit CFF to assert a claim against RIDOT which includes the 17% which it already has assumed on the substructure was its responsibility. The Court heretofore rejected the fire loss claim of $39,303.00 reducing Mr. Elmer's $3,282,749. to $3,243,446.00. 17% reduction brings the damages to $2,731,363.00 ($3,243,446. X 17% = $551,386.00).
The Court should not conclude this decision without reference to part of the argument advanced by RIDOT as it relates to the claim for damages. RIDOT has in its brief attempted to argue that John Elmer changed his testimony; that in the second trial, John Elmer relied upon a detailed cost analysis and an assumed "but for" date and in effect asked the Court to disregard his testimony. RIDOT asked the Court to reject John Elmer's opinion after spending some time attacking his detailed cost analysis, indicating that he has changed his position and that therefore his opinion was not credible.
Mr. Elmer did not change his position from the first to the second trial. He gave an opinion based upon a modified total cost. The factual predicates in this case do not permit a detailed cost analysis. The detailed cost analysis is inappropriate. He so testified. He did, however, testify that he worked on the assumption that Moseman would continue, during the time it built what it did build, to operate at an 11% overrun. Using that assumption, he then computed a "but for" date of completion and attempted to test his prior testimony to determine whether his reductions of the financial sheets showing a $4,000,000. plus loss were consistent. He had knocked off and reduced the claim from $4.3 million to $3.2 million. Using those assumptions he was able to project on that assumed measured mile that the loss would be approximately $3.1 million. He did not offer the detailed cost method on the assumed 11% overrun as a method of measuring the damages. He offered it solely as a check upon the total cost methodology that he had used. This was thoroughly explained by him when he was on the stand. It is the Court's judgment that RIDOT understood but did not wish to acknowledge the total cost methodology. Those figures stand uncontradicted and except as modified by the Court in its decision represent the damages sustained by Moseman.
5. Findings of fact
The Court adopts as its Findings of Fact those listed in the plaintiff's Proposed Findings of Fact under Moseman's claim at pages 107 through 120 and being paragraphs numbered 1 through 57.
This decision modifies the conclusion stated in paragraph 58. The Court has rejected the fire loss claim and has reduced the resulting total damages by 17%. To that extent, the Court rejects the conclusion in the Proposed Statement of Fact and affirms the figures set out in this decision.
U. CONSOLIDATED PRESTRESSED POSSESSIVE CLAIM
REFERENCE: Consolidated Prestressed Claim, CFF Brief, Section III, U, p. 241; RIDOT Brief, section labeled Pile Supplier.
1. Statement of total cost claim
Consolidated Prestressed Concrete ("CPC") is entitled to be paid the cost and lost profits associated with the termination of its contract with CFF occasioned by RIDOT's breach of the prime contract between RIDOT and CFF. CPC is also entitled to compensation for the four AASHTO girders that RIDOT improperly rejected.
2. Legal basis
A subcontractor can pass its claims through to the owner via the prime contractor. Universal Fiberglass Corp. v. UnitedStates, 537 F.2d 400, 404 (Ct. Cl. 1976). A subcontractor is entitled to the benefit of its bargain when its subcontract is terminated because the owner has breached its contract with the prime contractor. In such circumstances, the subcontractor is entitled to recover its cost and loss profits.
As to the AASHTO girders, if specifications are silent regarding acceptance standards, the general accepted industry standard will prevail. In re Mann Constr. Co., Inc., 81-1 B.C.A. (CCH) § 15,089 at 74,641-42 (May 1, 1981, WRB Corp. v.United States, 183 Ct. Cl. 409, 445, 487, 490 (1968). This is simply an expression of the age old rule that subjective unexpressed intentions of one party (particularly the drafter of the instrument) are not binding on the other party. An owner who attempts to hold a contractor to a higher standard than the industry's standards without advanced notice in the specification unreasonably interferes with the contractor's performance.Kenneth Reed Constr. Corp. v. United States, 475 F.2d at 588. In such circumstances the contractor is entitled to damages flowing from the unreasonable interference.
3. Facts
The Court had to gather many of the facts concerning CPC's claim from testimony and from the review of transcripts of the previous trial before former Mr. Justice Almeida. There was a time when RIDOT and CFF went through the procedure of having a Massachusetts pile supplier certified and a Massachusetts sand and gravel company certified to provide the aggregate for the concrete. As a matter of fact that company was PCI certified and met with RIDOT people and was compelled by RIDOT, although certified by the National Certification Board for work in the field to meet other requirements imposed upon it by RIDOT.
In addition there was some friction between CFF and the Massachusetts company. The pile company was Francouer. Francouer is Francouer Prestressed Company (hereafter Francouer). The sand and gravel company was Boston Sand and Gravel (hereafter Boston). Because of friction that existed between and among the prime contractor, CFF, and Francouer and between and among RIDOT and Francouer, Francouer produced and delivered piles, went through an approval process early in 1986, but soon dropped out of the picture and CFF engaged the services of CPC.
There was a like problem with meeting PCI standards with CPC and Rinker, the sand and gravel supplier for CPC. Eventually, standards were met and they were certified and approved by RIDOT. Notwithstanding lack of approval, RIDOT ordered from CPC some thirteen test piles, both before and after the original failure in April of 1986.
In order to prepare itself to accept the work involved in this multi-million dollar contract, CPC had to mobilize its plant to accommodate the making of 21,422 lineal feet of AASHTO girders and 63,478 lineal feet of 14", 20" and 24" square prestressed, pre-cast concrete piles which would be used to support the west abutment trestle and west approach section of the Jamestown Bridge. Suggestions were made concerning the plant and RIDOT's requirements; one I recall involved moving an inspector's hut so that it would be no more than 100 ft. from the batching plant when it was later purchased and placed upon CPC's property in Florida. There were requirements imposed upon CPC to redesign its forms so as to accommodate anticipated changes while RIDOT considered what it would do now that the original design of its piles would not support the bridge. During the lifetime of this relationship, not one single solitary pile for production was ordered by RIDOT. However, all piles ordered were produced, were accepted by RIDOT and were driven by CFF as test piles.
Much comment exists by RIDOT in its memorandum concerning the fact that these test piles did not meet specification and that the AASHTO girders did not meet specification. With the exception of the AASHTO girders, everything that was produced by CPC on orders from RIDOT was accepted by RIDOT, came to Rhode Island, was used on the Jamestown Bridge, the test piles were in the water for a certain length of time, then removed.
After the failure of the test piles to meet design test loads, the originally designed piles were put on hold. Thereafter, although it seemed evident to the Court that once the test piles failed in April of 1986, CPC was aware that no piles of the original 63,000 plus or minus linear feet would be ordered. It had a contract with CFF for the production of those piles, but CFF and RIDOT were involved in a dispute concerning whether the new piles to be designed by RIDOT amounted to a cardinal change in the contract. The length of the piles and the design of the piles radically changed from the original design concept. These changes were necessitated by the aberrant action of the soils under the west approach from North Kingstown along the trestle. As originally designed they were friction piles, that is they were to be supported by the soil into which they were driven rather than to be driven to or near bedrock. The Court believes that CPC was hoping to receive a contract from CFF once RIDOT decided upon the design of its new composite pile. That when that contract was received, it would provide for x number of lineal feet of the new composite pile and/or additional sizes and lengths of piles. It would be at that time that a new unit cost would have been struck. RIDOT, while taking over 18 months to determine what kind of a new design would be utilized, continued ordering test piles of various sizes and lengths from CPC. It placed full-time inspectors at the CPC plant, gave every impression that it intended to utilize CPC as its pile supplier. Much of the time during this delay in making the new pile design, the full capacity of CPC's yard had to be available to RIDOT. During this particular time the yard had the capacity to produce about at maximum only the piles which were anticipated to be used by RIDOT. It was in this framework that the relationship continued. It seems to the Court that the original contract was cancelled back in August of 1986, or in August of 1986 none of the parties, RIDOT, CFF and in the Court's judgment, CPC, was of a mind that RIDOT was going to use the original piles designed for this bridge. That order in effect was cancelled. But the overhead continued during this 18 month period prior to termination of CFF's contract. RIDOT, CFF and CPC acted as though CPC was going to receive the order and construct the piles. At this point, CFF and RIDOT signed a Termination Agreement.
Because of this turn of events, CPC was never able to recover its mobilization costs or its overhead nor to earn a profit. Two years went by. No production piles were ordered on the original contract. Two years went by and all that was going on was modifications in the capacity at CPC to produce different lengths and different styles of piles. CPC was requested and did obtain a supplier for the modified composite pile, the steel pile tips were formed directly into the concrete piles. It seems to the Court that this is not a real termination by CFF of its subcontract with CPC. It is rather a cancellation of the original piles with conduct expressed by the action of the parties subsequent to that cancellation exploring the new design of the piles. When CFF and RIDOT went their separate ways the umbilical cord supporting CPC's activities from RIDOT was severed and thereafter no production piles were ever ordered.
It is in this background that the Court examines the reasonableness of the start-up costs, the mobilization, the activities listed in Exhibit 72 of the expenses of CPC. It should be noted that while much testimony related to the qualification of CPC and CPC's desire to qualify its on-site batch plant to make materials to be used in the construction of the piles, that there was a disagreement between RIDOT and CPC concerning the AASHTO girders. The AASHTO girders were independent of the pile problem.
The position that RIDOT eventually took was that it would accept only AASHTO girders that were perfect, that is without any cracking whatsoever. The Court listened to testimony concerning how the cracking took place in three of the four AASHTO girders that were made by CPC as a result of the contract with CFF. The specifications are silent as to the acceptability of the AASHTO girders. Industry standards indicate that cracks of .006" will be acceptable without repair in a salt water environment. That cracks larger than .006" would be examined and repaired on an individual basis. The Court has heard testimony concerning the cracking on the three AASHTO girders, and as a matter of fact has viewed exhibits and had the AASHTO girders pointed out to the Court during a view taken in Florida. The cracking contained in those AASHTO girders is within normal industry standards. RIDOT's refusal to accept the one that is not cracked and the three that are within industry standards is a breach of the obligation owed to the contractor and unreasonably interferes with the contractor's ability to perform its side in the terms of its contract with CFF. The Court would venture to say that if a specification were written that these AASHTO girders would have to be perfect and without any cracks whatsoever, there would be few, if any, who would risk capital, cost and expense in an effort to produce such a product. The specifications in this case make no reference to acceptance standards, and therefore the acceptance standards are those dictated by the industry. These AASHTO girders on the testimony before the Court are acceptable and their rejection by RIDOT was wrongful.
RIDOT, in the course of its relationship with CPC, had paid for approximately 1,310 lineal feet of piles or about 2% of CPC's original anticipated production order. This fact is significant because in the unit price the overhead, starting-up costs, modifications and expenses, including profit, was to be recovered by the production of piles and AASHTO girders. The Court is of the opinion that RIDOT has no defense when one considers the totality of the actions taken by RIDOT as it relates to this claimant. CPC did everything it was asked to do. It produced piles. Piles were accepted, piles were used. These piles formed the basis upon which RIDOT made judgments concerning the inappropriateness of the original design and formed the basis as to what the new design would be, what size, what length and what the composition of the pile would be. It was through no fault of this claimant that it did not have the opportunity to receive the amended order and to recover its overhead and expenses pursuant to this contract.
The Court finds that all of the expenses set out in Exhibit 72 are reasonable and were necessary for this project. CPC spent $164,881.95 for labor and materials to prepare its 20" and 24" test piles and the AASHTO girder form beds for RIDOT's work and to store and handle the composite pile tips RIDOT ordered but did not immediately use. CPC spent an additional $51,101.37 in equipment needed to fulfill RIDOT's testing requirements at Rinker and CPC paid for railroad siding leasing costs for aggregate deliveries. CPC allocated 25% of the equipment and labor costs associated with the on-site batch plant to the job or $107,695.16 and spent an additional $46,154.78 for concrete materials, mix designs and trial batches for the batch plant. CPC had $79,796.09 in vendor cancellation charges suffered when the composite pile tip orders were cancelled. CPC's casting costs for the test piles and girders produced were $22,701.29. Material costs for the 20" and 24" composite pile tips were $85,402.20. CPC's overhead and profit was at the rate of 22.4% which was typical of its own work in other areas. The Court has noticed in its study of Exhibit 72 that the sum of $863,915.44 is listed as overhead during the two years that CPC dealt with RIDOT concerning the pile problem. The Court believes that that sum is recoverable, in addition to the 22.4% as overhead and profit on direct costs. The Court, however, does not feel that any recovery is appropriate in the circumstances of this case for loss of profit. In the Court's judgment, such an award would fly in the face of the realities of the situation as they existed from the time of the failure of the first test pile. The Court has therefore reduced the amount set forth as $2,194,972. by deducting profit on the original contract of $933,428. and will enter judgment for CPC on its claim of $1,261,544.
4. Findings of fact
The Court adopts as its Findings of Fact those set out by the plaintiff in its Proposed Findings of Fact under Consolidated Prestressed's claim on page 122 being paragraphs 1 through 22 and will amend paragraph 23 by striking the award for profit, and as amended will adopt and incorporate those Findings of Fact by reference.
RIDOT's COUNTERCLAIMS ASSERTED AGAINST CFF
RIDOT has asserted six counterclaims against CFF. (The Court will continue to use the reference section as set out in the Plaintiff's brief because of its clarity and the ability to move from one brief to the other brief using the references contained in Plaintiff's brief.)
A. EXCESS COSTS TO COMPLETE PIERS 15, 17, 18 and 19
REFERENCE: CFF Brief, Section IV, A, p. 255; RIDOT Brief, section labeled Excess Costs to Complete Piers 15, 17, 18 and 19
1. Statement of claim
RIDOT seeks $1,000,000. in excess costs to complete the stabilization work. (Piers 15, 17, 18 and 19)
2. Legal basis
During the negotiations for termination of the contract, it was agreed between RIDOT and CFF that CFF would retain its claim for a "cardinal change" and other breaches of the existing contract between the parties as a defense to the payment of the one million dollars called for by this agreement. That if the defense of a cardinal change or other substantial breaches which materially affected the contract did not prevail, then CFF would pay up to $1,000,000. to RIDOT for the cost of bringing piers 12 through 20 to plus 7.5 ft. above sea level.
The parties in their briefs have agreed that the cost to accomplish that stabilization work performed by Traylor Bros. was in excess of $1,000,000. ($1.4 million). It therefore follows that with regard to this counterclaim the only issue for the Court to decide is whether or not RIDOT by its actions and by its conduct breached the contract by reason of a cardinal change or otherwise.
3. Facts
RIDOT in asserting its claim in its brief states as follows:
. . . "The increase in the length of the piles that was required by the soils problem was not a cardinal change. It did not change the nature of the project but rather only changed the length of the concrete piles to be used to support a portion of the bridge. This, in and of itself, does not meet the requirements for application of cardinal change and therefore cannot be used as a defense to the above-referred claim by RIDOT."
On the other hand, CFF maintains that RIDOT materially breached the construction contract in two respects. First, the redesign of the foundation piles that supported two-thirds of the structure is such a fundamental change to the contract as to constitute a "cardinal change" to the contract. Second, RIDOT's repeated breaches of the agreement that give rise to CFF's claim and connection with the work actually performed taken in total are so substantial as to constitute a material breach sufficient to relieve CFF of any further obligation to perform. See, EdwardR. Marden Corp. v. United States, 442 F.2d 364 (Ct. Cl. 1971).
What is a "cardinal change"? In Allied Materials andEquipment Co. v. United States, 569 F.2d 562, 563-64 (Ct. Cl. 1978), the Court held that the underlying theory is that a contractor should not be compelled to perform a contract substantially different from the contract on which he bid. The cardinal change doctrine holds that changes to the bid work that are so substantial as to materially alter the nature of the project are deemed a breach of the agreement that relieves the contractor of any further obligation to perform. Edward R.Marden Corp. v. United States, Id., at 369.
Over time because contractors could not be compelled to perform work that it did not bid, "changes clauses" were inserted in contracts but under these changes clauses within contracts, a contractor could not be required to perform a substantially different contract. The contract between RIDOT and CFF contains such a changes clause within the terms of its provisions.
There are no hard and fast rules as to what constitutes a cardinal change. The determinations are made on a case by case basis. Factual situations relating to the nature and extent of the changed work has been used as a basis. Time has been used as a basis. The nature and extent of the change, time and the cost or combinations thereof have from time to time been utilized by the Courts in its decisions to determine whether a cardinal change exists.
The plaintiff, CFF, has drawn the Court's attention to the case of Luria Bros. and Co. v. United States, 369 F.2d 701 (Ct. Cl. 1966) as a case which represents, factually, a similar situation. In that case the contractor had agreed with the Navy department to construct an airplane hanger. The original specifications were defective in that "they misrepresented the nature of the bearing values of the material underlying the foundation of the structure at the prescribed elevations and hence the dimensions and depth at which the arch-column footings were to rest". As a result of revised specifications, the footings were placed at an elevation from 5 to 10 ft. lower than the original elevations. The Court viewed the consequences arising out of the revised elevations as significant and held that the contract had been breached by the government.
Now what are the facts as it relates to this cardinal change? These facts, which the Court is about to recite, formed the basis for the plaintiff, CFF, to come into this Court originally, prior to the Termination Agreement, to seek to be excused from further performance and to seek damages which had resulted from the continued breaches by RIDOT.
The west approach to the main bridge across the trestle constituted about two-thirds of the bridge structure. When the contract was bid, CFF predicated its bid on having to drive approximately 266 24-inch concrete piles to a depth of approximately -50 ft. to -67 ft., the depths that appeared on the plans delivered to the contractor. These piles would support 28 trestle bends in the trestle approach. CFF also anticipated driving 396 20-inch concrete piles to support the first 11 piers of the bridge. CFF had planned on driving them to a depth of -90 ft. to -95 ft. since these depths had appeared on the contract plans. At the time of bid, CFF was aware that RIDOT had the right to require the piles to be driven to greater or lesser elevations depending upon the actual friction values as developed in the field. It was because of a lack of knowledge as to how the soil would react that test piles were first driven before the length of production piles could be determined. Payments, the contractor was aware would be based upon the unit values assigned by the contractor in its bid. A unit price for materials and the work of driving the piles was required by the terms of the contract.
CFF also utilized the costs associated with the driving equipment which would by its nature be able to drive the concrete piles to the designated depths. For this work, CFF carried in its contract approximately $1.76 million.
As we now know, the soils in Narragansett Bay acted in an aberrant manner. Those who designed the bridge were surprised that friction piles would not support the structure as originally designed. The load test failed. RIDOT then decided that it would change the pile design. After several tests at various lengths, CFF doing the work and driving the test piles, RIDOT came up with a composite pile. It consisted of a bottom section of H steel pile of a type being utilized at piers 12 and 13. They were steel, primarily steel piles, and a prestressed concrete extension which was welded to it during the actual pile driving operation. These piles as now designed were to be driven to bedrock at elevations as low as -235 ft. — 140 ft. below the deepest anticipated elevation appearing in the original plans.
The composite pile changed the nature of the project. The equipment, which had been mobilized, and was on the job site to drive the original single piece prestressed concrete pile, was no longer suitable to drive the composite pile. The equipment necessary to support the pile during driving operation was substantially different. Mr. McGoldrick testified that CFF had originally intended to set a template at water level and to drop the prestressed original piles into the template. These piles were dropped into the soil and that multiple driving operations could be handled successively through that template. The new method required by the changes was entirely different. One, there was a substantial increase in the length and the weight of the pile to be driven. This necessitated the use of a larger hammer. Also, because splices would be made after the steel was partially driven, a frame system would have to be devised and developed to support the concrete pile in perfect alignment in order to weld it to the steel portion of the pile which had already been driven. Because of the length of some of the piles, more than one weld would have had to been made during the driving process. The concrete pile, as it was being welded to the steel in some instances would be 100 ft. in length, had to be supported above the water during the time it was being welded. This required substantial change in the work and equipment necessary to drive the piles.
No longer could CFF use a template and drive several piles. Many of the new piles had to be driven on an angle. There was additional cost in setting up and breaking down the equipment and moving to the next pile, there was a significant change in the time required to complete the work. The multiple changes in setup, the welding, the weight of the hammer and the support mechanism for tons of concrete being held in alignment, all prompted negotiations and discussions between RIDOT and CFF. CFF obtained information concerning what the cost would be to drive the new composite design pile. Its estimates range from 25 to 30 million dollars for this portion of the work. For this portion of the work, that is the pile driving of the west approach, such figures represented an increase of between 1,400 and 1,700% over the original estimate ($1.76 million versus $25 million to $30 million dollars). RIDOT on the other hand continued to insist that CFF would be paid contract unit prices for driving the concrete and steel piles and would receive a change order only for labor and materials to make the splice later. In the Fall of 1987, RIDOT came up with the figure that on its estimate it would take 12 million dollars in increased cost to do the work. In other words, RIDOT by its own estimate was indicating that it would be an increase of 600 to 700% in order to do the pile work for this bridge.
A recitation of these facts clearly indicates to the most casual observer that what RIDOT was asking to be done is more than an increase in the length of the original prestressed concrete pile. Such an increase might well not be sufficient to constitute facts upon which an application for cardinal change could rest.
The Court is well aware of the magnitude of this requested change. This was a new contract. The cost was substantially different. The personnel to perform the work had to be substantially differently trained. The equipment necessary to perform the work was different. The work being performed was in Narragansett Bay. The weights that had to be supported and the alignments that had to be made were substantially different. The length of the piles and the nature of the piles to be driven were substantially different. The Court believes that this is a change which is so substantial that it materially affects the contract between the parties. It abates any responsibility on the contractor to perform under the terms of the original contract.
CFF also points to the numerous and multiple breaches committed by RIDOT. The Court has one by one considered those allegations as part of this decision involving CFF's claim for additional compensation and has heretofore in this decision sustained the contractor's position in substantially all of its claims against RIDOT. The Court will not further lengthen this decision by adding again under this section to those substantial breaches permitted by RIDOT at the expense of this contractor. Inasmuch as a cardinal change absolves the contractor of further responsibility under the contract and the Court has ruled that the facts in this case support such an application, it is unnecessary for me to labor the point under this counterclaim.
The counterclaim for $1,000,000.00 made by RIDOT against CFF is denied.
4. Findings of Fact
The Court adopts the Findings of Fact laid out in the plaintiff's Proposed Findings of Fact under Excess Cost to Complete, starting at page 127 and numbered 1 through 23, as and for the Court's specific Findings of Fact. The Court believes that this decision substantially parallels each and all of those paragraphs in the Proposed Findings of Fact. They are adopted by the Court.
B. PIER 14 TREMIE DEFECTS
REFERENCE: Pier 14 Tremie Defects, CFF Brief, Section IV, B, p. 266; RIDOT Brief Section labeled Pier 14 Counterclaim.
1. Statement of Claim
RIDOT seeks to recover the cost of remedial work to the pier 14 tremie.
2. Legal Basis
CFF agrees that if the defects are the result of faulty workmanship on its part, it is responsible for the cost of the remedial work. CFF contends also that if the defects are not a result of defect of work but are the result of the RIDOT imposed placement methods and other RIDOT specifications, then RIDOT's claim must be denied.
3. Facts
The pier 14 tremie contained weak zones throughout the tremie. RIDOT relies solely upon the testimony of its expert, Fioravante Bares, to support its claim that there were defects and that the defects in the tremie resulted from the conduct of the contractor that the tremie was poured improperly and that the responsibility is CFF's because of poor workmanship.
CFF contends, as it did with the pier 16 tremie that RIDOT imposed restrictions upon the contractor which resulted in the weak spots within the tremie. The Court in Section III, G, Pier 16 Tremie had the opportunity to contrast the testimony of Mr. Bares and that of Mr. Tamaro who appeared as a witness on behalf of CFF. The Court has previously commented upon the lack of experience in marine environments and the fact that Mr. Bares' opinion was at variance with the physical facts and that his conclusions were not supported by the physical evidence. He was not present during any pour, he made no independent investigation and he merely offered an opinion concerning what was wrong with the tremie placement at pier 14. Notwithstanding his inability to articulate a basis for his opinion, he commented that the weak zones of the concrete and the lack of bedrock interface at pier 14 were the results of broken seals, horizontal movement of the tremie pipes, stiff tremie concrete and openings beneath the sheets.
The problem with his opinion on tremie 14 was exactly the same as it was on 16. There is no physical evidence of any broken seals or horizontal movement of the tremie pipes at pier 14. In fact, the records of the pier 14 pour kept by RIDOT said this was a good pour. There is no factual evidence at all to support either of those conclusions; the broken seal or the movement of the pipes. Nor, in this case, was there any lack of interface between the bedrock and the bottom of the tremie. There is no factual predicate present in the physical evidence before the Court to sustain this witness' rank speculation. The Court has heretofore commented on his lack of experience in a marine environment. Mr. Tamaro, who testified, not only had the experience to give an opinion, he conducted lengthy investigations at pier 16. At pier 14 RIDOT relaxed the distance between pipes and the flow of the concrete but would not adopt Mr. Tamaro's suggestion to permit the use of the advancing slope method. RIDOT extended the distance from 15 ft. to 21 ft. between pipes and the flow distance from 7 1/2 ft. to 15 ft., but there were six tremie pipes that were charged sequentially in building the tremie. The concrete was being placed at six different pipes and provided for multiple opportunities for the concrete to interface with other pours from the other pipes. The weaknesses found in tremie 14 were in the same locations — generally, throughout the mass as they were in tremie 16.
RIDOT tied the hands of the contractor. The contractor wanted to use an advancing slope method. RIDOT, without any basis in the contract, posed limitations upon six tremie pipes, no more than 21 ft. apart, with a flow distance in each of those pipes of 15 ft. Laitance is the fear. The weak areas caused by the cement's contact to water were trapped in the mass. When concrete interfaces with other concrete from other sources, there is an overlapping. This overlapping causes weak spots in the concrete. These weak spots were throughout the mass. The evidence is overwhelming that RIDOT's insistence upon dictating to the contractor how the contractor was to pour the cement caused the problem. When an owner dictates the method that the contractor shall employ in doing construction work, the owner warrants the success of the method he imposes upon the contractor and any failure to obtain good results, when the contractor follows those instructions, falls upon the shoulders of the owner, in this case, RIDOT.
RIDOT's claim for $2,139,199.32 for the cost of repair of this tremie is, therefore, denied.
4. Findings of Fact
The Court incorporates by reference the Proposed Findings of Fact of the plaintiff under Pier 14, Tremie Defects at page 135, being paragraphs 1 through 15, inclusive, as the Findings of Fact of the Court.
C. PIER 14 COFFERDAM REPAIR
REFERENCE: Pier 14 Cofferdam Repair — CFF Brief, Section IV, C, p. 271; RIDOT Brief, section labeled Pier 14 Cofferdam.
1. Statement of claim
RIDOT has placed a claim for the repair to the cofferdam in the approximate amount of $6,000,000.00 ($5,911,305.39). To quote from the language of the brief submitted by RIDOT:
 "At the time of termination, CFF had poured the tremie for pier 14, but had not been able to dewater it. In September, 1988, Traylor Bros., Inc., the interim contractor, undertook to dewater cofferdam 14. Because of latent defects in CFF's work, this could not be done. The inability to dewater the cofferdam, necessitated remedial measures to stabilize the cofferdam and to construct the pier shafts. CFF was directly responsible for this defect. The original tremie pour by CFF was defective, necessitating the remedial measures which are the responsibility of CFF." (emphasis added).
2. Legal basis
The Termination Agreement (joint Exhibit #1) states in part as follows:
 "3. The parties waive any claim for damages arising after the date of termination of the contract. This waiver includes any claim by Clark-Fitzpatrick for anticipated profits that it might have earned after the date of termination, if the contract had been completed and a waiver by the State of Rhode Island for any and all increases in costs resulting from the reprocuring and constructing the bridge by or through a new contractor." (emphasis added).
 . . .
 "6. All work completed and materials stored to date by Clark-Fitzpatrick and paid the State are hereby deemed accepted and, except as described below, the State of Rhode Island does hereby waive any and all claims resulting therefrom except for claims resulting from latent defects attributable to the work performed by Clark-Fitzpatrick and/or its subcontractors."
It would appear that RIDOT relies on the latent defect language contained in paragraph 6 to avoid the post-termination damage waiver provisions of paragraph 3. RIDOT claims that pier 14 cofferdam was "undewaterable" because of the type of sheeting used and the extensive time that elapsed between sheet installation and placement of the tremie seal.
CFF contests the claim on the basis that there was no latent defect — if there was a defect at all. Moreover, because the latent defect reservation in paragraph 6 of the termination agreement has no application to construction aids, such as cofferdams, even if there was a latent defect in the cofferdam, RIDOT would have no valid claim.
3. Facts a) History of the Cofferdam.
The pier 14 cofferdam sheeting installation was completed on March 10, 1986. On May 23, 1986, excavation work began at the cofferdam. CFF had anticipated that the cofferdam excavation would be complete in the month of June, 1986. Certain things happened, which have been discussed in other sections concerning the dispute relating to what constituted sound bedrock, and there was damage during the excavation to some of the bracing forms. Therefore, that summer between July 1 and September 8, 1986, the cofferdam was really closed for repairs to the bracing. Excavation started again after September 8, 1986 and continued throughout the winter. RIDOT accepted rock bottom in June of 1987 and the tremie was poured the later part of June, 1987. The cofferdam was dewatered once in July of 1987 to a level of about 12 ft. below level 1 in order to complete some repair work that was related to the prior year's shutdown because of the damage caused by one of the buckets during excavation.
On September 14, 1987, the cofferdam was dewatered down to level 2 braces. (See Exhibit 324 at p. 2). It was during this dewatering that CFF observed the vertical bowing of brace frame struts as the water was reaching level 2 of the brace frame. This was Mr. McGoldrick's testimony from the stand. The dam was then flooded and structural re-enforcements were designed by Muesser-Rutledge and they were put in place in December of 1987. It was at that time that the cofferdam was dewatered down to level 2. There was an extreme change in the weather and further operation ceased during the winter. The dam was reflooded. Work resumed at the dam in February, 1988 and again, it was dewatered down to level 2. By accident, during that dewatering down to level 2, it was actually, in fact, dewatered to almost level 3. Someone had failed to tend the pump during the night and, when discovered, rather than have it dewatered to level 2, it was almost down to level 3. This was approximately two weeks before the Termination Agreement. Testimony was given before the Court that in anticipation of the Termination Agreement, the contractor, not wishing to leave the cofferdam in a dewatered state with the pressures being asserted against the sides of the cofferdam, decided to equalize the pressures inside and outside the dam by flooding the dam and the dam was reflooded. It was in that state at the time of the entry into the Termination Agreement.
At termination, it would have been usual practice for the contractor to pick up its "marbles" and leave the job. By that the Court means that, if there is available to the contractor construction aids such as frames, steel, wooden forms, anything that is capable of being reused or sold for salvage, the contractor tries to turn a dollar and sells that material or takes it to be reused by the contractor at another place at another time. It happened at the suggestion of Federal Highway Administration that RIDOT asked CFF to waive its salvage claim and to leave the cofferdams in place. CFF agreed and left the cofferdams in place "as is and where is."
The next step in the history of this cofferdam occurred when bids were solicited for interim work to be done to preserve the structural work done by CFF.
The stabilization contract (Exhibit 306, p. 96-97) lists the work to be done under the contract relating to finishing the foundation work at piers 13, 14, 17, 18 and 19 through the pedestals. The stabilization contract specifically provided in its specifications that the bidders were to inspect cofferdams in place and, in particular, their design (Exhibit 306, p. 97, 98, 100-101). Bidders were required to either accept the dams in place or to include any redesign or modification in their bids. The specifications stated as follows:
 CONSTRUCTION METHODS — GENERAL
 203.03.1 Excavation. Add the following to this subsection of the Standard Specifications:
 * * *
 It is the intent of this contract to utilize the existing cofferdam designs. Accordingly, the Contractor is directed to review the approved shop drawings of the five cofferdams, check their respective designs, and satisfy himself that said designs are safe and acceptable for his use. In this regard the Contractor has the following two options.
 1. He may review and resubmit the shop drawings without revision with his approval indicated thereon as evidence that he accepts their accuracy, completeness, and compliance with contract requirements; or:
 2. If the Contractor has any reservations, he shall review and modify the shop drawings and shall submit the revised drawings, complete with all supporting data and engineering calculations to the Engineer for approval. The revised shop drawings shall bear the seal of a Registered Professional Engineer in the State of Rhode Island who has demonstrated experience and competence in cofferdam design and construction.
 Any additional material required to modify the cofferdams resulting from the Contractor's revisions of the existing shop drawings shall be paid for by the Contractor at no cost to the State.
(Exh. 306 at pp. 100-101.) The specifications further state:
 6. MODIFICATIONS TO RHODE ISLAND STANDARD SPECIFICATIONS:
 * * *
 105.02 PLANS AND SHOP DRAWINGS:
 Omit second paragraph and substitute as follows:
 The bridge designer, T.Y. Lin International and the Department have reviewed and approved shop drawings for Cofferdams 13, 14, 17, 18 and 19. These drawings are included with the contract plans. Also included with the contract plans are approved shop drawings for granite faced panels and tie down loops.
 With only minor exceptions, all materials required to complete the construction of these cofferdams in accordance with the approved shop drawings are stored at Davisville.
 The Contractor has two options; (1), review and resubmit the shop drawings without revisions with his approval thereon as evidence that he accepts responsibility for their accuracy, completeness and compliance with the contract requirements or; (2), review and modify these shop drawings. If the Contractor elects to modify the shop drawings, he shall submit the proposed revisions with all supporting data. The revised shop drawings shall bear the seal of a Registered Professional Engineer in the State of Rhode Island. Calculations shall be made by an Engineer with a proven experience in cofferdam construction. Any additional material required to complete these cofferdams resulting from the Contractor's revisions to the shop drawings shall be at the Contractor's expense and at no additional cost to the State.
 * * *
 107.16 CONTRACTOR'S RESPONSIBILITY FOR WORK:
 Add the following paragraph:
 All work completed by Clark/Fitzpatrick, Inc./Franki Foundations, a Joint Venture, or their subcontractors, that is to be incorporated in this work has been accepted by the State as satisfactorily completed in accordance with the Plans, Specifications and approved shop drawings. Prior to proceeding with the work under this contract and during the progress of said work, the Contractor shall inspect the existing work by others and confirm that it is essentially in conformance with the approved shop drawings. The Contractor shall immediately notify the Engineer if he detects any work not in conformance and shall submit a detailed report to the Engineer identifying any deficiencies.
 If there are defects in the work, deviations from the approved shop drawings, or damage to the cofferdams sustained by storms or other causes that require the Contractor to make repairs authorized by the Engineer, the cost of these repairs will be paid for on a force account basis. Once these defects are identified and repairs are made, the Contractor agrees to assume full responsibility for the work performed by others.
 * * *
(Exh. 306 at pp. 96-98.)
Traylor Bros., Inc. was the low bidder at a figure of about $8 million. Atkinson-Kiewit was the second low bidder at $9.5 million. Before signing the contract, Traylor Bros., Inc., claiming that it misunderstood the condition of the cofferdams prevailed upon RIDOT to release it of responsibility for the cofferdams, a responsibility that, according to the stabilization contract, fell upon the successful contractor. RIDOT relieved Traylor Bros. of that responsibility, i.e. the responsibility for the cofferdams. At trial, no witness ever appeared on behalf of RIDOT to explain to the Court the need for this relieving Traylor Bros. of the cofferdam responsibility.
Although the stabilization contract by its terms and specifications required Traylor Bros. to perform any necessary reblocking prior to dewatering, Traylor Bros. did not, according to the testimony of Mr. Janaros, conduct any inspection or do any reblocking prior to its attempt to dewater in September of 1988.
When the cofferdam sheeting is in the water, it responds to the conditions of the water so far as waves are concerned. The interlocking device that locks the steel from top to bottom, in effect, floats free and water easily passes between the locking devices, locking one sheet to another. When the cofferdam is dewatered, that is, the water is taken out of the cofferdam, pumped out, there is a tightening of the cofferdam all the way around the perimeter because the outside water now rests against the exterior walls of the cofferdam and presses against the internal bracing. If there is no blocking between the internal bracing and the cofferdam wall, there is a tendency for the locking device to snap in, causing it to be out of alignment. In the opinion of Muesser-Rutledge firm, inspecting for reblocking of the braces existed the year before. But for some unexplained reason, Traylor Bros. did not inspect and did not reblock. No one from Traylor Bros. actually testified at the trial. It seems that during the process of dewatering, there is evidence that water came through between the sheets. There is also evidence that during this process, there was a cindering done. This is a method used to tighten the interspace between the female and male locking device. A mixture of horse manure and cinders is dropped into the water just outside the dam at the interlocks. The material is sucked into the interlocks along with the water. The water causes the material to expand, which helps to seal the interlock. There is a report that when the interlock was cindered, it, in effect, stopped the water from coming in. If there was a gap — if the interlock was physically not engaged, all the cindering in the world would not have stopped the water from coming in. In any event, the cofferdam was dewatered down to level 2. Reports indicate that the water kept infiltrating into the cofferdam. RIDOT ordered the dam reflooded and, over the next few days, sent divers to inspect the cofferdam.
Apparently, based upon the video tapes taken by these divers and the verbal reports sent during the dive, RIDOT concluded that the cofferdam was not dewaterable and decided that it would pour a second tremie on top of the tremie poured by CFF. This decision was made after the divers' inspections but without the concurrence of the experts engaged by RIDOT who had previously indicated to place the matter on hold until all of the evidence is in. This was the fall of 1988 and the interest was high as it related to what the problems were at the Jamestown-Verrazzano Bridge. DMJM, RIDOT's consultant, RIDOT officials and Traylor Bros. met and decided on this rehabilitating procedure. Traylor Bros. insisted that the decision was the total responsibility of RIDOT. Upon receiving that assurance and upon being put on forced account for labor and materials, Traylor Bros. engaged a designer and the second tremie was poured. At no time did RIDOT ever contact CFF concerning the decision or the problem with the dewatering of cofferdam 14, or the repair by pouring a second tremie. The first notice of a potential claim came just before the start of trial late in 1990 when RIDOT advanced this claim for damages.
This was true despite the fact that RIDOT had notified CFF of the problem involving the weak zones in the pier 14 tremie and CFF had its representative on hand to examine the pier 14 tremie and to prepare, if you will, to participate in the remedial decisions on pier 14 tremie. But, even though they had taken time to notify CFF concerning the weakness in the pier 14 tremie, no notification came through concerning the problems with the infiltration of the cofferdam, or the inability to dewater it or the decision to pour a second tremie.
The Court must first look to determine what the intent of the parties was when they executed the Termination Agreement, particularly, paragraph 6. Paragraph 3 providing for a waiver of any claims for damages arising after the date of termination of the contract is clear. Both parties waived all claims in paragraph 3 against one another, acknowledged acceptance of the work and payment for it and that all claims were waived under paragraph 3 as of the date of termination. Paragraph 6, however, specifically reserved to RIDOT rights concerning latent defects. It is RIDOT's position that the inability to dewater the cofferdam is a latent defect. CFF takes the position (1) it was not defective and (2) that, if there was a defect and that defect is termed to be latent, that latent defect is not the latent defects that are applicable to paragraph 6.
The Court heard a great deal of testimony concerning the dewatering and the reflooding of the cofferdam prior to termination. CFF's dewatering down to level 2 and, at one time, almost down to the top of the tremie itself (one evening, when the pump was not being watched by CFF), and the problems encountered by Traylor Bros. when it attempted to dewater the cofferdam down to level 2 consumed hours of testimony. The Court has some strong factual evidence that if, after the placement of the tremie and before termination, CFF was able to dewater the cofferdam down to level 2 without experiencing a problem with infiltrating water, then when, after termination, Traylor Bros. went down to the same level and experienced infiltrating water, whatever was causing the infiltration of water in September of 1988 took place after the March termination date since no one before the Court contested the fact that CFF had, in fact, dewatered the cofferdam on three separate occasions, partially, to level 2 and below without incident. There is a strong feeling that something was done or not done after termination and, within that six month period prior to Traylor Bros. attempting to dewater the cofferdam to level 2. But, it seems to the Court, that the defense being inserted by CFF is dispositive of this claim. CFF says, in essence, that when the parties entered into this Termination Agreement that the latent defect provisions protected the owner from hidden defects in the work which would become the property of RIDOT, that is, the permanent structure. That throughout the terms of the agreement, the time subsequent to that agreement, RIDOT acted consistent with that interpretation of the agreement and consistent with the understanding that the latent defect provision related to the work on the bridge and not the construction aids which RIDOT had requested CFF to leave in place.
At the time of termination, this cofferdam had been in the water two years. It was intended to be in the water a far less period than that. When Traylor Bros. attempted to dewater it, it had been in the water an additional six months. When problems arose concerning the cofferdam, the notice provisions contained in the contract, as it relates to latent defect, were not given to CFF by RIDOT. Certainly, the imperfect pier 14 tremie pour was a latent defect. It was work that was done on the permanent structure for RIDOT and RIDOT properly notified CFF when it first began to take test bores in the permanent structure at the pier 14 tremie. This certainly could not have been discovered until some efforts were made to test the structural soundness of the pier 14 tremie. CFF had not poured the tremie. It was only after several additional pourings that the problem at 14 was determined to be exactly the same as the problem at the first pour at 16, but RIDOT properly, consistent with paragraph 6, notified CFF of this potential claim. The question then arises as to what does the terminology "latent defect" apply to. If it does not apply to defects in the property owned by the contractor and left on the job without warranty concerning its fitness to be used by successor contractors but solely to satisfy the requests of the Federal Highway Administration and RIDOT, then much of the testimony the Court heard concerning the theories as to how water infiltrated into the cofferdam, is meaningless. The Court interprets the provisions of paragraph 6 to refer only to the work performed on the permanent structure. It does not apply to the forms or the cofferdams that were used by the contractor to build the permanent structure. No warranties were made to anyone by CFF concerning the soundness or the suitability of any of those devices. It would seem to the Court that, even if one were to construe on the testimony of the state that this was a latent defect in the cofferdam, as a matter of law the defect is not covered by paragraph 6. It is not a latent defect and unless it is a latent defect under paragraph 6, RIDOT has waived any claim for damages arising after the date of termination and that settles the issue.
Let's test on the evidence that appears uncontradicted in this case as to the conduct of the parties with regard to this provision. What was the work that CFF was hired to do? That "work" was the bridge structure itself, that is, when built it would become the property of RIDOT. The latent defect reservation applies to the work subject to inspection to determine whether it is in conformance with T.Y. Lin's bridge plans and specifications. The Termination Agreement provided for acceptance of all work done and paid for and a waiver of all claims for that work done and paid for unless the work done and paid for was found to be defective because of a latent defect.
CFF made no warranty concerning the useability of the cofferdam by future contractors. RIDOT accepted and acquiesced in the "as is", "where is" situation and, in the stabilizing contract, required future contractors who were going to bid to assume the full responsibility for the cofferdams or, in the alternative, to provide money in their bid to improve what they felt was necessary at those cofferdams. No explanation was ever given for the release of Traylor Bros. from that obligation. CFF gave no notice of any pending claim as required by the original contract alleging a problem with the cofferdam. Mr. Janaros, in Exhibit 307, p. 35, states:
 "The State of Rhode Island assumed the responsibility of cofferdam 14 when CFF was terminated from their contract. Our contract, 8819 (stabilization contract), specifications acknowledge that responsibility . . ."
The conduct of RIDOT all the way up to and including just before the case went to trial indicates that it accepted the notification and interpretation of CFF concerning paragraph 6. On August 10, 1988, CFF wrote to RIDOT and stated as follows:
 "The joint venture notes that since March 21, 1988, the cofferdam sheeting and bracing has been exposed to the elements in the bay. The joint venture makes no representation as to the current condition of the structures or the safety or suitability of those structures. The joint venture assumes no liability for any action taken by Traylor Bros., or others, in the resumption of work at each of these cofferdam locations, per the current contract plans and specifications prepared by RIDOT, or otherwise, for the specific work."
RIDOT never acknowledged that letter and never disavowed the intent of that letter. It seems to the Court that needless time was spent at trial and has been spent by counsel in their briefs concerning this issue. One additional matter I would like to point out is that counsel's briefs sometimes can be misleading. The Court heard much testimony and relies, not only on its own notes, but relies upon the accuracy of matters set forth in the brief. A reading of the briefs from RIDOT's point of view would seem to indicate that when a decision was made concerning the need for the second tremie, that Morse Klubock was privy to the decision made. An examination of Exhibit 307, the first 14 or 15 pages of that exhibit, would seem to indicate that the decision to pour the second tremie was made at the September 30, 1988 meeting in the field at which representatives of RIDOT, DMJM and TBI were present; that Mr. Klubock of Puerini was not present at that meeting. The Court made no specific mention in its notes during the testimony of that witness concerning the time that the decision was made, but there is a conflict. The Court has had to examine, in some detail, that discrepancy and has resolved it in favor of the representations made by the plaintiff concerning who was present at the September 30, 1988 meeting. The fact that the decision was made at that time is indicated because there is a notation in the record that T.Y. Lin would be called concerning the second tremie. Much testimony was given by Mr. Klubock and Mr. Tamaro speculating what caused and how the infiltration came about. RIDOT's expert, Mr. Klubock, talked to one diver and viewed some video tapes on September 26th. It would seem that his advice representing Puerini was to wait until all the evidence was in. This is documented in Exhibit 307. No tests were ever done by anyone on the steel that formed this cofferdam. Once the second tremie was poured, the cofferdam was dewatered. The same steel was used. The Court had no evidence at all before it that any future repairs of the interlocking steel was performed. These issues and resolving the testimony of these witnesses is, in the Court's judgment, unnecessary because the Court has determined that as a matter of law, the parties to this agreement, when talking about latent defects, were talking about the bridge structure, the substructure, the tremies, the superstructure, the bridge, that which the contractor was building for the owner. Latent defects in the construction aids were not intended to be part of paragraph 6. For that reason and that reason alone, the Court rules that RIDOT waived in the Termination Agreement claims for damages arising after the date of termination, save for latent defects in the work. That the word "work" refers to the permanent bridge and, even assuming there was a latent defect in the cofferdam, it is not covered by paragraph 6. The Court, therefore, denies the claim of RIDOT in the amount of $5,911,305.39.
4. Findings of Fact
While the Court agrees substantially with the Findings of Fact proposed by the plaintiff, listed as Pier 14 Cofferdam Repairs, p. 139, paragraphs 1 through 50, the Court finds that because of the decision made concerning the latent defect, it is unnecessary for the Court to further set out findings of fact. The Findings of Fact cover each and all of the factual issues and the weight of the testimony. No further findings of fact will specifically be added because, in the Court's judgment, it is a question of law as to what was covered by paragraph 6.
D. REPAIR TO CFF'S WORK
REFERENCE: Repair to CFF's Work — CFF Brief, Section IV, D., p. 307; RIDOT Brief, section labeled Repairs to Defective Work Done by CFF and Moseman.
The Termination Agreement reserved for RIDOT the right to seek recovery of those costs to the extent repair costs exceeded the amount withheld by RIDOT at termination. RIDOT had $130,327.00 of CFF's money withheld to pay for these costs. If that wasn't sufficient, the Termination Agreement allowed RIDOT to sue for the excess. This is the basis of this counterclaim. This amount is $219,673.00 ($350,000.00 minus $130,327.00).
The evidence presented to the Court was that when RIDOT sought bids for the completed work from Atkinson-Kiewit and Traylor Bros., Inc., RIDOT specified the remedial work would be a separate pay item, that is, RIDOT was requesting what amount the contractor would be seeking to be paid to it of the total contract price for completing the bridge upon the completion of the separate item relating to the repair work that had to be done to CFF's work.
The amount that is to be requested as a payout does not necessarily reflect the fair value or the cost of the item that must be completed by the contractor before payment by the owner. Sometimes contractors like to recover as much money up front in the contract as the owner will give them without reference to the value of the work performed as of the date that that payment is made.
No detailed bid estimates concerning the remedial work necessary to correct deficiencies in CFF's work was received in evidence. There was testimony from RIDOT that $350,000.00 represented the fair value to do this work. On cross-examination, CFF brought out the fact that RIDOT's engineers, before the completion contract was offered for bid, prepared a bid estimate for the remedial costs associated with this work. RIDOT's engineers, that is, the section of RIDOT devoted to making estimates as to what work ought to cost, indicated that its opinion was that the remedial work could be completed for $20,000.00. This was despite the fact that, at the time this estimate was made as to what the remedial work would cost, RIDOT was fully aware that it was holding $130,000. plus or minus belonging to CFF. This information became available during cross-examination. No effort was made to explain the Traylor Bros. estimate of $150,000.00 as a payout or the pay item of $350,000.00 as a payout item for this remedial work. These two contractors who bid for the completion of the Jamestown Bridge wanted to be paid $200,000.00 difference upon the completion of this work. The Court is of the opinion that these payout figures do not represent the cost of repair of the work to be done on CFF's work.
The only testimony the Court heard concerning cost estimates were from the RIDOT engineers at $20,000.00 and the figures submitted by CFF in the amount of $33,820.00. It seems to the Court that either of these estimates are far more reliable than the payout figure used by the two contractors who were bidding to complete the bridge upon completion of that remedial work. As the Court said, nobody appeared from either Traylor Bros. or Atkinson-Kiewit to explain the cost to do that work. The Court will accept $33,820.00 as the fair value to complete this remedial work.
RIDOT has withheld $130,327.00 and inasmuch as the cost of repairs is but $33,820.00, RIDOT has in its hands and possession $96,507.00 which is being wrongfully withheld. The Court will direct, in granting this claim, that the sum of $33,820.00 be withheld as payment for the repairs and that the balance of $96,507.00 will be paid to CFF.
4. Findings of Fact
The Court adopts the Findings of Fact contained in the plaintiff's Proposed Findings of Fact under Repair to CFF's Work, at p. 152, being paragraphs 1 through 7 as its Findings of Fact and incorporates them herein by reference.
E. REPAIR TO MOSEMAN'S WORK
REFERENCE: Repair to Moseman's Work — CFF Brief, Section IV, E., p. 305; RIDOT Brief, section labeled Repair to Defective Work Done by CFF and Moseman.
1. Statement of claim a) Superstructure Repairs
Upon termination, Moseman's work was inspected and $69,500. was withheld for repairs. This work was also included in the new contract to complete the bridge as a separate pay item. RIDOT's engineers on a pre-bid estimate concluded that $40,000. would be a sufficient sum to do those repairs. When that estimate was made, the engineer, likewise, was aware that RIDOT was holding $69,500. of Moseman's money. Likewise, as in the prior claim, Atkinson-Kiewit identified $300,000. and Traylor Bros. $200,000. as the pay amount upon completion of the work. RIDOT now seeks $230,500. in damages, that is the difference between $300,000. and the retained amount of $69,500.
Again, it was Mr. Janaros, the RIDOT witness, who conceded that RIDOT did not have any detailed estimate for the $300,000., but nonetheless he insisted that $300,000 represented the fair value for the work. He did not try to reconcile the difference between $300,000 and $200,000 pay out figures for Atkinson-Kiewit and Traylor Bros., nor did he attempt to reconcile the difference between RIDOT's engineer's estimate in the pre-bid documents of $40,000. The Court is of the opinion that pay out figures at a particular time when work is done do not necessarily represent the fair value of the work performed at that particular time; they're merely a point in the total performance of the larger contract when the contractor desires to have some money. None of the contractors came in, showed their bid estimate for the work. Cross examination brought out that RIDOT's engineers thought the work could be performed for $40,000. In this regard, an additional estimate was received by Mr. Everson who testified that in his opinion, based upon his examination of the repair work to be done, that it could be done for between $40,000. and $60,000. The Court believes that both the estimate of Everson and the estimate of the RIDOT engineers have greater reliability than any pay out figure testified to by Mr. Janaros as part of the contract work on the bridge. The Court will determine that the amount of $60,000. represents the fair value for the remedial work. The Court will allow RIDOT's claim to that extent. Since that amount is less than what RIDOT withheld the Court will order that the amount of $9,500, be refunded to Moseman.
 b) Lifting Diaphragm Repairs
RIDOT asserts a claim against CFF about which CFF is unclear in that it is uncertain whether it relates to Moseman's or VSL's work. CFF will address the issue here and briefly in connection with VSL's work. The claim is for cracking in the lifting diaphragms which were installed in segments 18 and 19, cracking evidently occurred when the segments were moved onto the transverse section of the rail system. Remedial steps involved adding additional steel and thickening the diaphragms. Neither CFF nor Moseman could have been responsible for the cracks to the lifting diaphragms. When RIDOT terminated CFF's contract the diaphragms had not been poured and the transverse sections of the rail system had neither been constructed nor designed. That this was in fact so is established in defendant's Exhibit U-177 which is a portion of the bid documents refining the remedial and corrective work required. The bid documents specifically require Atkinson-Kiewit to place the end diaphragms in segments 18 and 19 (Exhibit U-177 at pages 171-172). The bid documents confirm that the transverse section of the rail system was not constructed at the time of CFF's contract termination and that the successor contractor was responsible for its design.
In addition, James Everson further established by his exhibits, some photographs, Exhibits 310 A-D depict the condition of segment 18 and 19 on September 17, 1989. Even as of that date the diaphragms have not been poured. More over, Mr. Everson testified that the transverse section of the rail system where the cracks had occurred had not been built at that time. Finally, Mr. Everson offered an opinion based upon review of the defendant's Exhibits Q-147, S-175, T-176, U-177 and his own personal observations that the cracking to the diaphragm would not have been attributable to the work of CFF or Moseman. He testified that was the basis for his opinion was quite simple: (1) the diaphragms had not been poured; (2) the transverse railway had not been set and (3) Moseman's design was not used. Somebody else did the work; somebody else is responsible.
4. Findings of fact
The Court incorporates by reference the findings of fact contained in the plaintiff's Proposed Findings of Fact, Repair to Moseman's Work, page 155, being numbers 1 through 13 inclusive, modifying paragraph 8 by amending $40,000. to that of $60,000. and amending $29,500. to the sum of $9,500. In all other respects the Court adopts the findings of fact as and for its own.
F. REPAIR TO VSL'S WORK
REFERENCE: Repair to VSL's Work — CFF Brief, Section IV, F., p. 255; RIDOT Brief, section labeled VSL Design Errors Counterclaim.
1. Statement of claim
RIDOT seeks to recover from CFF the sum of $1,358,929.10 as costs it claims to have incurred by reason of design defects related to VSL's Construction Option design.
2. Legal basis
RIDOT relies upon the latent defect language in the termination agreement; that is paragraph 6 of that agreement. CFF contends that the language has no application to the work and/or the defects were not latent and as to the claim for extra costs to perform work after termination, the claims have been waived.
3. Facts a) The Claims
RIDOT has claims which fall into three different categories.
First, RIDOT asserts claims because the tie-down loops designed by VSL and installed by CFF in piers 12, 15 and 16 would not withstand the loads necessary to lift the segments into place. RIDOT also modified the tie-down loop design for piers 2 through 11 and piers 17 through 19 which had not been constructed as of the date of termination.
RIDOT issued a change order to Traylor Bros. (pier 17) and to Atkinson-Kiewit (piers 2 through 11 and piers 12, 15, 16, 18 and 19), the follow-on contractors building the bridge for the extra work required by the design changes to the tie-down loops. RIDOT claims $1,014,792.90 for this work; $2,467.97 to Traylor Bros. for the pier 17 extra work; $943,580. to Atkinson-Kiewit for the extra work at piers 12, 15 and 16 (constructed by CFF) and piers 18 and 19 (constructed by Traylor Bros.) and $68,744.96 for extra work at piers 2 through 11 which were being constructed by Atkinson-Kiewit.
Lastly, RIDOT seeks recovery for additional costs to repair pre-cast Span segments 16 through 19 which cracked during movement at Davisville. RIDOT also seeks recovery for extra work expended to make modifications to Spans 2 through 11 which had not been pre-cast as of the time when the cracks were discovered in Spans 16 through 19.
RIDOT claims $162,777.30 for the repairs to the previously cast Spans 16 through 19 and $180,713.38 for Spans 2 through 11.
 b) Factual background
VSL was a subcontractor to CFF for design and erection work necessitated by the Construction Option. It was VSL's concept to pre-cast superstructure bridge spans on land, barge them to the site and lift them into place. VSL had used this method many times in many places. VSL was responsible for the design modifications to the bridge post-tensioning design to accommodate the stresses associated with moving spans from the pre-cast yard to the site and lifting them into place. It was also responsible for the actual lifting of the segments.
VSL requested CFF to install tie-down loops at piers 12, 15 and 16. CFF installed them. There were no spans actually lifted into place during the time when CFF was working for RIDOT. At the time of termination no pre-cast spans had been lifted nor barged to the site, nor brought up to the superstructure.
After termination RIDOT appropriated VSL's design. VSL objected indicating that not only did it have a proprietary right to the design but that further it was not intended for anyone else's use. Certainly it was not intended to be used by someone who did not have extensive experience in performing this lift procedure. As a result of this RIDOT separately engaged VSL as the "engineer of record" for erection of the superstructure and a designated subcontractor for engineering work in connection with the completion contract. However, the completion general contractor (Atkinson-Kiewit) was not required to use VSL as the "lift" subcontractor.
It was as a result of these new RIDOT/VSL arrangements that VSL began reviewing and upgrading its documentation for use by other contractors. VSL discovered that the tie-down loops did not carry lifting forces deep enough into the piers and needed to be redesigned. VSL immediately notified RIDOT and urged it to notify the bidders for the completion contract of the design modification. RIDOT refused, electing to treat the modifications as a change order. In the completion contract that went out to bid RIDOT was impressed with the design option of lifting the spans into place by using these tie-down loops and unlike the contract it had with CFF, it specified in the completion contract that tie-down loops would be used and used the design that it had appropriated from VSL to include this design in the new plans and specifications for the completion contractor so that the new design specifically made the tie-down loops to be used for lifting the spans into place part of the bridge. It was part of the permanent structure. It was intended to be used as the method of putting the spans in place.
Later on when Atkinson-Kiewit was moving Span 19 cracks developed in that span. That span had to be moved both longitudinally and transversely and cracks developed along the diaphragm during the transverse movement. It was during the longitudinal movement cracks developed because of insufficient post-tensioning in the bottom slab. These were the problems.
While RIDOT has presented all of its claims in the suit before the Court the only claims that are material and relevant to the litigation involving CFF are those claims which come about for the repair of work done by VSL while VSL was a subcontractor of CFF. VSL was also a subcontractor of Atkinson-Kiewit and RIDOT may have claims against VSL through the prime contractor, Atkinson-Kiewit. Likewise, RIDOT may have some rights against VSL by reason of the interim contract with Traylor Bros. Those claims have to be separated and dropped out of this litigation.
As to the tie-down loops the only piers that were constructed by CFF were piers 12, 15 and 16. They were the three piers where at the request of VSL tie-down loops were installed by CFF. Likewise, as CFF's subcontractor VSL provided CFF with post-tensioning redesign for the pre-cast spans to accommodate their transportation and placement. This is the work that was done by CFF which is subject to be repaired as being defective, defective in design. The Court cannot lose perspective about the suit against CFF for deficiencies attributable to its contractor. This same contractor stayed on the job so-to-speak and worked for somebody else and provided design information. It was not until it was providing that design information that VSL discovered that the tie-down loops were improperly designed. They wouldn't accomplish what they had been designed for. CFF urges the Court that there are multiple defenses available to CFF.
First, CFF relies upon the latent defect language contained in the contract and again draws the analogy between construction aids and the bridge structure itself. These tie-down loops were not part of the bridge. They were put there as an accommodation to VSL who had agreed with CFF that it would raise the span into place. It was a method, one of the methods, that could be used by VSL to put the span in place. There were other methods testified to in court. The use of another span to provide a counterweight during the lifting process being one. But this was a method devised by the subcontractor who had the responsibility under its contract with CFF to lift the span into place. After the termination agreement RIDOT adopted this method and wrote it into its specifications for the completion of the bridge and took on VSL as its design contractor.
At best as to the tie-down loops what is involved here is pier 12, 15 and 16. Although RIDOT asserts a claim of $943,580. based upon five spans, CFF, in its relationship with RIDOT, only built three of those five spans. So that the repair work of the loops if they are part of the bridge would be sixty percent of $943,580. or approximately $566,148. VSL estimated that the total cost to do that work would be about $101,581. and on those figures for the three piers it would be $169,301.
The same situation exists when one considers the cracking in the various spans. The bottom slab cracking of Span 19. The totals were not broken out in this presentment to the Court. At best RIDOT would only be responsible for 11/24ths of the $68,000. to repair the cracking or in the amount of $31,167.
RIDOT has made claims for repair costs to Spans 16 through 19. Those spans contain 24 sections. Moseman, a subcontractor of CFF, had completed 11 sections. It had completed pouring Span 19 and 5/6ths of Span 18. It did not pour 16, 17 or the final segment of Span 18. On the testimony before the Court VSL admitted that there was a design error and that these spans had to be repaired. RIDOT has set out a cost of $68,000. and has not broken it out as to CFF's work. As a subcontractor of CFF the designer VSL admits that remedial work was necessary. It seems to me that 11/24ths of $68,000. is the measure of damages to repair work that was admitted by the designer to be defective and in need of repair. The Court will award that $31,167. as damages to RIDOT.
What has taken place in this situation is that RIDOT, after appropriating the design upon termination, and being without a transfer or sale by CFF of VSL's method of lifting the span, made a decision to instruct Traylor Bros. to put the tie-down loops on piers 17 through 19. That was an after termination decision. There's no question that RIDOT sustained some damages because, as originally designed, the tie-down loops were insufficient to provide support for the lift. RIDOT later made a decision to mandate that the tie-down loops be included at each pier to provide a lifting mechanism to put the span in place. These were decisions that RIDOT made after termination. It elected, just before putting the completion contract out for bid, not to notify contractors of the design problems. The successful bidder would receive a change order to correct the design errors. These decisions had nothing to do with CFF's subcontractor VSL or the work that VSL had done for RIDOT. In the Court's judgment there is no basis to hold that the tie-down loops installed by CFF were latent defects. If the loops were part of the bridge, the defect was not latent — they were installed according to design. If they were merely construction aids, even if latent, paragraph 6 does not apply.
The work on piers 2 through 11, which was handled with a change order, had not been constructed as of the time of termination. Any work done on piers 2 through 11 was therefore new work done by a new contractor. It certainly was not repair of any work done by VSL while VSL was a subcontractor of CFF which is a further reason for denying recovery for those additional costs necessitated by the change order.
The Court will deny the balance of the claim and will assess damages only in the amount of $31,167.00.
5. The Court awards damages in the following summary.
 To the plaintiff, CFF:
 (a) Detailed cost claims: $13,282,467.00
 (b) Inefficiency claims: $ 4,614,727.00
 (c) Detailed damages related
 to inefficiency claims: $ 400,585.00
 ______________
 Sub-total $18,297,778.00
 10% profit $ 1,829,778.00
 ______________
 Total $20,127,556.00
 Moseman $ 2,731,363.00
 CPC $ 1,261,544.00
 ______________
 Total $24,120,463.00
 Damages awarded for RIDOT on its counterclaim:
 (a) Increased cost to complete: $ 0.00
 (b) Tremie repair: $ 0.00
 (c) Cofferdam rehabilitation: $ 0.00
 (d) Repair to CFF work: ($ — 96,507.00)
 (e) Repair to Moseman's work: ($ — 9,500.00)
 (f) Repair to VSL work: $ 31,167.00
 _______________
 Total: ($ — 74,840.00)

John Fowler, an experienced marine contractor, best expressed, a marine construction truism: before work begins, only God knows what the true subsurface condition will be.
The testimony in this case has now told the world how true that marine truism is. From the very beginning the building of the Jamestown-Verrazzano bridge was destined to cost more than originally anticipated, if for no other reason than the unusual and unexpected nature of the subsurface material. The unanticipated behavior of the soils is no one's fault, just the reality of constructing in soils below a large body of water. RIDOT made a bargain with CFF. CFF agreed not to include amounts in its bid for unusual subsurface conditions and RIDOT in turn promised if encountered it would pay the extra resulting costs. This trial has demonstrated that RIDOT failed to keep its promise. It was RIDOT's attitude from the very beginning not to agree to extra compensation for CFF under any circumstances — not even in circumstances where RIDOT believed the extra costs were not the contractor's responsibility. This attitude resulted in delay and a disrupted project. This attitude made matters worse — RIDOT became THE PROBLEM.
Counsel will appear before the Court in chambers on April 5, 1993 at 9 A.M. for entry of judgment.